**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
Phillip Kim, Esq.
Jonathan Horne, Esq.
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email:  lrosen@rosenlegal.com
Email: pkim@rosenlegal.com
Email: jhorne@rosenlegal.com
Lead Plaintiffs' Counsel


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH PUDDU, MARK GHITIS, VALERY BURLAK, and ADAM BUTTER<br><br>    Plaintiffs,<br><br>v.<br><br>6D GLOBAL TECHNOLOGIES, INC., NYGG (ASIA), LTD., BENJAMIN TIANBING WEI A/K/A BENJAMIN WEY, TEJUNE KANG, MARK SZYNKOWSKI, TERRY MCEWEN, AND NYG CAPITAL LLC D/B/A NEW YORK GLOBAL GROUP<br><br>    Defendants. | Case No: 15-cv-8061-RWS<br><br><u>CLASS ACTION</u><br><br>**JURY TRIAL DEMANDED**<br><br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

Lead Plaintiffs Joseph Puddu and Mark Ghitis, and named plaintiffs Valery Burlak and Adam Butter (the "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Complaint against Defendants 6D Global Technologies, Inc. ("6D"), NYGG (Asia) Ltd. ("NYGG (Asia)"), Benjamin Tianbing Wei ("Wey"), Tejune Kang, Mark Szynkowski, Terry McEwen, and NYG Capital LLC d/b/a New York Global Group ("NYGG") (collectively, the "Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased the publicly traded common stock of 6D f/k/a CleanTech Innovations, Inc. ("6D" or "CleanTech") from June 16, 2014 to September 10, 2015, both dates inclusive ("Class Period"), or in a private placement taking place on September 29, 2014, and November 21, 2014.

2.      Plaintiffs and class members are the most recent, and the last, victims of the now-notorious criminal Benjamin Wey and his associates.

3.      Between about 2008 and 2015, Benjamin Wey controlled an extensive criminal conspiracy that employed numerous associates, including compliant public companies and their officers and directors. Wey ran and owned a New York-based financial consulting firm, the NYGG. Wey also ran and owned a China-based investment banking firm, NYGG (Asia), which Wey claimed was entirely independent of both he and NYGG. Chinese companies seeking a U.S. stock market listing retained the NYGG (Asia) (the "NYGG Clients"). Wey

assisted the NYGG Clients in arranging for auditing, investment banking, legal and other professional services to prepare for and obtain a public listing in the United States.  In the process, Wey secretly acquired large blocs of the NYGG Clients' stock through nominees. Because Wey's shares accounted for the majority of the NYGG Clients' free-trading stock, Wey was then able to manipulate trading in the NYGG Clients' stock, pushing up trading prices. He then sold his shares at artificially inflated prices. After Wey sold his stock, the NYGG Clients' stock price quickly collapsed. Wey also controlled the NYGG Clients' day-to-day operations, and caused them to pay the NYGG and Wey's nominees – purportedly for services rendered, though no services were, in fact, rendered. All told, it is estimated that Wey made more than $70 million from his scheme, and caused hundreds of millions of dollars in damages to investors. He and an associate have been indicted; he and many more associates have also been civilly sued by the SEC.

4.     With CleanTech, though, Wey (and not innocent investors) was the one left holding the bag. Days after it approved CleanTech's listing, the NASDAQ discovered that it had concealed material information about the NYGG's involvement in its affairs. The NASDAQ delisted CleanTech's stock – *after* Wey had acquired his shares, but *before* Wey could sell them.

5.     Through two years of litigation, completely controlled by Wey, CleanTech was able to have the SEC reverse the NASDAQ delisting. To do so, however, Wey and CleanTech were required to make numerous false statements to the NASDAQ, the SEC, and the courts. Critically, one consistent false statement in their campaign to relist was that the NYGG and NYGG (Asia) were distinct entities, with Wey having no interest in NYGG (Asia). This statement was completely false; NYGG (Asia)'s purported boss Roger Li was Wey's sister's domestic partner, and reported to Wey himself. Wey, in truth, owned all of NYGG

(Asia). Wey even caused CleanTech to take its campaign to the public, through numerous false and inflammatory press releases, as well as news reports from organizations he secretly controlled.

6.    Though Wey's campaign to reverse CleanTech's delisting ultimately succeeded in 2013, his victory was pyrrhic. It left CleanTech, which even after the campaign had no public market for its stock, owing NYGG (Asia) $16 million. Wey therefore decided to try for a fresh start.

7.    In June 2014, Wey caused CleanTech to agree to "acquire" Six Dimensions, Inc., a small private U.S. company that, improbably, provides IT services (CleanTech, supplies physical equipment used in wind turbines in China). The "acquisition" was a complicated transaction whose critical terms were: (a) CleanTech "sold" its operations to its Chinese officers and directors, who, in return, cancelled all of their personally-held CleanTech shares; (b) CleanTech "acquired" Six Dimensions in exchange for stock (i.e., CleanTech stock); and (c) NYGG (Asia) converted its CleanTech debt into 6D stock (the transaction which included these terms and others is the "6D Acquisition"). NYGG (Asia) was left holding about 46% of 6D's stock, while Six Dimension's former shareholders held about 50%.

8.    SEC rules require companies to disclose persons who beneficially hold more than 5% of their stock. But if 6D told investors that Wey beneficially held 45% of its stock, it would admit that its own and Wey's repeated claims to the NASDAQ that Wey did not own and control NYGG (Asia) were false. The NASDAQ would delist 6D in a heartbeat if it ever discovered that CleanTech had secured reversal of the NASDAQ's delisting decision by lying in the record and to the SEC. Moreover, by this time, Wey had become notorious, including through a well-publicized sexual harassment trial before Judge Gardephe that ended with an $18 million verdict against Wey, as well as a defamation action filed by a FINRA

judge who ruled against Wey's associates and thereby became the subject of years' worth of slanderous articles appearing in Wey-controlled media.

9.    Defendants thus continued to misleadingly omit that the NYGG (Asia)'s shares' ultimate owner was Benjamin Wey.

10.    Wey also personally managed much of 6D's business. He interviewed all candidates for leadership position. He selected 6D's auditor. He selected 6D's acquisition targets, and negotiated agreements. He had ultimate responsibility for 6D's financing. Ultimately, as 6D's Chairman and CEO, defendant Kang, later candidly privately admitted, "basically, I work for [Wey]." Defendants did not disclose that Wey was 6D's unofficial CEO, either, misleadingly claiming that 6D's business was managed by its Board of Directors and Officers; officially Wey was neither, but in truth, Wey was the ultimate control person of 6D.

11.    On September 10, 2015, the Department of Justice ("DOJ") and SEC announced, respectively, the criminal indictment of and a civil lawsuit against Wey. The DOJ and SEC releases disclosed, among other things, that Wey's pre-class period claim to NASDAQ and the SEC not to own NYGG (Asia) had been a brazen lie. Thus, the DOJ and SEC releases revealed that Defendants' class period omissions of Wey's status as beneficial owner of NYGG (Asia)'s 6D shares was misleading. That same day, shocked to discover that Wey had secured reversal through lies, the NASDAQ halted trading in 6D's stock.

12.    It is apparent that Defendants made their omissions of material fact with scienter. Soon after the September 10 trading halt, an institutional investor which had invested $10 million in 6D just a month before sued to get its money back. The investor claimed it had not known of Wey's involvement, and sought an order of attachment from Judge Castel. To convince Judge Castel that the investor was not entitled to an attachment, 6D filed declarations under penalty of perjury from each of its CEO, Kang, and its CFO, Szynkowski, claiming that Wey was not

and had never been a shareholder of 6D. Defendants thereby denied knowledge that NYGG (Asia)'s shares were actually beneficially owned by Benjamin Wey. Ultimately, Judge Castel denied the institutional investor's motion.

13.     But Kang and Szynkowski's statements were knowingly false. Plaintiffs have obtained a recording of Kang, made about 4 months before he signed his declaration, candidly admitting to another 6D executive that "Benjamin Wey" is "a shareholder" of 6D and, as such, "he's got influence" over it. And even beyond their misconduct in the Discover litigation, Defendants' conduct evidences conscious misbehavior. For example, Kang instituted a rule prohibiting other 6D employees from referencing Wey in any email to him; if any 6D employee needed to reference Wey in an email because of an emergency, they should use a code name.

14.     As this Complaint is filed, more than 6 months after the NASDAQ first instituted a trading halt, trading in 6D stock is still halted. Plaintiffs are left holding worthless, illiquid securities.

## II.  JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

17.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District, Defendants are present in this District, and there are related actions involving overlapping defendants pending in this District.

18.    In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

### III.  PARTIES AND IMPORTANT NON-PARTIES

#### A. Plaintiffs

19.    Lead Plaintiffs **Joseph Puddu** and **Mark Ghitis** acquired 6D securities at artificially inflated prices during the Class Period and were damaged thereby. Mr. Ghitis purchased shares in the Private Placement (defined herein).

20.    Named Plaintiffs **Valery Burlak** and **Adam Butter** acquired 6D securities and were damaged thereby.

#### B. Defendants

21.    Defendant **6D Global Technologies, Inc., f/k/a CleanTech Innovations, Inc.** ("6D" or "CleanTech"), is a Delaware corporation headquartered in New York, New York. Between December 12, 2014, and the close of the Class Period, 6D's stock traded on the NADSAQ under ticker symbol SIXD. Between September 29, 2014, and December 12, 2014, 6D's stock traded on the NASDAQ and OTCQB exchange under ticker SIXD. Between June 16, 2014, and September 29, 2014, 6D's stock traded on the NASDAQ and OTCQB exchange under ticker CTEK.

22.    6D offers a suite of IT solutions in numerous diverse areas, including mobile application development, big data & analytics, enterprise resource planning, IT infrastructure staffing, and digital & content management systems.

23.    Defendant **Tejune Kang** has been 6D's Chairman and CEO since September 2014. Kang resides in New York, New York. Kang owns 29.7% of 6D Global's outstanding shares.

24.     Defendant **Mark Szynkowski** has been 6D's CFO since December 2014. Szinkowski was only appointed CFO after being interviewed by Benjamin Wey.

25.     Defendant **Terry McEwen** has served as a 6D director since September 30, 2013.  Between June 11, 2014, and September 29, 2014, McEwen served as 6D's sole director and CEO.

26.     Defendant **Benjamin Tianbing Wei a/k/a Benjamin Wey** ("Wey") is NYGG's CEO, and has both day-to-day operational and ultimate control over NYGG (Asia). As further set out below, Wey is a notorious promoter of fraudulent Chinese companies. Wey also possessed and exercised control over 6D during the Class Period. Wey has been indicted by the United States and sued by the SEC. In addition, a New York jury returned a verdict against Wey for $18 million for sexual harassment and defamation. Wey resides in New York.

27.     Defendant **NYGG (Asia), Ltd.** ("NYGG (Asia)") is a Chinese company that is an alter ego of Wey and the NYGG. NYGG (Asia)'s purported head, Roger Li, is Wey's sister's domestic partner, and reports directly to Wey. Wey possessed and exercised control over NYGG (Asia) during the Class Period. According to 6D's 2015 Proxy Statement filed with the SEC on April 30, 2015 on Form 14A (the "2015 Proxy"), as of April 20, 2015  NYGG (Asia) held 44.9% of 6D's outstanding shares.

28.     Defendant **NYG Capital LLC d/b/a New York Global Group** ("NYGG") is a New York-based company offering financial consulting and investment banking services that is the alter ego of Wey.  Wey controlled NYGG during the Class Period.

29.     Collectively, Defendants Kang, Szynkowski, McEwen, and Wey, are the Individual Defendants.

30.     Collectively, 6D, NYGG, and NYGG (Asia), and the Individual Defendants, are the Defendants.

### C. Non-parties

31.     **Deer Consumer Products, Inc.** ("Deer"), **SmartHeat, Inc.** ("SmartHeat"), and **Agfeed, Inc.** ("AgFeed") were clients of the NYGG.

32.     **Matthew Sullivan** joined 6D in 2010, when it was staffed by just Defendant Kang and a bookkeeper. He was 6D's national technical recruiter, and later became an executive vice president with lead roles in several acquisitions. In a proxy statement filed September 4, 2014, 6D listed Mr. Sullivan as its only named executive officer, beside Defendant Kang, and claimed:

> **Matthew Sullivan, Age 50, Executive Vice President**
>
> Mr. Sullivan is a seasoned executive with more than 20 years of experience in Information Technology and business development with Fortune 500 companies. Mr. Sullivan currently serves as the Executive Vice President for Six Dimensions. Mr. Sullivan is responsible for ensuring overall revenue and margin growth for Six Dimensions, strategic acquisitions, partnerships, and operations. Prior to being named to his current position in 2011, Mr. Sullivan was Vice President of Emerging Technologies and in 2011 spearheaded the CMS practice, implemented strategic growth initiatives, led recruitment efforts, attracted customers, increased sales, and improved Six Dimensions' overall profitability. In collaboration with the Six Dimensions team, Mr. Sullivan launched 6D Labs in Cincinnati, Ohio, the company's center of excellence focused on solution delivery and support for technology implementations. In addition to being a member of the Massachusetts Institute of Technology (MIT) Sloan School of Management, Mr. Sullivan is currently attending Notre Dame's Leadership Institute and has also attended Northeastern University in Westford, MA where he was awarded with a Bachelor's of Science in Human and Public Relations.

33.     Beginning December 2014, Mr. Sullivan worked in 6D's New York office.

34.     Mr. Sullivan resigned on July 14, 2015. In an 8-K filed that same day, 6D claimed that Mr. Sullivan resigned "to pursue other opportunities in the not-for-profit sector." In fact, Mr. Sullivan has told Plaintiffs that 6D's claim is "a clear misrepresentation" and that, instead, he resigned because he suspected that Wey and Kang were misleading 6D's shareholders. Mr. Sullivan works for a for-profit company. In July 2015, Mr. Sullivan filed a formal whistleblower complaint concerning 6D with the SEC on Form TCR.

35.     As further set out below, Wey made more than $70 million in fraudulent proceeds by manipulating the stock of NYGG's clients. Wey used nominees he secretly owned to conceal his ownership of the NYGG clients' stock (the "Nominees"). The Nominees included NYGG (Asia), **HanHua Limited**, **Roosen Commercial Corp.**, **Strong Growth Capital, Ltd.**, and **Wolf Enterprises, Ltd.**

36.     Wey employed numerous other individuals to complete his scheme. Among them were attorneys **William Uchimoto** and **Robert Newman**. The NYGG clients retained either Uchimoto, or Newman, or both, as their legal counsel. Uchimoto and Newman then worked closely with Wey to achieve his own objectives, often at the expense of the NYGG clients' public shareholders' interests.

## IV.  BACKGROUND

### A. Benjamin Wey begins his career of regulatory violations

37.     Through more than a decade of securities laws violations and other increasingly brazen misconduct, Wey has become notorious to public company investors, journalists, and the public at large.

38.     Wey started his career in Oklahoma. Wey graduated from the Oklahoma Baptist University with a degree in finance in 1992. He also completed

an MBA from the University of Central Oklahoma in 1999. And while studying for his MBA, Wey started an investment advisory firm in Oklahoma.

39.    But Wey quickly left both the brokerage business and Oklahoma under a cloud. In 2002, Wey was suspended and fined by the NASD, FINRA's forerunner.

40.    And – for separate offenses – Wey was also censured by the Oklahoma Department of Securities in 2005. Wey was charged with a disclosure violation, including advising a retired 68 year old woman to invest her life savings in the shares of a penny stock without telling her that he was in fact the stock's paid promoter. Wey then violated the retiree's instructions to sell the stock by repurchasing it for her account shortly after the sale without authorization. The retiree lost more than 75% of her life savings.[1] Wey agreed he would never again seek to do any brokerage or investment advisory business in Oklahoma.

41.    In 2002, Wey founded an Oklahoma-based firm that he called Benchmark Global Capital Group, and was a director, its majority shareholder, and its CEO. He was fired for cause within six months – namely, trading on insider information and misappropriating company funds.

42.    To distance himself from his regulatory violations, Wey changed the spelling of his last name from Wei to Wey.

43.    Soon thereafter, Wey hit upon the strategy he would repeatedly employ in the next decade: (1) covertly acquire large stock interests in U.S-listed shell companies; (2) cause the companies to list on major U.S. exchanges, artificially inflating trading prices through stock manipulation; and (3) covertly sell his shares at a profit; while (4) supplementing his income by causing the Chinese companies to pay him investment banking fees. Wey's scheme required that he

---

[1] Jamil Anderlini, Made in China, undone in America, Financial Times, July 26, 2011 (available at < http://goo.gl/s1ihL7>)

exercise control over the companies. Wey's scheme also required that he and the companies conceal Wey's involvement from the public.

### B. Benjamin Wey's scheme

#### 1. Benjamin Wey acquires ownership

44.     NYGG (Asia) would help its purported clients (the "NYGG Clients") list in the United States through a reverse merger. In a reverse merger, a private company lists on a major exchange without undergoing an IPO. Instead, the private company is "acquired" by a defunct public shell, but in return, receives the majority –but not all – of the defunct public shell's shares. After the reverse merger, the private company is a subsidiary of the public company, but the private company's former shareholders own the majority of the public company's shares. Thus, in economic substance, a reverse merger is merely the private company's listing on a public market.

45.     Wey would locate public shells in the U.S. for the NYGG Clients' reverse mergers. Through a variety of nominees, Wey would then acquire the public shells' shares before the reverse mergers. Thus, after the reverse mergers closed, Wey would hold substantially all of the NYGG Clients' shares that were not held by the private company's shareholders. While the former private company's shareholders would then hold the majority of the public company's shares, Wey and his nominees always controlled more than 5% of the new public company's shares. To completely control public trading in the new public company's shares, Wey would then cause the private company's shareholders to enter into lock-up agreements restricting them from trading their shares. Wey would be able to pull off his scheme because he worked hand in glove with the lawyers he foisted upon the Chinese private companies, Newman and Uchimoto.

46.     Wey would not disclose his holdings to the public markets, and in fact would go through considerable trouble to conceal his name from public markets.

For example, the Chinese operating company that became CleanTech retained Newman to represent it in its reverse merger. Newman, taking direction from Wey not the Chinese operating company, located a promising public shell, Everton Capital Corporation. Newman was also retained by Everton.

47.     Wey, through his nominees, bought substantially all of Everton's shares. Concurrently with Wey's acquisition of Everton shares, Newman instructed Everton's transfer agents to issue 5,000,000 new Everton shares to a person he represented was Everton's new CEO, President, CFO, Treasurer, and Secretary. All communications between Newman and Everton's purported CEO were through Wey. As a result of the issuance to the new purported CEO, Wey and his nominees only held 9.11% of Everton's shares.

48.     Newman then presented Everton to CleanTech. As part of the reverse merger, Everton's purported CEO agreed to cancel all his shares for nominal consideration. Thus, the only Everton shareholders who received any CleanTech shares were Wey and his nominees. Following the reverse merger and its elaborate lead-in, Wey and his nominees beneficially owned more than 5% of CleanTech's shares.

49.     Newman did not obtain a conflicts waiver from either Everton or the Chinese operating company. Newman's dual representation was not disclosed to investors.

### 2.  *Wey causes the NYGG Clients to be listed on major exchanges*

50.     Public shells do not trade on major liquid markets like the NASDAQ or NYSE, but instead trade over-the-counter. The over-the-counter market did not provide sufficient liquidity to allow Wey to sell his shares. After the reverse merger, Wey would thus cause the NYGG Clients to list themselves on major exchanges, including the NASDAQ.

51.    At the time of many of the NYGG Clients' listings, the NASDAQ required that listing applicants show they had at least 300 shareholders who each held at least 100 shares of common stock (the "300 Shareholder Requirement.") The 300 Shareholder Requirement's purpose was to show that many different investors had an interest in buying and selling the applicant's stock. Thus, persons who had received their shares directly from the applicant or affiliates did not count towards the 300 Shareholder Requirement. Yet to create the illusion that the NYGG Clients had the requisite trading interest, Wey gave shares to dozens of his friends, family members, business associates, and others, and Wey's associates falsely told the NASDAQ that the shares had not been given by the NYGG Client's affiliates.

52.    To list on major exchanges, Wey also used wash and matched trades to simulate interest in, and manipulate prices of, NYGG Client's stock. CleanTech completed its reverse merger in July 2010. Its first trade as a newly-public company was a trade of 1,000 shares at $5.10/share, or about 70% above the price of a recent offering. Wey touted the 70% increase to prospective investors. In fact, the trade was a wash trade; Wey's sister Tianyi Wei was both the buyer and the seller.

53.    Using the purported trading interest fraudulently manufactured by Wey, the NYGG Clients would apply for, and obtain, listings on major trading exchanges.

### 3.  Wey sells his and the nominees' shares

54.    Wey would use his control of the public market for the NYGG Clients' shares to sell his own and his nominees' shares at inflated prices.

55.    To maximize the profits he could earn selling the shares he held himself and through his nominees, Wey continued to manipulate the trading price of the NYGG Clients' shares. For example, in February 2011, Wey emailed Erbek:

[Erbek], Cleantech just traded at $4.50 per share.  Please make sure
the trader buys the stock at $5 per share, stay at $5 per share bid price,
not less.  Please make sure this happens right away.

56.    That same day, Erbek purchased two tranches of CleanTech shares at
$4.86 and $4.93 per share, respectively.

57.    After sufficiently pumping the NYGG Client's stock price, Wey
would liquidate the Nominee's stock in a series of sales, and then arrange for the
proceeds to be transferred back to him. For example, between October 12 and
October 30, 2009, Wey placed orders to sell huge numbers of Deer shares held by
a nominee, Strong Growth, generating proceeds of $4.4 million, $3.5 million of
which were quickly transferred to a bank account held by Tianyi Wei. On
December 10, 2009, Wey's wife Michaela Wey received $3.3 million from Tianyi
Wei's bank account. Michaela Wey reported the $3.3 million as a gift from a
foreign person on her tax filings. Benjamin Wey and Michaela Wey obtained at
least $19 million of such "gifts" from Tianyi Wei alone. The "gifts" from Tianyi
Wei were only a fraction of the total proceeds from Wey's fraudulent scheme. It is
estimated that total proceeds from the scheme exceeded $70 million.

            *4. Wey causes the NYGG Clients to pay investment banking fees*

58.    Wey and NYGG were significantly involved with the NYGG Clients'
day-to-day operations. For example, in 2011, the NASDAQ asked SmartHeat and
Deer to disclose all relationships between them and Wey and NYGG, among
others. By that time, Wey and the NYGG's activities had included conducting the
companies' financial modeling, choosing their lawyers and auditors, reviewing
drafts of their SEC filings, identifying and recommending individuals to serve as
their directors, advising them on handling pending litigation, and discussing non-
public information with company officers. Yet SmartHeat and Deer falsely claimed
that Wey had a much more limited role – he introduced them to underwriters, and

was a business acquaintance of their officers. 6D would continue this practice of materially understating Wey's role.

59.    To increase his return from the fraudulent scheme, Wey also caused the NYGG Clients to hire his nominees to provide investment banking services. Notably, though the NYGG Clients paid the nominees about $11 million, the nominees did not provide any substantial services.

60.    Two NYGG Clients, SmartHeat and Deer, hired a nominee to provide purported consulting services in connection with secondary offerings. SmartHeat paid the Wey nominee $3.9 million, or 6.3% of the total raised, and Deer paid the nominee $3.8 million, or 6% of the total raised. Neither SmartHeat nor Deer disclosed to investors that the nominee was affiliated with Wey. To ensure that the offering documents made appropriate disclosures, the underwriter asked both the nominee and Wey whether the nominee had any affiliation with Wey. Both Wey and the nominee falsely told the underwriter that the nominee had no affiliation with Wey.

61.    Wey also caused Deer to announce a share repurchase program. Pursuant to the share repurchase program, Deer bought 798,300 shares for $6.9 million. Deer represented in its SEC filings that it had made open-market purchases. In fact, every share Deer repurchased belonged to Wey or his nominees.

62.    Wey and the NYGG Clients removed company officials and agents who did not support Wey. For example, Wey told an attorney representing AgFeed that one of Wey's nominees would receive a $300,000 finder's fee for a transaction. The AgFeed attorney demanded that Wey certify he was not affiliated with the nominee. Wey signed a false certification claiming he was not affiliated, but then caused AgFeed to fire the attorney. AgFeed replaced the attorney with Uchimoto, Wey's coconspirator.

### C. The NASDAQ discovers Wey's scheme and delists CleanTech

63.     On August 28, 2010, Barron's published an article titled Beware This Chinese Export (the "Barron's Article"). Among other things, the Barron's Article called attention to the NYGG's claims that 15% of the Chinese companies on the NASDAQ were its client. The Barron's Article also called attention to Wey's relationship with Deer. Though Deer had not disclosed any relationship, Wey's Chinese website showed him flying with Deer's management on a private jet on the night before pricing of a $75 million offering. The article also pointed out that CleanTech was an NYGG client.

64.     CleanTech had applied to have its stock listed on the NASDAQ. On September 1, 2010, the NASDAQ emailed CleanTech's counsel, demanding that it explain all its relationships with Wey.

65.     CleanTech responded in a September 2 email that falsely downplayed Wey's role:

   a.   CleanTech claimed that NYGG (Asia) and NYGG were separately owned and operated. In fact, Wey owned and operated both NYGG (Asia) and NYGG.

   b.   CleanTech claimed that Wey was compensated by NYGG, not CleanTech. In fact, CleanTech compensated Wey through the Nominees both by direct payments for investment banking services and with shares.

   c.   CleanTech claimed that NYGG was compensated by NYGG (Asia), not CleanTech. In fact, NYGG and NYGG (Asia) were alter egos.

   d.   CleanTech claimed that Wey's work was limited to introducing it to financial and professional service providers. In fact, as set out above, Wey thoroughly dominated CleanTech.

66.    On October 29, 2010, the NASDAQ issued to CleanTech document and information requests. NASDAQ requested, among other things, a detailed written narrative describing all due diligence work performed by NYGG and NYGG (Asia).

67.    In response, CleanTech continued to misrepresent that Wey and NYGG (Asia)'s work was limited to introducing CleanTech to financial and professional service providers.

68.    Based on CleanTech's misrepresentations, NASDAQ granted CleanTech's listing request. On December 10, 2010, CleanTech's stock was listed on the NASDAQ.

69.    CleanTech had not disclosed to the NASDAQ that it had hired the NYGG (Asia) to conduct a private placement of CleanTech stock.

70.    As reported in an 8-K filed December 16, 2010, on December 13, 2010, CleanTech completed a private placement, selling 2,500,000 Units at $4.00 each, for total proceeds of $10 million (the "December Financing").  Each Unit consisted of one share of stock and one warrant to purchase 67.5% of one share of stock at $4.00 per share. The closing price of CleanTech's stock on December 15, 2010 was $8.40 per share.

71.    On December 23, 2010, CleanTech filed a registration statement to register the 4,187,500 shares underlying the Units, as well as 300,000 shares underlying warrants issued to NYGG (Asia) (the "December Registration"). NYGG (Asia) also received cash compensation, and made a $10 million loan. In addition, Strong Growth, which bought one quarter of the Units for $2.5 million, was a known associate of the NYGG (Asia).

72.    The NASDAQ was alarmed and incensed that CleanTech had not previously disclosed the impending private placement in response to the NASDAQ's information requests. The NASDAQ delisted CleanTech's stock.

73.     The NASDAQ, however, did not know that Wey owned and controlled NYGG (Asia). In fact, over the next two years, Wey and CleanTech would repeatedly and falsely tell the NASDAQ, the SEC, and the courts that NYGG (Asia) and NYGG were separately owned and operated. The NASDAQ would not discover that Wey was lying until the SEC and DOJ's press releases on September 10, 2015.

### D. CleanTech and Wey repeatedly lie to the NASDAQ and to investors to overturn NASDAQ's delisting.

74.     CleanTech appealed the delisting. Wey, and not CleanTech, controlled the delisting appeal.

75.     In the delisting appeals hearings, CleanTech falsely told the NASDAQ that three quarters of the $10 million December Financing came from independent agents not affiliated with either NYGG or NYGG (Asia). In fact, the other three purchasers in the December 13, 2010 private placements – HuaHUa Limited, Roosen Commercial Corp., and Wolf Enterprises, Ltd. – were all Wey nominees. And while CleanTech disclosed that Strong Growth was a NYGG affiliate, it specifically claimed that Wey had no beneficial ownership in it.

76.     Wey also made false statements to the NADSAQ and the SEC in the CleanTech delisting appeal. In June 2011, Wey submitted a letter to the NASDAQ making the false and misleading statements that:

       a.  "Neither I nor [NYGG] has any beneficial ownership of the securities issued in the [December 2010] financing." In fact, Wey's nominees accounted for substantially the entire financing.

       b.  NYGG and NYGG (Asia) were "separately owned and operated." In fact, Wey owned and operated both NYGG and NYGG Asia.

    c.  NYGG (Asia)'s office was managed by Ming (Roger) Li. Wey misleadingly failed to disclose that Li was Tianyi Wei's domestic partner, and that Li reported directly to Benjamin Wey.

    d.  Wey did not receive any fees or other revenues from NYGG (Asia). In fact, Wey and his Nominees received substantially all of NYGG (Asia)'s income.

    e.  NYGG (Asia) identified three other funds willing to participate in the December Financing. In fact, the three other funds were Wey Nominees.

77.    CleanTech then sued the NASDAQ. *CleanTech Innovations, Inc. v. NASDAQ Stock Market, LLC*, 11-cv-9358-KBF. In its lawsuit, CleanTech alleged that it had suffered crippling damages from the NASDAQ's delisting. CleanTech's Amended Complaint falsely represented that CleanTech was not subject to delisting, because:

> NASDAQ staff, headed by Mr. Emen, had been given uncontradicted evidence that [Wey]: (1) did not control or own stock in CleanTech; and (2) did not receive any of the compensation of [NYGG (Asia)] for financings it arranged in China.

*CleanTech Innovations, Inc. v. Nasdaq Stock Market, LLC*, 11-cv-9358-KBF, dkt. # 11, at ¶14.

78.    The statement was false because (1) Wey beneficially owned more than 5% of CleanTech's stock through the Nominees, and (2) Wey wholly owned NYGG (Asia), and so received substantially all of the compensation paid to NYGG (Asia).

79.    CleanTech's lawyers were Fensterstock & Partners LLP (F&P). Yet Wey himself instigated and controlled the litigation. Examples of Wey's control over the litigation include:

    a.   According to a complaint filed by F&P against CleanTech for nonpayment of legal fees, before being retained, F&P met with Wey at NYGG's offices. *Fensterstock & Partners, LLP v. CleanTech Innovations, Inc.*, Index. No. 151030/2012, Dkt. # 2 ("F&P Complaint"), ¶20. CleanTech was not present for the meeting and did not meet with F&P.

    b.   NYGG, and not CleanTech, paid the attorney's retainer. F&P Complaint, Exhs. 4, 5.

    c.   Wey, and not CleanTech, handled public relations for the lawsuit, including introducing CleanTech's attorney to reporters. F&P Compl., ¶30; Exhs. 5, 10.

    d.   The NYGG appeared at hearings. F&P Complaint ¶¶27, 32, 34. While CleanTech also appeared at certain hearings, it appeared through Arnold Staloff, an outside director. *Id.* Notably, Mr. Staloff is one of Wey's coconspirators, and was also a director of NYGG Clients Deer, AgFeed, and SmartHeat.

    e.   NYGG was copied on confidential client communications. F&P Complaint, Exh. 9

    f.   According to CleanTech's lawyers, Wey "derive[d] benefits from and involv[ed] himself in the litigation," including by selecting defendants and advising on legal theories. F&P Complaint, ¶39, Exh. 7.

80.    Indeed, Wey demanded that CleanTech's complaint not reference NYGG or NYGG (Asia). F&P Compl., Exh. 9. Wey demanded that CleanTech's complaint reference him as "the Consultant", and suggested edits to "make [himself] look less culpable." F&P Opposition to NYGG's Motion To Dismiss, F&P docket # 15, at 6.

81.     CleanTech's suit against the NASDAQ was dismissed. CleanTech hired law firm Stradley Ronon Stevens & Young, LLP ("Stradley"), to represent it on appeal and in an administrative proceeding before the SEC appealing the delisting. CleanTech did not pay Stradley's bills, either, and Stradley sued. In fact, Stradley's engagement letters were signed not by CleanTech's officers or directors, but by Wey's coconspirator, Staloff. *Stradley Ronon Stevens & Young, LLP v. CleanTech Innovations, Inc.*, Case No. 140302896 (Penn. Ct. Comm. Pleas), Complaint Exhibits A and B.

## V.  DEFENDANTS' CLASS PERIOD MISCONDUCT

### A. The 6D Acquisition

82.     With its NASDAQ listing gone, CleanTech was unable to dupe public investors into buying its shares to sustain its operations. CleanTech thus had to fund its operations through loans from Wey. As alleged above, to conceal his involvement in CleanTech's operations, Wey caused the loans to be made by the NYGG (Asia), which he and CleanTech had represented was a separate entity.

83.     CleanTech continued to incur substantial losses, and by early 2014, CleanTech owed NYGG (Asia) approximately $16 million. Wey had no prospects of either selling his CleanTech stock or being repaid.

84.     Beginning early 2014, at Wey's urging, CleanTech began to explore a sale or merger. Wey separately searched for potential acquirors or merger candidates for CleanTech.

85.     In March 2014, a mutual acquaintance introduced Six Dimensions, Inc., to Uchimoto, Wey's coconspirator and habitual attorney. Six Dimensions is an American IT company with no business in common with CleanTech, which manufactures products used in wind turbines in China. Wey, Six Dimensions, and CleanTech nonetheless began to discuss a business combination between Six Dimensions and CleanTech.

86.     On April 8, 2014, CleanTech, Six Dimensions, and NYGG (Asia) held a meeting to discuss a potential business combination. CleanTech was represented by Uchimoto. NYGG (Asia) was represented by Wey, NYGG's general counsel James Baxter, and outside counsel

87.     Six Dimensions expressed interest in a transaction, but only on condition that CleanTech become a shell by repaying its debt and divesting its entire operations. Following the divestiture, CleanTech would "acquire" Six Dimensions, and in return award CleanTech shares to Six Dimension shareholders.

88.     NYGG demanded that CleanTech proceed with the transaction, which CleanTech did. The terms of the transaction included:

   a.  The total capitalization of 6D would be 77,575,442 shares.

   b.  CleanTech's operating subsidiaries would be returned to CleanTech's officers and directors. In exchange, CleanTech's officers and directors would cancel all of their personally-held CleanTech stock. Thus, the only remaining CleanTech stock would be held by purportedly public investors. Wey, through nominees, would hold a large portion of the remaining CleanTech stock. CleanTech's officers and directors would likewise resign from their positions.

   c.  NYGG would exchange its debt for $16 million of 6D common stock, or 35,149,883 shares.

   d.  CleanTech would acquire all of Six Dimension's issued and outstanding stock, in exchange for 38,664,871 shares of CleanTech common stock.

   e.  CleanTech would raise at least $3 million in a private placement. CleanTech ultimately raised $5.6 million in gross proceeds, issuing 2,709,484 shares (the "Private Placement").

      f. CleanTech would change its name to 6D Global Technologies, Inc., and convert from a Nevada corporation to a Delaware corporation.

89.     Collectively, all of the terms set out in ¶88, above, are the "6D Acquisition".

90.     The 6D Acquisition ultimately closed on September 29, 2014.

91.     The Private Placement closed in two separate transactions. On September 29, 2014, CleanTech sold 2,201,031 of its shares at $2.07 per share for gross proceeds of $4.6 million. Then, on November 21, 2014, CleanTech sold an additional 508,453 of its shares at $2.07 per share for gross proceeds of $1.1 million.[2] Following the 6D Acquisition, and including the Private Placement, 6D's capitalization was as follows:

| | Number of shares | Percentage of total 6D shares |
|---|---|---|
| NYGG (Asia) | 35,629,883 | 46% |
| Former Six Dimension Shareholders | 38,664,871 | 50% |
| Private Placement Purchasers (other than NYGG (Asia)) | 2,229,484 | 2.9% |
| Former CleanTech shareholders | 1,051,204 | 1.4% |
| Total | 77,575,442 | 100% |

**B. 6D must list on the NASDAQ**

92.     By June 20, 2014, the NASDAQ had informed CleanTech that it no longer complied with five separate NASDAQ Listing Rules. The NASDAQ informed CleanTech that it would be delisted if it did not address the five violations.

---

[2] Wey, through Early Bird Tech Limited, acquired 480,000 CleanTech shares in the Private Placement.

93.     On August 4, 2014, in response to CleanTech's failure to address the issue, the NASDAQ notified CleanTech that it had not complied with certain of the Listing Rules, and as such issued a determination to delist CleanTech's common stock. Pursuant to NASDAQ rules, the delisting was stayed during the pendency of CleanTech's appeal.

94.     CleanTech's continued listing on the NASDAQ was a condition precedent to Six Dimension's obligation to complete the 6D Acquisition.

95.     The NASDAQ held a hearing on 6D's appeal on September 4, 2014.

96.     On December 4, 2014, 6D received a letter from the NASDAQ approving 6D's listing. 6D's stock began trading on the NASDAQ on December 12, 2014 under ticker SIXD.

97.     Had 6D revealed that Wey was a beneficially owner of NYGG (Asia)'s shares, it would thereby reveal that Wey and CleanTech's representations to the NASDAQ in reversing the NASDAQ's delisting had been false.

98.     Should the NASDAQ ever discover that Wey had obtained a reversal of the NASDAQ's delisting determination by lying to the NASDAQ, the SEC, and the courts, the NASDAQ would delist CleanTech's stock in a heartbeat.

99.     Accordingly, it was material to investors that Wey was not a beneficial owner of the NYGG (Asia)'s 6D shares.

### C. Wey controls 6D's activities as a public company

#### 1.  Day-to-day operational control

100.   Throughout the Class Period, Wey continued to control 6D's day-to-day business operations, both through his own personal involvement and through his staff at the NYGG. Indeed, according to Mr. Sullivan, Wey was involved "almost daily" in 6D's operations. Mr. Sullivan reports several examples of Wey's involvement:

a. Financing. According to Mr. Sullivan, Wey had primary responsibility for securing 6D's financing.

b. Capital markets. According to a December 10, 2014 email from Defendant Kang to Mr. Sullivan:

Keep in mind that [CleanTech] is a 3-4 year disaster that was going on for them and we literally came in this year and cleaned sht up and went public w/ an American company. True alignment in that sense *where [Benjamin Wey] has the capital markets expertise and we are here to grow the company. Need to round out other roles as you know, but that's what we are doing.*

c. Auditor selection. Wey demanded that 6D change its auditor to BDO USA LLP. Notably, Wey had referred the NYGG Clients to Goldman Kurland Mohidin LLP ("GKM"). GKM is a member of the BDO Seidman alliance. 6D officials, including Defendant Kang and Mr. Sullivan, objected to hiring BDO, citing (inter alia) cost. 6D officials nonetheless ultimately acquiesced to Wey's demand, hiring BDO in October 2014.

d. Internal employee matters. Mr. Sullivan acquired 500,000 6D shares in September 2014, 100,000 of which vested in March 2015. Wey and 6D demanded that Mr. Sullivan refrain from selling his 6D shares to the public. Mr. Sullivan began the process of removing restrictive legends from his stock, but in or around June 2015, Wey personally called Sullivan to warn him not to submit any paperwork to remove restrictive legends. Wey requested that Mr. Sullivan sell his shares to Wey's friends instead. Wey was also regularly involved in other 6D internal employee matters. For example, Wey attended 6D's corporate retreat in Florida.

e. Selection of personnel. In Fall 2014, 6D searched for a CFO. Wey personally interviewed all the candidates, and signed off on 6D's

25

choice, Defendant Szynkowski. In general, Wey personally interviewed the candidates for all leadership positions.

f. Internal company policy. In or around May/June 2015, Wey instructed Kang to create and implement an aggressive document destruction policy. Pursuant to Wey's instructions, 6D enacted a policy calling for all emails to be destroyed within 90 days.

g. Disclosures. Wey reviewed 6D's SEC filings before they were filed, and provided instructions. For example, Wey instructed 6D that in announcing Defendant Szynkowski's hire, it did not need to seek approval from Defendant Szynkowski's former employer before mentioning it. Mr. Sullivan, who attended conference calls concerning preparation of 6D's 10-Ks and 10-Qs, recalls that Wey participated in the calls, too.

h. Operations. Wey managed numerous operational matters for 6D. Wey and Kang worked to set up an office in Ireland to benefit from favorable tax treatment. Wey was intimately involved in various internal 6D matters, to the point that 6D rescheduled a December 2014 *marketing* call when Wey said he could not attend. Pursuant to Wey's orders, Mr. Sullivan and Defendant Kang also traveled to Washington D.C. to meet with the NASDAQ to plead for 6D's listing at the September 4, 2014 hearing.

i. Controlling 6D's litigation. Wey selected 6D's counsel. 6D was represented in its only two litigation matters other than this action and the Discover Action by John Bostany.[3] Bostany is Wey's lawyer, having previously represented NYGG Client Deer in a

---

[3] *6D Global Technologies, Inc. v. Bei Lu*, 15-cv-1120-LGS (S.D.N.Y.); *Six Dimensions, Inc. v. Brading*, 15-cv-8309-PGG-BCM (S.D.N.Y.)

highly-publicized lawsuit against a shortseller, *Deer Consumer Products, Inc. v. Little Group*, No. 650923/2011 (Sup. Ct. N.Y. Ct.).[4] In fact, Bostany's offices are located in the same building as the NYGG, the Trump Tower, at 40 Wall Street. 6D kept Wey abreast of confidential litigation developments. For example, 6D's attorneys immediately informed Wey of all new developments in 6D's attempt to list on the NASDAQ. 6D also copied Wey on litigation communications with its attorneys. Wey also provided directions to 6D's attorneys. For example, on February 27, 2015, Wey emailed 6D's attorney to instruct him in preparing a court filing:

From:  Benjamin Wey ®[5]
Sent: Friday, February 27, 2015 1:05 P.M.
To: John P. Bostany
Cc: Tejune Kang; Han Dang; Mark Zsynkowski; Charen Kim
Subject: Re: SIX D Order to Show Cause

John,
This is a simple solution. You can make a statement/affidavit that based on your conversation with the compliance officer of the brokerage firm where the shares in Bei Lu's name are held, they can be sold right away, at any time, unless there is court intervention. This is the basis to go back to the judge and ask for a freeze order at a minimum, to prevent to [sic] shares from being sold and proceeds leaving the U.S. and back to China. You are an officer of the court and you can do this easily. Call my office should you have more questions.

Ben[jamin Wey][6]

j.  Physical location. Wey visited 6D's offices every few weeks. Similarly, Wey's attorney Robert Newman repeatedly visited 6D's

---

[4] Bostany also represented two brokers employed by Wey to pump up Deer's stock price in an action filed in this District, *Scholander v. RRZ Management, Inc.*, 13-cv-6131-KPF.

[5] Benjamin Wey has trademarked his name, as reflected in his email address.

[6] 6D's attorney followed Wey's directions. *See 6D Global Technologies, Inc. v. Lu*, 15-cv-1120-LGS, dkt. # 8, at ¶4.

offices. Sullivan recalls seeing Newman at 6D's offices at least three times. Defendant Kang also regularly visited NYGG's offices.

k.  Material non-public information. Wey was regularly provided with material non-public information, as described herein.

2.  *Control of 6D's acquisitions*

101.  Wey and the NYGG took personal control over 6D's acquisitions from beginning to end.

102.  Wey dictated 6D's overall acquisition strategy. Wey ordered 6D to maximize the percentage of stock issued and minimize the cash portion of the consideration it paid for its acquisitions. Wey also required that 6D offer stock that could only be resold much later – usually not within two years.

103.  Wey and the NYGG drafted the form definitive acquisition agreement used in 6D's acquisitions.

104.  At Wey's direction, 6D's acquisition strategy also focused on acquiring companies so as to attract large investors. For example, as of March 31, 2015, 6D had about $2.67 million in cash, and had incurred a net loss in Q1 2015 of $0.53 million. According to emails sent to and conversations with Mr. Sullivan, 6D nonetheless sought to acquire large companies with revenues of at least $10 million with marquee blue chip customers. 6D engaged in acquisition discussions with Bridgeline Digital, Inc., a public company with a FY 2014 net loss of ($6.2 million) on revenues of $23.7 million. According to Mr. Sullivan, who was responsible for 6D's M&A, acquiring Bridgeline made no operational sense. Rather, the purpose of the acquisitions was to attract investors like Discover by acquiring businesses with marquee customers and high revenues. Wey's focus on securing financing for 6D thus dictated 6D's acquisition strategy.

105.  Wey also managed 6D's individual acquisitions.

106.   In many cases, Wey initially brought the acquisition target to 6D. For example, in or around December 2014, Wey asked 6D to look into acquiring Whiteboard Animation Studio. Wey contemporaneously disclosed to Kang and Sullivan that Whiteboard Animation Studio's owner Steve Day was related to Wey by marriage. In a December 2 email describing the potential acquisition to Mr. Sullivan, Kang stated:

> Here's what I also like about this play.
>
> It aligns interests of [Benjamin Wey] even more w/ our success and growth because this is more than just $ to him as investment. This becomes also personal since family is related as well for overall growth of 6D Global.[7]

107.   After initial introductions, Wey personally negotiated certain of the acquisition terms. For example, Wey met with Mr. Day over lunch to establish terms of 6D's acquisition of Whiteboard. And even when Wey did not personally negotiate terms, he gave orders to 6D personnel in conducting negotiations. For example, in December 2014, Wey ordered Mr. Sullivan to go meet Mr. Day; pursuant to Wey's orders, Mr. Sullivan went to meet Mr. Day at Mr. Day's offices, and not vice versa.

108.   At Wey's insistence, in Spring-Summer 2015, 6D also sought to acquire a New York digital creative agency owned by Wey's second cousin's husband for approximately one million dollars in stock. The owner backed out of the deal when he learned more about Wey's background which, by that time, included a highly-publicized sexual harassment lawsuit.

109.   Wey and his legal team reviewed all acquisition agreements. 6D asked Wey to make changes directly to the acquisition agreements. 6D then forwarded the agreements, with Wey's changes, directly to the acquiree.

110.   While finding companies to acquire was a constant preoccupation at 6D, during the Class Period, 6D only closed two acquisitions:

---

[7] The acquisition did not close.

    a. On March 4, 2015, 6D closed the Storycode acquisition for $600,000 and 300,000 shares of common stock, coupled with potential earnout shares.

    b. On March 20, 2015, 6D acquired SwellPath for $300,000 and 300,000 shares of common stock, and up to an additional 300,000 shares and a potential additional $650,000 based on SwellPath's achievement of milestones.[8]

111. Wey and his legal team reviewed both the Storycode and SwellPath agreements, and made substantial changes to the terms of both.

112. 6D officers acknowledged that Wey controlled acquisitions. For example, in a February 18, 2015 email copying Defendant Kang, Mr. Sullivan acknowledged to Wey that "your guidance is critical to our success of [sic] these acquisitions."

### 3. *Defendants admit to Discover that Wey controls 6D*

113. 6D was not profitable and relied on cash infusions to fund its acquisitions.

114. Shortly after the SwellPath and Storycode acquisitions, 6D began to search for investors who would make a large new investment.

115. In late July 2015, 6D was introduced to Discover Growth Fund ("Discover") a Cayman Islands exempted mutual fund managed by Discover Fund Management LLLP from its U.S. Virgin Islands office.

116. On August 10, 2015, 6D and Discover signed a Stock Purchase Agreement (the "SPA"), providing for Discover to make a $10 million investment in 6D convertible preferred stock.

117. 6D's conduct with Discover demonstrates that (a) Wey completely dominated 6D, and (b) Wey completely dominated NYGG (Asia).

---

[8] In violation of SEC rules, 6D did not publicly file the acquisition agreements.

a. Discover's broker has declared under penalty of perjury that (a) Defendants Kang and Szynkowski would refer to NYGG (Asia) and Wey interchangeably as the holder of 45% of 6D's stock, (b) the broker spoke to Wey numerous times in negotiating and closing the SPA, and (c) 6D represented that NYGG (Asia)'s permission was necessary for the transaction. *Discover Growth Fund v. 6D Global Technologies, Inc.*, 15-cv-7618-PKC, dkt. # 23, ¶4 (S.D.N.Y.) ("*Discover*").

b. Shortly after closing, Kang arranged to fly to the Virgin Islands to meet with Discover, bringing with him "a representative from NYGG Asia the other large shareholder in 6D Global." *Discover Docket # 24-1*. In fact, the representative was Wey. *Discover Docket # 12, at ¶2*. Discover's Investment Advisor's Fund Manager John Kirkland has declared under penalty of perjury that Kang introduced Wey by stating "basically, I work for him." *Id.* In addition, at the meeting, Wey stated that (a) he controlled NYGG (Asia) and through NYGG (Asia), controlled 6D Global, as well, (b) Wey controlled 6D's public trading and recent price movements had been caused by Wey's manipulation, and (c) if Discover ever wanted to sell its shares, it should sell them to Wey or his designees rather than on the public market. *Id.*; *Discover Docket # 1, at ¶32*.

c. Kirkland also describes under penalty of perjury an incident showing Wey's total domination of 6D. At the meeting where he was introduced to Discover, Wey excused himself to use the restroom. Kirkland asked Kang what he thought of Wey. Kang answered with a lengthy non-responsive narrative. Upon returning,

31

Wey looked directly at Kang, who immediately stopped speaking, and "sheepishly" recounted Kirkland's question and Kang's complete answer. *Discover* Docket # 24, at ¶5.

**D. The securities laws mandate disclosure of beneficial owners in 10-Ks and Proxy Statements.**

118.   Regulation S-K imposes general disclosure obligations applicable to SEC filings made pursuant to the Securities Act and Exchange Act. Regulation S-K mandates disclosure if so indicated in the form underlying SEC filings. 17 C.F.R. §229.10.

119.   Item 403 of Regulation S-K mandates disclosure of, among other things, the name of any person who or that *beneficially owns* more than 5% of any class of the issuer's securities, as well as the amount of securities owned ("5% Owners"). 17 C.F.R. §229.403.

120.   A "beneficial owner" includes "any person who, directly or indirectly, through any contract, ***arrangement, understanding, relationship, or otherwise*** has or shares (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) Investment power which includes the power to dispose, or to direct the disposition of, such security." 17 C.F.R. §240.13d-3(a) (emphasis added). At all times, Wey held both voting power and investment power over all of NYGG (Asia)'s 6D shares, and accordingly, was one of the NYGG (Asia)'s 6D shares' beneficial owner.

121.   Item 403 mandates disclosure of 5% Owners in:

   a.   Annual reports on Form 10-K. Instructions to Form 10-K, Item 12.

   b.   Proxy Statements on Schedules 14A or 14C.[9]

---

[9] Schedule 14C mandates disclosure of "the information called for by all of the items of Schedule 14A of Regulation 14A [other than matters not relevant here] which would be applicable to any matter to be acted upon at the meeting if proxies were to be solicited in connection with the meeting." Schedule 14C, Item 1.

### E. Defendants' misleading Class Period statements.

122.   The Class Period begins on June 16, 2014, when 6D issued an 8-K announcing some of the terms of the 6D Acquisition, signed by Defendant McEwen, stating in relevant part:

> On June 11, 2014, in consideration of the Exchange Agreement and the related transactions, ***the Registrant's largest creditor, NYGG (Asia) Ltd.***, a British Virgin Islands corporation ("NYGG [Asia]"), entered into a Forbearance and Waiver Agreement with the Registrant (the "Forbearance Agreement"). Pursuant to the Forbearance Agreement, NYGG [Asia] and its affiliates agree to forbear from exercising certain of their respective rights and remedies related to the Registrant's debt obligations to them and certain events of default thereunder. The forbearance period extends from June 11, 2014 until the first to occur of (i) September 10, 2014, (ii) the transfer of the Controlling Shares to the Registrant in exchange for the transfer of the Subsidiary Interests to the Controlling Shareholders and (iii) the termination of the Exchange Agreement. Upon the earlier to occur of (i) the occurrence of a forbearance default (which includes any failure by the Registrant to comply with and/or diligently pursue the Exchange Agreement) or (ii) the expiration of the forbearance period, NYGG [Asia]'s agreement to forbear shall immediately terminate and it shall thereafter be entitled to exercise all of its rights and remediates with respect to the Registrant's debt obligations to it.
>
> Further to the Forbearance Agreement, NYGG [Asia] also agrees to unconditionally release each of the China Subsidiaries from all of their debt obligations to it. The terms of NYGG [Asia]'s release and waiver are set forth in a separately-executed Release and Waiver Agreement between NYGG [Asia] and each of the China Subsidiaries (the "Waiver Agreement").
>
> (emphasis added).

123.   The Forbearance Agreement, which was attached to the June 16 8-K, provided:

---

Schedule 14A mandates disclosure of the information required by Item 403 of Regulation S-K. Schedule 14A, Item 6. (d).

B. The Lender [defined as NYGG (Asia)] and/or NYG Capital LLC [i.e., NYGG] have acquired indebtedness of the Borrower previously owed to Fensterstock & Partners LLP and intend to acquire additional indebtedness of the Borrower on or prior to the Distribution Date including, without limitation, amounts that are owed by the Borrower to the law firm of Stradley Ronon (the "<u>Additional Indebtedness</u>", and together with the Prior Loans, the "<u>CTek Indebtedness</u>").

[...]

D. The Borrower has requested that each of the Lender and NYG[G] forbear from exercising certain of their respective rights and remedies with respect to the CTek Debt Obligations and the Events of Default, and the execution of this Agreement is a condition precedent to the effectiveness of the Exchange Agreement.

2. <u>Forbearance</u>.

2.1 Subject to the terms and conditions of this Agreement, and provided that no Forbearance Default (as defined below) has occurred, the Lender agrees that during the period commencing on the date of this Agreement and ending on and the first to occur of (i) September 10, 2014, (ii) the Distribution and (iii) the termination of the Exchange Agreement (the "<u>Forbearance Period</u>"), the Lender will not, and will procure that NYG[G] will not, file suit or take any other action to enforce its rights with respect to the Existing Default. This limited forbearance does not extend to any other default or Events of Default with respect to the CTek Debt Obligations or any other rights and remedies available to the Lender with respect to the Existing Default. Upon the earlier of (a) the occurrence of a Forbearance Default (as defined below) or (b) the expiration of the Forbearance Period, the Lender's agreement to forbear shall automatically be deemed terminated and the Lender shall be entitled to, immediately and without notice, exercise all of its rights and remedies with respect to the CTek Debt Obligations and this Agreement.

**LENDER:**

NYGG (ASIA) LTD.

By: /s/ Roger Li

        Name:  Roger Li

Title:    Managing Director

124.   The statements in the two above paragraphs were misleading because they omitted to disclose that NYGG (Asia) and NYGG were alter egos both completely controlled by Wey..

125.   On June 24, 2014 CleanTech filed its Preliminary Information Statement on Schedule 14C (the "First Proxy") relating to the 6D Acquisition. The First Proxy was signed by Defendant McEwen. The First Proxy repeated the misleading statement that NYGG (Asia) was being issued shares in the 6D Acquisition, which was misleading for failing to disclose that Wey beneficially owned NYGG (Asia)'s shares. In addition, Item 403 of Regulation S-K required the First Proxy to disclose, which it did not, that Wey beneficially owned all of NYGG (Asia)'s shares.

126.   In addition, the First Proxy included a copy of the bylaws which would govern 6D:[10]

### ARTICLE III
### BOARD OF DIRECTORS

SECTION 1. Number, Qualification and Term of Office. The business, property and affairs of the Corporation shall be managed by a Board consisting of not less than three or more than seven Directors.

### ARTICLE V
### OFFICERS

SECTION 1. Number. The officers of the Corporation shall be a President, Secretary, and Treasurer, each of which officers shall be elected by the Board of Directors, and such other officers as the Board of Directors may determine, in its discretion, to elect. Any number of offices may be held by the same person. Any officer may hold such additional title descriptions or qualifiers such as "Chief

---

[10] The First Proxy provided that "[a]pproval by shareholders of the Reincorporation will automatically result in the adoption of all the provisions set forth in the 6D Delaware Certificate of Incorporation and the 6D Delaware Bylaws."

Executive Officer", "Chief Operating Officer", "Chief Financial Officer", "Senior Vice President", "Executive Vice President" or "Assistant Secretary" or such other title as the Board of Directors shall determine.

127.   The statements in ¶126 were misleading for omitting to disclose that in fact 6D's operations were conducted and controlled by Wey and the staff of the NYGG, rather than 6D's officers and Board of Directors.

128.   The SEC called Defendants' attention to Regulation S-K Item 403's requirement that they disclose NYGG (Asia)'s beneficial ownership in 6D securities in a July 21, 2014 letter providing in relevant part:

> As part of your Debt Conversion discussion, please disclose NYGG (Asia) Ltd.'s ultimate beneficial ownership of the company's stock following the closing of the Exchange. Your disclosure should cover beneficial ownership of the company's securities that NYGG, directly or indirectly, will have after the closing of the Exchange. As defined in Exchange Act Rule 13d-3, a beneficial owner of a security includes "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) investment power which includes the power to dispose, or to direct the disposition of such security."

129.   The SEC's letter plainly called for 6D to disclose that Wey would be the beneficial owner of NYGG (Asia)'s 6D shares, in that Wey (a) would have the sole dispositive power over NYGG (Asia)'s 6D shares, and Wey (b) has investment power over NYGG (Asia)'s 6D shares.

130.   Then, in an August 4, 2014 letter commenting on 6D's amended proxy statement (the "Second Proxy"), the SEC demanded that 6D further disclose the name of the natural person with voting and dispositive control over NYGG (Asia)'s shares.

131.    On August 13, 2014, in response to the July 21 and August 4 SEC letters, 6D filed its third proxy for the 6D Acquisition (the "Third Proxy").The Third Proxy was signed by Defendant McEwen.

132.    Despite the SEC's twice calling 6D's attention to the requirement that 6D set out beneficial ownership of NYGG (Asia)'s 6D shares, the Third Proxy nevertheless omitted to disclose that Wey would beneficially own NYGG (Asia)'s 6D shares.

133.    The Third Proxy also repeated the statements set out in ¶126 above, which were misleadingly incomplete for the reasons provided in ¶127, above.

134.    On September 4, 2014, 6D filed its Definitive Proxy on Schedule 14C relating to the 6D Acquisition (the "Definitive Proxy"). Defendant McEwen signed the Definitive Proxy. The Definitive Proxy repeated all of the misleading statements contained in the Third Proxy, which were misleading for the reasons set out in ¶¶131-133, above.

135.    The 6D Acquisition closed on September 29, 2014. Therefore, by October 15, 2014, Wey was required to file a Schedule 13D disclosing that he beneficially owned the 35,629,883 6D shares held in the name of NYGG (Asia), but he did not.

136.    On October 1, 2014, Defendant 6D filed a report on Form 8-K to report on, inter alia, the change in control resulting from the 6D Acquisition. Defendant Kang signed the October 1 8-K. Pursuant to the instructions to Form 8-K, Defendant 6D was required to report the "identity of the person(s) who acquired such control [and] the basis of the control, including the percentage of voting securities of the registrant now beneficially owned directly or indirectly by the person(s) who acquired control". Instructions to Form 8-K, Item 5.01.

137.    Accordingly, in the October 1 8-K, 6D was required to report that Wey beneficially owned the 35,629,883 NYGG (Asia) 6D shares. Instead, 6D

misleadingly reported that NYGG (Asia) beneficially owned the 35,629,883 NYGG (Asia) 6D shares, without disclosing that Wey was also a beneficial owner.

138.   Attached as Exhibit 3-4 to the October 1 8-K were 6D's By-Laws, including the provisions are set out in ¶126 above. These statements were misleading for the reasons set out at ¶127, above.

139.   On November 12, 2014, 6D filed its 10-Q for the quarter ended September 31, 2014 (the "Q3 2014 10-Q"), signed by Defendant Kang, which provided in relevant part:

> *The largest holder of our common stock has significant voting power and may effectively control the outcome of any stockholder vote.*
>
> NYGG (Asia), Ltd. holds, in the aggregate, approximately 46.2% of the outstanding shares of our common stock as of November 10, 2014.  As a result, NYGG (Asia) has the ability to substantially influence and, in some cases, may effectively control the outcome of corporate actions requiring stockholder approval, including the election of directors.  This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors.

140.   This statement was misleadingly incomplete for failing to disclose: (a) that Wey (and not the NYGG (Asia)) in fact controlled 6D; (b) that Wey's control was not limited to shareholder votes, but that, rather, Wey exercised day-to-day control over 6D.

141.   On December 12, 2014, 6D's stock began trading on the NASDAQ under ticker SIXD.

142.   On February 5, 2015, 6D filed a Proxy Statement on Schedule 14C (the "February Proxy") relating to adoption of 6D's 2015 Omnibus Incentive Plan, pursuant to the written consent of Kang and the NYGG, whom the February Proxy represented accounted for a majority of 6D's voting shares. The February Proxy was misleading because Item 403 of Regulation S-K required the February Proxy

to disclose (which it did not) that Wey beneficially owned all of NYGG (Asia)'s shares.

143.   On March 30, 2015, 6D filed its annual report on Form 10-K for the year ended December 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Defendants Kang, Szynkowski, and McEwen. In addition, pursuant to the Sarbanes-Oxley Act of 2002 (the "SOX"), Defendants Kang and Szynkowski each separately certified that:

> 1. I have reviewed this annual report on Form 10-K of 6D Global Technologies, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]

144.   The 2014 10-K was misleading because Item 403 of Regulation S-K required the 2014 10-K to disclose (which it did not) that Wey beneficially owned all of NYGG (Asia)'s shares.

145.   The 2014 10-K provided, in relevant part:

> *The largest holder of our common stock has significant voting power and may effectively control the outcome of any stockholder vote.*
>
> NYGG (Asia), Ltd. holds, in the aggregate, approximately 46.2% of the outstanding shares of our common stock as of November 10, 2014. As a result, NYGG (Asia) has the ability to substantially influence and, in some cases, may effectively control the outcome of corporate actions requiring stockholder approval, including the election of directors. This concentration of ownership may also have the effect of delaying or preventing a change in control of 6D Global, even if such a change in control would benefit other investors.

146.   This statement was misleadingly incomplete for failing to disclose: (a) that Wey (and not the NYGG (Asia)) in fact controlled 6D; (b) that Wey's control

was not limited to shareholder votes, but that, rather, Wey exercised day-to-day control over 6D.

147.   On April 17, 2015, 6D filed its preliminary 2014 Proxy on Schedule 14A (the "2014 Preliminary Proxy"), signed by Defendant Kang. Then, on April 30, 2015, 6D filed its definitive 2014 Proxy on Schedule 14A (the "2014 Definitive Proxy", and collectively, the "2014 Proxies"), signed by Defendant Kang

148.   The Proxies were misleading because Item 403 of Regulation S-K required the 2014 Proxies disclose (which they did not) that Wey beneficially owned all of NYGG (Asia)'s shares.

### F. LOSS CAUSATION

149.   On September 8, 2015, the United States Attorney for the Southern District of New York filed an indictment against Defendants Wey and his broker Seref Dogan Erbek on charges including stock manipulation and fraud relating to CleanTech and other NYGG Clients. *United States v. Wey*, 15-cr-611 (the "Indictment"). In the investigation that led to the Indictment, Wey asserted his Fifth Amended privilege against self-incrimination.

150.   The Indictment was unsealed on September 10, 2015 and Wey was arrested the same day. The Indictment is attached hereto as Exhibit 1 and incorporated by reference. Also on September 10, 2015, the SEC filed a complaint in this District alleging that Defendants Wey and numerous others conspired commit fraud in connection with CleanTech and other NYGG Clients (the "SEC Complaint"). *SEC v. Wey*, 15-cv-7116-PKC. The SEC Complaint is attached hereto as Exhibit 2 and is incorporated by reference. Finally, also on September 10, 2015, the Department of Justice and SEC each issued press releases announcing, respectively, the Indictment and the SEC Complaint (the "Press Releases", and with the Indictment and SEC Complaint, the "September 10 Disclosures").

151.   The September 10 Disclosures first revealed:

    a. Wey exercised control over the NYGG Clients. *E.g.* SEC Complaint ¶ 80.

    b. That NYGG (Asia) was anominee for Wey. *E.g.* Department of Justice Press Release;

    c. That Wey owned and controlled NYGG (Asia). SEC Complaint ¶81; and

    *d.* That Wey's representations to the NASDAQ in the CleanTech delisting that (a) NYGG (Asia) and NYGG were separately owned and operated, (b) NYGG (Asia)'s offices were run by an employee independent of Wey, were lies. *Id.*

152.   The September 10 Disclosures therefore revealed that Wey and CleanTech had lied to the NASDAQ in CleanTech's delisting proceeding.

153.   Incensed and alarmed that the grounds CleanTech and Wey had cited to secured reversal of the NASDAQ's delisting decision were false, the NASDAQ immediately halted trading in 6D's shares. As this Complaint is filed, trading has not resumed.

154.   Because of the trading halt, Plaintiffs and Class Members have not been able to sell their 6D shares. They are thus left holding worthless illiquid securities.

## G. Additional facts probative of scienter.

### 1. *Defendants had a motive to conceal Wey's involvement in 6D.*

155.   Defendants concealed Wey's involvement because they knew they could not reveal to investors that he was associated with 6D.

156.   Wey has become increasingly notorious for his erratic public behavior. For example, Wey sued a colleague of his for reporting to their joint employer that "[m]any people wonder why [Wey] is not in jail for what he did to investors", that Wey "misleads the public as he secretly sells the stocks [he

promotes] through his family and business friends and no one can trace it to him []
[h]e did this with a number of companies," and that "Wey's business [i.e., NYGG]
was a 'front for illegal activities,' and that Wey violated securities laws. *Benjamin
Wey v. Dixon Chen*, Index. No. 108299/2009, Dkt. No. 70, Slip Opinion at 6-8
(N.Y. Sup. 2011). Wey's suit was dismissed.

157.   Wey himself uses media outlets he controlled to publicly harass his
enemies. For example, Christopher Brummer, a well respected law professor at
Georgetown University Law Center arbitrator who, when he sat on FINRA's
National Adjudicatory Council, upheld findings against two of Wey's associates.
Over the following years, using his publication TheBlot.com, Wey issued
numerous articles calling Professor Brummer (inter alia) an "Uncle Tom"
(Professor Brummer is African American), claiming he was "caught in multiple
fraud", caught "lying, exaggerated [sic] biography", and "caught messing with
another man's wife." *Brummer v. Wey*, 153583/2015, dkt. # 2, ¶2 (N.Y. Sup. Ct.)
Notably, Professor Brummer's defamation suit survived Wey's motion to dismiss
even given New York's demanding defamation law.

158.   Professor Brummer was only one of the many persons targeted by
Wey's childish antics. In March 2016, journalist Dune Lawrence wrote of the then-
two years she had spent as a target of Wey's ire. Wey had stated her appearance
was ravaged by "years of consuming hormone-fried chicken and stressing over
money" and Ms. that Lawrence was implicated in "a new Bernie Madoff fraud".
Wey added bizarre sexual innuendo, such as that Ms. Lawrence was like "a dog
wagging her tail trying to attract a mating partner."  Wey also claimed that Ms.
Lawrence was "racist". Dune Lawrence, The Journalist and the Troll: This Man
Spent Two Years Trying to Destroy Me Online, Bloomberg Businessweek March
16, 2016, available at <http://www.bloomberg.com/features/2016-benjamin-wey/>.
Wey was also hit with an $18 million judgment in this Court for sexually

harassing, defaming, and retaliating against former NYGG intern Hanna Bouveng. *Bouveng v. NYG Capital LLC*, 14-cv-5474-PGG-DCF. There, as well, Wey defamed the plaintiff in his media and to her friends and family, including that she was sleeping with "a Black man" and "dangerous criminal", and that she was a "Swedish party girl who had just landed in New York's nightclubs after a year of providing 'entertainment' in the nightclubs and casino houses of Hong Kong and Macau." *Bouveng v. NYG Capital LLC*, No. 14 CIV. 5474 PGG, 2015 WL 3503947, at *3 (S.D.N.Y. June 2, 2015).

159.   It is plain that Defendants understood that being associated with Wey was a serious liability. Sullivan referred to Wey as a "very creepy guy". And in March 2015, Sullivan told Defendant Kang that he felt "uncomfortable in my position as an officer of the company, [how] Ben Wey was conducting himself not just on a personal level but on a business level and that I was deeply concerned." Sullivan then reminded Kang that he had fiduciary responsibilities to 6D investors.

160.   Similarly, in or around June 2015, Defendant Kang and Sullivan held a call to discuss, among other things, Benjamin Wey (the "June Call"). Plaintiffs obtained a recording of the June Call. During the June Call, Defendant Kang recounts how he had recently had drinks with Wey, but that he and Wey had deliberately left separately. As Kang recounted on the June Call, the reason the two left separately was that Benjamin Wey had explained "you don't want to be seen with me." On hearing Kang's story, Sullivan reminded Kang that Wey's conduct called into question Wey's "morals and character". Sullivan told Kang that Wey's conduct would make Sullivan's job of attracting potential acquirees more difficult.

161.   Indeed, as early as December 2014, Kang issued instructions to other 6D executives not to discuss or mention Wey in any emails. Kang continued that if, because of an emergency, other 6D executives had to mention Wey, they must use a code name to refer to Wey. Defendants understood that Wey did not wish to

leave a paper trail, either. In December 2014, Sullivan left a voicemail message for Wey, hoping to invite him to a business lunch; Wey returned Sullivan's call, leaving a voicemail message himself. When Sullivan told Kang Wey had left a voicemail message, Kang responded "I'm surprised he left vm".

162.   And in December 2014, 6D attended an Adobe vendor conference in Las Vegas, hoping to meet with potential acquirees. In a December 18 email following the conference, Defendant Kang ordered senior 6D officials to arrive at consistent answers to questions that 6D had repeatedly received. One of the five questions was "Who is NYGG and [Wey's] reputation?" 6D held a conference call with Wey to plan its answer to the question. In fact, a senior 6D official's notes from the Adobe conference specifically mention that Storycode's owner Jason Porath (which 6D eventually acquired) had read background on Wey and considered his involvement a risk.

### 2.   *Defendants make false exculpatory statements.*

163.   When it sued 6D, Discover sought an order attaching the $10 million it had invested in 6D.

164.   As alleged above, Discover claimed that it had not known about Wey's involvement and, in particular, had not known he was a beneficial owner of NYGG (Asia)'s shares. 6D responded that Wey did not, in fact, own NYGG (Asia)'s shares and was thus not a shareholder of 6D.

165.   To oppose Discover's motion, Defendants Kang and Szynkowski each submitted declarations under penalty of perjury. Defendants Kang and Szynkowski's declarations each falsely denied (a) that Wey was the NYGG (Asia) 6D shares' beneficial owner, and (b) that Wey governed 6D's affairs.

166.   First, Defendants Kang and Szynkowski falsely denied that Wey was a 6D shareholder.

167.   Defendant Kang declared under penalty of perjury that:

As one of CleanTech's primary creditors, NYGG Asia was also involved in the merger and became a significant holder of shares of 6D Global's common stock. At all times after 6D Global began operations, ***I communicated principally with Mr. Roger Li regarding matters related to NYGG Asia.***

Kang Declaration Dated October 2, 2015, Discover Dkt. # 20, ¶9 (emphasis added).

168.   Defendant Kang also declared that "Mr. Wey has never been an officer, director, ***or shareholder*** of 6D Global". *Id.* ¶17 (emphasis added)

169.   Defendant Szynkowski declared that "[d]uring my tenure with 6D Global [] Benjamin Wey has never served as an officer, director, ***or shareholder*** of 6D Global." Szynkowski Declaration Dated October 2, 2015, Discover Dkt. # 19, at ¶29 (emphasis added).

170.   Kang and Szynkowski's statements were knowingly false. At all times, Kang and Szynkowski knew that Wey was the beneficial owner of the NYGG (Asia)'s 6D shares. In fact, on the June Call, Kang stated that ***"Benjamin Wey" was "a shareholder" of 6D***.

171.   Moreover, as further set out above, Kang had extensive contacts with Wey, who closely monitored his investment in 6D. Kang's contacts with Li, by contrast, were very limited. In ***May 2015***, more than a year after 6D and NYGG (Asia)'s first meeting, Kang travelled to China ***to meet*** Li and other NYGG (Asia) personnel. Kang provided Li and the other NYGG (Asia) personnel a 1-2 page dossier presentation ***to introduce them*** to 6D.[11]

---

[11] And here, as well, Wey himself was involved. Wey was supposed to accompany Defendant Kang, but cancelled 2 days before departure. It was apparent to 6D employees that something sinister was afoot. Sullivan reached the belief at the time that Wey had cancelled because he did not want there to be evidence that he had travelled with Defendant Kant, casting doubt on Defendants' claim that Wey was not heavily involved in 6D's operations.

172.   Szynkowski and Kang also misleadingly downplayed Wey's role. For example, Szynkowksi declared under penalty of perjury that:

> To be sure, I understand that Mr. Wey has served as an occasional unpaid consultant to 6D Global in connection with 6D Global's efforts to engage strategic growth opportunities through financing arrangements or corporate acquisitions, and I have spoken to Mr. Wey on occasion in that regard.

Szynkowski Declaration Dated October 2, 2015, Discover Dkt. # 19, at ¶30.

173.   Defendant Kang also declared under penalty of perjury that "[i]ndeed, since I first met him in 2014, *Mr. Wey has never dictated the operations of 6D Global or its decision-making*." Kang Declaration Dated October 2, 2015, Discover Dkt. # 20, ¶17 (emphasis added).

174.   Defendants' statements were false. Szynkowski's statement was false because Wey's numerous functions at 6D were in no way limited to financing or corporate acquisitions, and included (for example) interviewing defendant Szynkowski for his job. And contrary to Kang's claim that Wey never dictated 6D's operations, Kang admitted on the June Call that through Wey's shareholdings, "*he's got influence*" over 6D. And it is plain that Wey dictated several of 6D's decisions, including at least its choice of auditor and its document preservation policy, among other matters.

## VI.  PLAINTIFFS' CLASS ACTION ALLEGATIONS

175.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired 6D securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants and the officers and directors of the Company at all relevant times (the "Immediate Excluded Persons"), members of the Immediate Excluded Persons' immediate families and their legal

representatives, heirs, successors or assigns and any entity in which the Immediate Excluded Persons have or had a controlling interest.

176.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, 6D securities were actively traded on the NASDAQ and the OTCQB rxchange. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by 6D or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

177.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

178.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

179.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   whether Defendants omitted to disclose material facts to the investing public during the Class Period which they were required to disclose about the business, operations and management of 6D Global;

      c.      whether the Individual Defendants caused 6D and the NYGG to make omissions of material fact during the Class Period;

      d.      whether Defendants acted knowingly or recklessly in making misleading omissions; ;

      e.      whether the prices of 6D securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

      f.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

180.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

181.   Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

182.   Alternatively, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

      a.      Defendants failed to disclose material facts during the Class Period;

      b.      the omissions were material;

      c.      6D securities are traded in an efficient market, in that:

    i.   6D's shares were traded on the NASDAQ and the OTCQB Exchange, automated and highly liquid markets;

    ii.  6D was covered by at least three analysts;

    iii. During the Class Period, of the approximately 78.2 million issued and outstanding 6D shares, about 35.6 million were owned by Wey, and about 23.3 million shares were owned by 6D's officers and directors, leaving about 19.3 million freely tradable shares. On average, about 290,000 6D's shares were traded each week, or 1.5% of the total freely tradable shares, permitting a strong presumption that 6D's stock traded on an efficient market.

    iv. More than 20 market makers made a market in 6D's stock; and

    v.  New company-specific information was rapidly reflected in 6D's stock price.

    d.    Plaintiffs and members of the Class purchased or acquired 6D securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

183.  Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**FIRST CAUSE OF ACTION**
**Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

184.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

185.  This cause of action is asserted against all Defendants.

49

186.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase 6D securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

187.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of 6D as specified herein.

188.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of 6D's value and performance and continued substantial growth, which included the making of, or the participation in the making of, omissions to state material facts necessary in order to make the statements made about 6D and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers 6D securities during the Class Period.

189.   Each of the Defendants' primary liability, and controlling person liability, arises from the following: (a) Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (b) by virtue of their responsibilities and activities as senior officers and/or directors of the Company,

were privy to and participated in the creation, development and reporting of the Company's  plans, projections and/or reports; (c) Defendants enjoyed significant personal contact and familiarity with the other members of the Company's management team, internal reports and other data and information about the Company's, operations, and (d) Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded omitted material facts they had a duty to disclose.

190.   Defendants had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material omissions were done knowingly or recklessly and for the purpose and effect of concealing 6D's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' materially misleading omissions during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to discover whether those omissions were misleading.

191.   As a result of the failure to disclose material facts, as set forth above, the market price for 6D's securities was artificially inflated during the Class Period.

192.   In ignorance of the fact that market prices of 6D's publicly-traded securities were artificially inflated or distorted, and relying directly or indirectly on the misleading omissions made by Defendants, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs

and the other members of the Class acquired 6D's securities during the Class Period at artificially high prices and were damaged thereby.

193.    Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding 6D's financial results and condition and business operations, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired 6D Global securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

194.    By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

195.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

196.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## SECOND CAUSE OF ACTION
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants and Defendant NYGG

197.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

198.    This second cause of action is asserted against each of the Individual Defendants and Defendant NYGG (the "Controlling Persons").

199.    The Controlling Persons acted as controlling persons of 6D within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights,

participation in and/or awareness of the Company's operations and/or intimate knowledge of aspects of the Company's dissemination of information to the investing public, the Controlling Persons had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are misleadingly incomplete. The Controlling Persons were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleadingly incomplete prior to and/or shortly after these materially misleading statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to include information necessary to make the statements nonmisleading.

200.  In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

201.  As set forth above, Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

202.  By virtue of their positions as controlling persons, Controlling Persons are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

203.  This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

       a.    Determining that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

       b.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

       c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

       d.    Awarding such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: March 18, 2016                    Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         /s/Jonathan Horne
                                         Jonathan Horne, Esq.
                                         Laurence M. Rosen, Esq.
                                         Phillip Kim, Esq.
                                         275 Madison Avenue, 34th Floor
                                         New York, NY, 10016
                                         Telephone: (212) 686-1060
                                         Facsimile: (212) 202-3827
                                         Email: lrosen@rosenlegal.com
                                         Email: pkim@rosenelgal.com
                                         Email: jhorne@rosenlegal.com

                                         Lead Plaintiffs' Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2016, I filed the foregoing document via CM/ECF, which sent notification of such filing to all counsel of record.

Dated: March 18, 2016                    /s/ Jonathan Horne