UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

JOSEPH PUDDU; MARK GHITIS; VALERY                   15 Civ. 8061
BURLAK; and ADAM BUTTER,

                Plaintiffs,                   OPINION

    -against-

6D GLOBAL TECHNOLOGIES, INC.,
NYGG (ASIA), LTD.; BENJAMIN
TIANBING WEI A/K/A/ BENJAMIN WEY;
TEJUNE KANG; MARK SZYNKOWSKI;
TERRY MCEWEN; and NYG CAPITAL LLC
D/B/A/ NEW YORK GLOBAL GROUP,

                Defendants.

-------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiff

        THE ROSEN LAW FIRM, P.A.
        275 Madison Avenue, 34th Floor
        New York, NY 10016
        By:  Jonathan R. Horne, Esq.
            Phillip C. Kim, Esq.

        Attorneys for Defendants

        K&L GATES LLP
        599 Lexington Avenue
        New York, NY 10022-6030
        By:  Peter N. Flocos, Esq.
            B. John Casey, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/6/17

**Sweet, D.J.**

Defendants 6D Global Technologies, Inc. ("6D"), Tejune Kang ("Kang"), Mark Szynkowski ("Szynkowski"), and Terry McEwen ("McEwen" and, collectively, the "6D Defendants" or the "Defendants") have moved pursuant to Rule 12(b)(6), Fed. R. Civ. P., to dismiss the second amended complaint ("SAC") of plaintiffs Joseph Puddu, Mark Ghitis, Valery Burlak, and Adam Butter (collectively, the "Plaintiffs"). Based upon the conclusions set forth below, the motion of the 6D Defendants is granted, and the SAC is dismissed.

## I. Prior Proceedings

The Plaintiffs filed their putative class action complaint on October 13, 2015. The SAC was filed on April 4, 2016. It alleges that the Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), and Section 20(a) of the Exchange Act.

1

CleanTech, a now-defunct company based in China, manufactured structural towers used in wind turbines and was briefly listed on the NASDAQ. SAC ¶ 7. 6D, which is a successor to CleanTech, is a Delaware company whose operations – software offerings and technology consulting – take place entirely in the United States. SAC ¶¶ 25-26. Kang is its CEO, and Szynkowski is its CFO. SAC ¶¶ 27-28. McEwen has served as a 6D director since September 30, 2013, and between June and September 2014, he served as its sole director and CEO. SAC ¶ 29.

Wey is alleged to be a notorious promoter of fraudulent Chinese companies. SAC ¶ 30. He, through his companies New York Global Group ("NYGG") and NYGG (Asia), assists the Chinese companies in listing their stock on U.S. exchanges and connects them with investment bankers and a compliant auditor in exchange for a large portion of their stock. SAC ¶ 46. Wey then discreetly sells the stock through a network of associates and nominees. *Id.* The companies' stock price collapses soon after Wey's stock sales. *Id.* Wey made more than $70 million from his fraud. SAC ¶ 61.

In early 2011, CleanTech was delisted by the NASDAQ for failing to disclose its connections with Wey in its listing

3

application. SAC ¶ 76. Wey was the acknowledged principal of NYGG, and CleanTech claimed that it had a relationship with NYGG (Asia) but not with NYGG. Additionally, CleanTech claimed NYGG (Asia) was separately owned and operated by Ming "Roger" Li ("Li"), a false statement Wey himself repeated in a letter to the NASDAQ. SAC ¶¶ 5, 69 a., 80 b., c., 81, 191. Wey at all times was NYGG (Asia)'s controlling shareholder and personally controlled its operations. SAC ¶¶ 126, 127. CleanTech eventually obtained a reversal of the NASDAQ's decision, but the NASDAQ warned that if it ever discovered that Wey was NYGG (Asia)'s controlling shareholder, it would promptly delist CleanTech.

In June 2014, CleanTech announced that it would merge with a private company, Six Dimensions, to become 6D. SAC ¶ 7. In connection with the merger, CleanTech would sell its existing business and convert CleanTech's debt held by NYGG (Asia) into equity in the new company, 6D. *Id.* Following the merger, which closed in September 2014, NYGG (Asia) held approximately 45% of 6D's shares. SAC ¶ 95.

6D's bylaws represented that it was governed much like other public companies. Its day-to-day business was purportedly handled by its named executive officers, nominated by the Board

4

of Directors, who were identified for the benefit of
shareholders in 6D's SEC filings. SAC ¶¶ 137, 138, 149.
Defendants implied that NYGG (Asia)'s (and not Wey's) control
would be limited to matters requiring stockholder approval, such
as the election of directors. SAC ¶¶ 151, 152, 156, 157.

The 6D Defendants were aware that they could not
report that Wey was associated with 6D. Prior to the Class
Period, Wey's fraudulent business dealings were partially
exposed to the press and to investors. Wey's business associates
have claimed his business is a "front for illegal activities,"
SAC ¶ 174, while a Barron's news article reported that the stock
price of firms Wey promoted would typically collapse to zero
amidst accusations of fraud that his handpicked auditor had
missed, SAC ¶ 67. Wey accused public figures of things like
having bodies ravaged by "years of consuming hormone-fried
chicken and stressing over money" and being "like a dog wagging
her tail trying to attract a mating partner" or being an "Uncle
Tom" who was "caught messing with another man's wife." SAC ¶¶
174, 175. Moreover, Wey sexually harassed a NYGG intern, who
later won a widely-publicized lawsuit in which the jury awarded
her $18 million in damages, $16 million of which were punitive,
and the Honorable Paul G. Gardephe held that Wey's misconduct

5

was "at the extreme end of the [reprehensibility] spectrum." SAC
¶ 177. Matthew Sullivan ("Sullivan"), a named 6D executive
officer, referred to Wey as a "very creepy guy," and in March
2015, told Kang he felt "uncomfortable in my position as an
officer of the company, [about how] Ben Wey was conducting
himself not just on a personal level but on a business level and
I was deeply concerned." SAC ¶ 178.

Wey told Kang "you don't want to be seen with me." SAC
¶ 179. Kang instructed other 6D employees not to discuss or
mention Wey in any emails, except in an emergency, and then to
use a code word to refer to Wey. SAC ¶ 181.

However, Wey was personally involved in 6D's day-to-
day management. He had primary responsibility for securing 6D's
financing. SAC ¶ 107 a.-b. Wey selected 6D's auditor. SAC ¶ 107
c. Wey interviewed 6D's CFO candidate and signed off on its
choice. SAC ¶ 107 e. Wey personally interviewed the candidates
for all leadership positions. *Id.* Wey dictated how and when 6D
personnel could sell their 6D stock, demanding they sell stock
to Wey's friends. SAC ¶ 107 d. In May or June of 2015, Wey
instructed Kang to create and implement an aggressive document
destruction policy, requiring that all emails be destroyed

6

within 90 days. SAC ¶ 107 e. Wey reviewed, made changes to, and approved 6D's SEC filings before they were filed. SAC ¶ 107 g. Wey controlled 6D's litigation, selected its counsel, and gave instructions. SAC ¶ 107 i. 6D rescheduled meetings, including marketing discussions, if Wey could not attend. SAC ¶ 107 h. Wey caused 6D to violate Board directives, including by disobeying a direct Board order and violating restrictions imposed by 6D's publicly filed employee stock compensation program to award stock options to NYGG employees. SAC ¶ 109. Wey manipulated public trading in 6D's stock. SAC ¶ 127.

Wey was responsible for 6D's capital markets strategy and activity, which Kang acknowledged. SAC ¶ 107 b. Wey personally controlled 6D's acquisition strategy. SAC ¶ 110. Wey dictated 6D's overall strategy, which was to acquire targets to entice a large investor. SAC ¶¶ 111, 113. Wey selected individual acquisition targets. SAC ¶¶ 115, 117. Wey provided 6D's form acquisition agreement, negotiated individual terms, and reviewed all acquisition agreements. SAC ¶¶ 112, 114, 118.

Wey visited 6D's offices every few weeks, and Kang also regularly visited NYGG's offices in Trump Tower. SAC ¶

7

107 j. Wey's attorney and co-conspirator Robert Newman
("Newman") also regularly visited 6D's offices. *Id.*

In December 2014, Kang emailed Sullivan, stating that
a proposed acquisition "aligns [the] interests of [Benjamin Wey]
even more [with] our success and growth because this is more
than just [money] to him," and that Wey's interests already were
"aligned" with 6D's because of his "investment" in 6D. SAC ¶
115. Further, Kang stated that the proposed transaction would
mean Wey's family "as well" benefits from 6D's growth. *Id.* In a
June 2015 call, Kang admitted that Wey "is a shareholder" of 6D
and as such "he's got influence" over it. SAC ¶ 13.

Additionally, in discussions with Discover Growth Fund
("Discover"), a large investor, Defendants referred
interchangeably to NYGG (Asia) and Wey as the holder of 45% of
6D's stock. SAC ¶ 126. After Discover had signed investment
agreements with 6D, Kang summarized his relationship with Wey to
Discover as: "[B]asically, I work for him." SAC ¶ 127. When Wey
excused himself to use the bathroom during a meeting with
Discover, Discover asked Kang pointed questions about Wey, but
when Wey returned, Kang immediately stopped speaking and
"sheepishly" recounted the questions and answers. SAC ¶ 128. Wey

8

also stated at the meeting with Discover, in Kang's presence, that he (Wey) controlled 6D. SAC ¶ 127.

On September 10, 2015, the United States Department of Justice ("DOJ") and the SEC announced that they had indicted and sued, respectively, Wey and certain of his associates for securities fraud, including in connection with CleanTech. The SEC complaint and DOJ indictment, and the accompanying press releases, revealed that NYGG (Asia) was a Wey nominee, and that Wey – not Li, as had been claimed – was in truth 6D's controlling shareholder. SAC ¶ 164.

The NASDAQ immediately halted trading in 6D's stock on the ground that Wey actually held NYGG (Asia)'s 6D shares. SAC ¶ 164 d., 166-67. 6D appealed the NASDAQ's delisting.

In the course of its audit of 6D's 2015 financial statements, BDO USA LLP ("BDO") conducted procedures to determine whether Wey's influence over 6D violated its internal controls. BDO determined that Wey and Kang had disobeyed the Board's explicit instructions and issued stock options to NYGG employees in violation of company rules, and that Kang had repeatedly lied to 6D's Board, and to an internal 6D

9

investigation conducted by the law firm Blank Rome LLP, about Wey. SAC ¶ 15. BDO told 6D it could no longer rely on its CEO's Kang's representations and would have to resign as auditors unless Kang resigned himself. When 6D refused to terminate Kang, BDO resigned, along with 6D's audit committee chair, making its findings public. *Id.*

Shortly thereafter, the NASDAQ delisted 6D's stock. When trading resumed in March 2016, 6D's stock price fell to $1.00 the first day, and continued to fall to $0.21 over the next three trading days. SAC ¶ 172.

## III. The Applicable Standards

The Rule 12(b)(6) standard requires that a complaint plead sufficient facts to state a claim upon which relief can be granted. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a motion to dismiss under Fed. R. Civ. P 12(b)(6), all factual allegations in the complaint are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor. *Littlejohn v. City of N.Y.*, 795 F.3d 297, 306 (2d Cir. 2015); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993). However, "a

10

plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Twombly*, 550 U.S. at 555 (quotation marks omitted). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 663 (quoting *Twombly*, 550 U.S. at 570).

A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." *Twombly*, 550 U.S. at 557 (internal quotation marks omitted).

Additionally, while "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" *Munoz-Nagel v. Guess, Inc.*, No. 12-1312, 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)) and *Prince v. Madison Square Garden*, 427 F.

11

Supp. 2d 372, 384 (S.D.N.Y. 2006); *see also Williams v.*
*Calderoni*, No. 11-3020, 2012 WL 691832, *7 (S.D.N.Y. Mar. 1,
2012). The pleadings, however, "must contain something more than
. . . a statement of facts that merely creates a suspicion [of]
a legally cognizable right of action." *Twombly*, 550 U.S. at 555
(quoting 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND
PROCEDURE § 1216 (3d ed. 2004)).

Plaintiffs must do even more to state a claim for
federal securities fraud. *See Emps.' Ret. Sys. v. Blanford*, 794
F.3d 297, 304 (2d Cir. 2015); *S. Cherry St., LLC v. Hennessee*
*Grp., LLC*, 573 F.3d 98, 110 (2d Cir. 2009). These claims are
subject to the strict pleadings standards of both Rule 9(b) and
the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-
4(b)(2) ("PSLRA"), which was enacted in 1995 "[a]s a check
against abusive [securities] litigation by private parties . . .
." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,
313, 319, 321 (2007).

Plaintiffs must satisfy Rule 9(b)'s requirement that
"the circumstances constituting fraud" be "state[d] with
particularity." Fed. R. Civ. P. 9(b). Thus, "[t]o satisfy the
pleading standard for a misleading statement or omission under

12

Rule 9(b), a complaint must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Blanford*, 794 F.3d at 305 (internal quotation marks and citation omitted).

The PSLRA builds on Rule 9's particularity requirement, imposing requirements for both scienter and proximate causation.[1] As to scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to "each act or omission alleged to violate this chapter." 15 U.S.C. § 78u-4(b)(2)(A); *see also Tellabs*, 551 U.S. at 313. This "state of mind" requires a showing "of intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 188 (1976), or recklessness, *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000). For the requirement of a "strong inference," a plaintiff must show that the inference of fraudulent intent is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs*, 551 U.S. at 314. Thus, the Court "must consider, not only inferences

---

[1] Proximate causation is hereinafter referred to as "loss causation."

13

urged by the plaintiff, . . . but also competing inferences
rationally drawn from the facts alleged." *Id.*

As to loss causation, "the plaintiff shall have the
burden of proving that the act or omission of the defendant
alleged to violate this chapter caused the loss for which the
plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).
The plaintiffs must "prove that the economic harm that it
suffered occurred as a result of the alleged misrepresentations
and that the damage suffered was a foreseeable consequence of
the misrepresentation." *Rothman v. Gregor*, 220 F.3d 81, 95 (2d
Cir. 2000) (internal quotation marks and citation omitted).
Because the SAC alleges a "corrective disclosure" theory of loss
causation, *see* SAC ¶¶ 164-65, Plaintiffs here must allege facts
showing that a corrective disclosure revealed the information
that Plaintiffs contend was previously omitted. *See Lentell v.
Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (a
disclosure that "do[es] not reveal to the market the falsity of
[] prior" statements "do[es] not amount to a corrective
disclosure"). The SAC must also distinguish the effect of the
alleged fraud from the "tangle of [other] factors" that can
affect a stock's price. *Dura Pharms., Inc. v. Broudo*, 544 U.S.
336, 343 (2005); *see also Lentell*, 396 F.3d at 177 (complaint

14

must plead "facts sufficient to support an inference that it was defendant's fraud - rather than other salient factors - that proximately caused plaintiff's loss").

## IV. The Misrepresentation or Omission of a Material Fact is Inadequately Pled

In order to state a Section 10(b)/Rule 10b-5 claim, a complaint must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014); *see also Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 494 (S.D.N.Y. 2016).

The SAC alleges two misstatements or omissions that purportedly rendered certain statements misleading.

First, according to Plaintiffs, 6D's public disclosures listing its beneficial owners were misleading because they failed to identify Wey, who purportedly

15

"controlled" and/or "beneficially owned" 6D's largest
shareholder, NYGG (Asia). 6D allegedly was supposed to disclose
this fact in its 10-K and proxy statements as per Item 403 of
Regulation S-K.3 SAC ¶¶ 135-136, 143, 146-148, 153. Plaintiffs
do not contend that Wey personally owned more than five percent
of 6D's shares, but rather that Wey controlled NYGG (Asia) and
thus was a beneficial owner of 6D shares.


Second, according to Plaintiffs, 6D's bylaws,
which were attached to some of the company's SEC filings,
were misleading because they listed certain officerships
but failed to disclose that Wey was the "unofficial" CEO of
6D, as he "control[led] 6D's day-to-day business
operations, both through his own personal involvement and
through his staff at NYGG." SAC ¶¶ 10, 107, 138, 149, 151.


The first alleged omission is that Wey beneficially
owned more than five percent of 6D's shares because he owned or
controlled NYGG (Asia). First, Plaintiffs have not shown that
there was, indeed, an omission. The September 4, 2014 proxy
statement (the "Definitive Proxy"), pertaining to the reverse
recapitalization transaction, is cited by Plaintiffs as one of
the documents that purportedly omitted material information. *Id.*

16

¶ 145. However, the Definitive Proxy disclosed that NYGG (Asia)
was "represented" by Wey and that Wey was interacting with Six
Dimensions (6D's predecessor) in that connection:

> On April 8, 2014, a meeting was held among the
> Company, represented by Mr. Uchimoto, Six
> Dimensions, represented by Mr. Kang and others
> from Six Dimensions and Mr. Peter Campitiello,
> Esq. of Kane Kessler, P.C. ("Kane Kessler"),
> counsel for Six Dimensions and NYGG Asia,
> represented by Mr. James Baxter, Esq., Mr.
> Benjamin Wey and Mr. Neal Beaton, Esq. from
> Holland & Knight LLP ("Holland & Knight"),
> counsel to NYGG Asia, for the purpose of
> exploring a possible merger of Six Dimensions and
> the Company [CleanTech]. Prior to this meeting,
> Six Dimensions had pursued other mergers and
> funding opportunities with parties unrelated to
> the Company or NYGG Asia.

The Plaintiffs acknowledge that 6D was explicit in its
public filings that NYGG (Asia), as 6D's largest shareholder,
had the ability to "substantially influence" and "control" 6D:

> NYGG (Asia), Ltd. holds, in the aggregate,
> approximately 46.2% of the outstanding shares of
> our common stock as of November 10, 2014. As a
> result, NYGG (Asia) has the ability to
> substantially influence and, in some cases, may
> effectively control the outcome of corporate
> actions requiring stockholder approval, including
> the election of directors. This concentration of
> ownership may also have the effect of delaying or
> preventing a change in control of 6D Global, even
> if such a change in control would benefit other
> investors.

17

SAC ¶ 150. These "disclosures and representations, taken
together and in context, would [not] have misled a
reasonable investor." *Fila*, 195 F. Supp. 3d at 494 (quoting
*Rombach v. Chang*, 355 F.3d 164, 172 n. 7 (2d Cir. 2004));
*see also In re ProShares Trust Sec. Litig.*, 728 F.3d 96,
103 (2d Cir. 2013) (affirming dismissal of claim after
"read[ing] the prospectus cover-to-cover.").

        Even taking Plaintiffs' allegation that there was an
omission as true, Plaintiffs fail to "show, beyond mere
speculation," that the facts allegedly omitted were actually
true. *Turner v. MagicJack VocalTec, Ltd.*, No. 13 CIV. 0448, 2014
WL 406917, at *6 (S.D.N.Y. Feb. 3, 2014); *see also Wright v.
Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) ("[A]
defendant must actually make a false or misleading statement in
order to be held liable under Section 10(b).) (internal
quotation marks and citation omitted); *SEC v. Cedric Kushner
Promotions, Inc.*, 417 F. Supp. 2d 326, 332 (S.D.N.Y. 2006).
Specifically, Plaintiffs must plausibly establish Wey's
"beneficial ownership" of 6D as defined in Item 403. 17 C.F.R. §
240.13d-3(a). The term "beneficial owner" has independent legal
significance; for a person to be a beneficial owner, he or she

18

must have "voting power" or "investment power" over the shares.
*Id.*

Plaintiffs allege that Kang stated, in a
surreptitiously recorded phone conversation, that Wey is "'a
shareholder' of 6D and, as such, 'he's got influence' over it."
SAC ¶ 13. Kang is not alleged to have stated that Wey (i)
controlled or owned NYGG (Asia), or (ii) controlled or owned
more than five percent of 6D's shares. They contend that Wey
"owned" and "controlled" NYGG (Asia), and through that
ownership, thereby owned and controlled 6D. SAC ¶¶ 135-136, 143,
146-148, 153. Plaintiffs state in their Opposition that
"Defendants' misconduct [predominantly] consists in omitting to
disclose that Wey beneficially owned 45% of 6D's stock." Op. at
10. The Plaintiffs' factual support for this allegation,
ultimately, is that Wey "owned" NYGG (Asia). Mere "ownership,"
however, is conclusory, and is not sufficient to satisfy the
Rule 9(b) and PSLRA pleading standard. *See Ashcroft v. Iqbal*,
556 U.S. 662, 679 (2009) ("While legal conclusions can provide
the framework of a complaint, they must be supported by factual
allegations.").

The Plaintiffs also rely on statements by third parties to support their theory of beneficial ownership. They point to a declaration filed in another lawsuit that described a meeting in July or August of 2015, in which unnamed "executive officers" of 6D "casually refer[ed]" to NYGG (Asia) and Wey interchangeably. This purported "casual" statement says nothing about whether Wey was a "beneficial owner" of 6D under Item 403, and falls far short of meeting the particularity requirements of Rule 9(b) and the PSLRA. Moreover, the meeting happened after 6D issued the last allegedly misleading SEC disclosure.

Plaintiffs additionally claim that the SEC's assertion, in its September 2015 complaint against Wey, that Wey beneficially owned CleanTech shares at various times means that Wey beneficially owned 6D shares, because certain of those times overlap with 6D's existence. The SEC did not allege that Wey owned 6D shares, as opposed to CleanTech shares. The SEC's CleanTech stock-price manipulation claims appear confined to the time preceding 6D's existence, and Plaintiffs do not allege that Wey manipulated 6D's stock. Moreover, allegations in an SEC complaint cannot serve to allege adequately the instant claim. See *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) (holding that "neither a complaint nor references to

20

a complaint which results in a consent judgment may properly be cited in the pleadings" because there had been no "actual adjudication of any of the issues"); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (striking allegations in securities fraud complaint that referred to or relied on a separate SEC complaint).

Plaintiffs have not alleged any other facts demonstrating that Wey beneficially owned more than five percent of 6D shares, which is the threshold required to be a "beneficial owner" under Item 403. They admit that a company's owner does not necessarily control the voting and investment power of the stock that the company holds in other entities. Opp. at 10 ("[T]here could be times in which an owner does not share either of these rights."). "An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets[.]" *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). Because Plaintiffs did not plead with particularity more than Wey's generic ownership of NYGG (Asia), their claims are insufficient to establish that Wey had "the power to vote" or "the power to dispose" of NYGG (Asia)'s shares, as required to be a beneficial owner under Item 403. 17 C.F.R. § 240.13d-3(a).

21

The second alleged misstatement in the SAC is that 6D's bylaws, which were attached to a few of 6D's SEC filings, were misleading because they "did not disclose that Wey was 6D's unofficial CEO." SAC ¶ 10; *see also id.* ¶¶ 137, 149. The claim that Wey was 6D's "unofficial CEO" is based upon a series of allegations in the Complaint to the effect that Wey had interactions with certain 6D officers.

6D Defendants had no duty to disclose that Wey was the "unofficial CEO" of 6D. Federal securities law is settled that "[s]ilence, absent a duty to disclose, is not misleading." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). In other words, "[f]or an omission to be actionable, the securities laws must impose a duty to disclose the omitted information." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002); *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact.").

Consistent with Rule 3b-7, "[t]he few cases that have found an employee to be a de facto officer because of their ability to make policy involved alleged 'consultants' who were actually in total control of a company." *SEC v. Prince*, 942 F.

22

Supp. 2d 108, 134 (S.D.N.Y. 2015) (emphasis added); *see also id.*
("The SEC has never alleged that Prince was 'running the
company' and thus none of these cases involve factual situations
similar to the present one."). Plaintiffs plead no facts showing
that Wey, even if he acted as an "unofficial CEO," somehow
managed to usurp the Board's ultimate authority to manage 6D,
which is the relevant control issue. There is no allegation that
Wey or NYGG (Asia) sat on the 6D Board, that Wey had any
influence over the Board, or that Wey held a 6D officer
position.

        Plaintiffs have not sufficiently alleged how the
additional statement in the bylaws – "[t]he business, property
and affairs of the Corporation shall be managed by" the 6D Board
of Directors – was misleading. Absent allegations that Wey
controlled the 6D Board, this alleged omission is insufficient
to state a claim. *See In re KKR Fin. Holdings LLC S'holder
Litig.*, 101 A.3d 980, 993-94 (Del. Ch. 2014) (applying the
seminal case of *Kahn v. Lynch Communications Systems, Inc.*,
where the Delaware Supreme Court described two scenarios in
which a stockholder could be found a controller under Delaware
law: where the stockholder (1) owns more than 50% of the voting

                            23

power of a corporation or (2) owns less than 50% of the voting power of the corporation but "exercises control over the business affairs of the corporation," and rejecting the theory that an external management company affiliated with the plaintiff controlled a company called KFN, even though it supplied all of the officers of KFN, because the complaint failed to allege that KKR or the manager controlled the KFN Board).

Plaintiffs assert for the first time in their Opposition that the 6D Defendants had an independent obligation to disclose Wey as "an executive officer" pursuant to 17 C.F.R. 229.401(b), based upon the activities he allegedly undertook with respect to the company, such as communications with the CEO, visits to the company, and advice on strategy. Opp. at 16- 17. Plaintiffs may not use motion to dismiss briefing to amend their pleadings. *See Veterans in Positive Action, Inc. v. Dep't of Veterans Affairs Veterans Health Admin.*, No. 13 CIV. 3306 PAE, 2013 WL 5597186, at *2 (S.D.N.Y. Sept. 30, 2013) ("[P]laintiffs may not use an opposition brief to amend their complaint."). Therefore, this theory is disregarded.

24

## V.    Scienter Has Not Been Adequately Pled

A plaintiff can meet the strict scienter pleading
requirements under the PSLRA only by "alleging facts to show
either (1) that defendants had the motive and opportunity to
commit fraud, or (2) strong circumstantial evidence of conscious
misbehavior or recklessness." *ECA v. JP Morgan Chase Co.*, 553
F.3d 187, 198 (2d Cir. 2009). The scienter requirement is
applicable in cases that allege omissions supposedly rendering
statements misleading. *In re Bank of Am. AIG Disclosure Sec.
Litig.*, 980 F. Supp. 2d 564, 586 (S.D.N.Y. 2013). This is
because "[i]t is entirely possible for a defendant to make an
honest but negligent mistake in judging how much detail needs to
be included in public statements in order to avoid misleading
the market." *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d
434, 437 (S.D.N.Y. 2006).

Plaintiffs have not pled facts showing the 6D
Defendants' motive or opportunity to commit fraud. The only
"motive" that Plaintiffs attempt to plead is that "Defendants
concealed Wey's involvement because they knew they could not
reveal to investors that he was associated with 6D," and that

25

"[i]t is plain that Defendants understood that being associated with Wey was a serious liability." SAC ¶¶ 173, 178.

However, as set forth above, it was disclosed in public SEC filings that Wey was a representative of 6D's largest if not controlling shareholder, NYGG (Asia), and had interactions with 6D in that context. This disclosure counters the Plaintiffs' "motive and opportunity" theory that "Defendants concealed Wey's involvement because they knew they could not reveal to investors that he was associated with 6D." SAC ¶ 173; *see, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 586 (defendant's "own disclosures . . . support an inference against scienter that is far stronger than the competing inference that the plaintiffs suggest").

As to the alleged omission regarding Wey's purported beneficial ownership, Wey would have been independently required to publicly disclose his beneficial ownership on a Schedule 13D. See 17 C.F.R. § 240.13d-1. In this case, while NYGG (Asia) disclosed its beneficial ownership on Form 13D, Wey did not disclose any ownership of 6D. Plaintiffs allege no facts why the 6D Defendants should not have relied on NYGG (Asia)'s

26

statutorily required disclosures, and the lack of any corresponding disclosure from Wey.

Plaintiffs do not adequately plead facts showing that Kang, Syznowski, or McEwen were aware at any relevant time of any of Wey's previous bad acts that purportedly made Wey a "serious liability." They have alleged that Kang recounted, during a surreptitiously recorded conversation in June 2015, that he and Wey "recently" deliberately left a restaurant separately because Wey told Kang "you don't want to be seen with me." SAC ¶ 179. This is insufficient to meet the pleading standard here. Further, the alleged conversation occurred after the final SEC disclosure complained of by Plaintiffs (the April 2015 Proxy).

The absence of facts suggesting that Plaintiffs believed Wey was a "liability" during some relevant time period counters the inference that the 6D Defendants had "motive or opportunity" to commit fraud. *See, e.g.*, *Wang v. Bear Stearns Cos.*, 14 F. Supp. 3d 537, 546 (S.D.N.Y. 2014) ("Absent credible allegations that Zhou or Bland had access to nonpublic facts about Bear Stearns's unfolding financial condition, Wang's claim

27

cannot satisfy the PSLRA and the particularity requirements of Rule 9(b).").

Plaintiffs have also not alleged that Kang, Szynkowski, or McEwen "benefitted in some concrete and personal way from the purported fraud," as is required by the "motive and opportunity" test. *See ECA*, 553 F.3d at 198; see also *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (plaintiffs must allege "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures"). They provide no facts showing that 6D Defendants received any "concrete benefits," by, for example, selling their shares at an artificially inflated price. Indeed, they do not allege that Kang, Szynkowski or McEwen (or even NYGG (Asia)) sold a single share of 6D stock during the Class Period. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *In re Glenayre Techs., Inc. Sec. Litig.*, No. 96 CIV. 8252 (HB), 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998), aff'd sub nom. *Kwalbrun v. Glenayre Techs., Inc.*, 201 F.3d 431 (2d Cir. 1999) (no inference of scienter where the

28

company's highest ranking officers did not sell stock before the
company disclosed the allegedly omitted information); *Turner*,
2014 WL 406917, at *11 ("That three of the four individual
Defendants, all high-ranking executives at the Company, did not
sell stock during the Class Period . . . rebuts an inference of
scienter."). As the Second Circuit has made clear, a lack of
insider stock sales cuts against finding scienter. *See San
Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris
Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) (the failure of some
defendants to sell stock during class period undermined the
plaintiffs' allegations that any defendant intended to inflate
the stock price for personal profit).

Plaintiffs have alleged that the 6D Defendants
committed fraud because they were motivated to list on the
NASDAQ, an alleged "condition precedent to completing the 6D
Acquisition." Opp. at 18. However, obtaining a NASDAQ listing
and completing a beneficial corporate transaction are general
corporate motives that are insufficient to plead scienter. *See
In re Solucorp Indus., Ltd. Sec. Litig.*, No. 98 Civ. 3248(LMM),
2000 WL 1708186, at *5 (S.D.N.Y. Nov. 15, 2000) (allegation that
defendants were motivated to be listed on the NASDAQ Small Cap
Market was "no different from alleging an abstract desire to

enable the company to enjoy a high stock price and thereby ease
the difficulties of raising additional capital") (internal
quotation marks and citations omitted); *Kalnit*, 264 F.3d at 141
("[T]he desire to achieve the most lucrative acquisition
proposal can be attributed to virtually every company seeking to
be acquired. Such generalized desires do not establish
scienter.").

## VI.   **The Allegations of Loss Causation Are Inadequate**

To plead loss causation, a plaintiff must plausibly
allege "that the *subject* of the fraudulent statement or omission
was the cause of the actual loss suffered, *i.e.*, that the
misstatement or omission concealed something from the market
that, when disclosed, negatively affected the value of the
security." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d at 173
(emphasis in original; internal quotation marks omitted)

Plaintiffs have relied upon the following "corrective
disclosures," are referred to collectively as the "September 10
Federal Allegations:"

- The September 10, 2015 unsealing of the Justice
  Department Indictment filed against Wey two days

30

> earlier in the Southern District of New York and the Press Release issued by the U.S. Attorney's Office that same day (the "Indictment Press Release").

- The September 10, 2015 SEC Complaint filed against Wey (the "SEC Complaint") and the press release issued by the SEC that same day (the "SEC Press Release").

SAC ¶¶ 161-165. As an initial matter, as noted by the Honorable Kevin Castel in the Discover/6D litigation, the September 10 Federal Allegations set forth only unproven Government allegations of a stock manipulation scheme purportedly orchestrated by Wey - not established facts. *See Discover Growth Fund v. 6D Glob. Techs. Inc.*, No. 15 Civ. 7618 PKC, 2015 WL 6619971, at *7 (S.D.N.Y. Oct. 30, 2015) ("The charge in the indictment and the allegation in the SEC complaint are not evidence of the truth of the assertions therein.").

Even if unproven Government allegations could qualify as a corrective disclosure, the September 10 Federal Allegations still did not reveal the alleged fraud. The September 10 Federal Allegations do not state that Wey was the "unofficial CEO" of 6D and "conducted and controlled" the operations of 6D, as the Plaintiffs allege. SAC ¶ 138. The Indictment Press Release focuses on Wey's alleged "scheme" to manipulate the stock prices of U.S.-listed companies, but nowhere even mentions 6D. Nor does

31

it disclose that Wey would control the operations of these companies. Similarly, the 24-page Indictment against Wey does not once reference 6D, nor state that Wey owned 6D or controlled 6D's operations. And the SEC Press Release focuses on Wey's alleged stock manipulation scheme, without mention of 6D or NYGG (Asia). The SEC Complaint is the only document out of the four that even references 6D, and it states as follows: "In late 2014, CleanTech merged with a small American technology company and became 6D Global Technologies Inc., which is currently traded on the NASDAQ under the ticker symbol, 'SIXD.'" The SEC Complaint does not allege that Wey controlled 6D.

The September 10 Federal Allegations do not disclose the second alleged omission, either. While the documents discuss Wey's purported scheme to use NYGG to engage in stock manipulation with other companies, there are only a handful of brief references to a "Beijing office" of NYGG. Neither the Indictment nor the SEC Complaint alleged that Wey owned or controlled NYGG (Asia) or that Wey had the power to vote or direct the disposition of NYGG (Asia)'s shares, as would be required to be an indirect beneficial owner. *See* 17 C.F.R. § 240.13d-3(a).

32

Because the September 10 Federal Allegations did not
reveal the alleged omissions, the omitted information could not
have caused the price drop that followed thereafter, and
therefore there is no loss causation. *See Lentell*, 396 F.3d at
175 n.4.

Plaintiffs have also "not adequately pled facts which,
if proven, would show that [their] loss was caused by the
alleged misstatements as opposed to intervening events."
*Lentell*, 396 F.3d at 174. Plaintiffs do not allege that Wey's
stock manipulation scheme occurred at 6D, nor have Plaintiffs
alleged any facts showing that it was the purported revelation
of the "fraud" (that Wey controlled 6D or NYGG (Asia)) in the
September 10 Federal Allegations – as opposed to the SEC's and
U.S. Attorney's allegations of Wey's stock manipulation scheme –
that caused the share price to decline.

Furthermore, the loss in stock price Plaintiffs seek
to recover did not take place until six months after the
September 10 Federal Allegations. SAC ¶ 172. Plaintiffs allege
that the NASDAQ halted trading on 6D's shares immediately after
the September 10 Federal Allegations, and that trading did not
resume until March 29, 2016, when 6D began trading over the

counter. Plaintiffs allege that the price dropped from the previously frozen $2.90 to $1.00 on March 29, 2016, that it fell to $0.50 on March 30, to $0.30 on March 31, and to $0.21 on April 1. Plaintiffs' loss-causation theory is that omitting from SEC filings Wey's alleged five percent beneficial ownership of 6D shares, and Wey's alleged role as "secret" CEO, caused 6D to be delisted, which in turn "caus[ed] its share value to decline." Opp. at 22.

The NASDAQ stated with respect to the delisting that "we do not know whether CEO Kang acted at Wey's behest or was otherwise influenced by Wey. . . . We cannot conclude on this record that Wey has control over the NYGG Asia shares."). Whether or not Wey beneficially owned more than five percent of 6D's shares or controlled 6D was not a basis for 6D's delisting, which Plaintiffs concede in their Opposition in quoting NASDAQ's findings. Additionally, the September 10 SEC and DOJ allegations focused on Wey's alleged scheme to manipulate CleanTech share prices years before 6D existed, but did not allege that Wey was 6D's "unofficial" CEO. Plaintiffs contend that Wey's alleged "secret CEO" status was revealed in 6D's March 23, 2016 8-K disclosing the resignation of 6D's auditor, BDO. Opp. at 24. Although the 8-K and the attached BDO letter reflect BDO's

concerns that Wey was an uncompensated "advisor," neither the 8-
K nor the attached BDO letter characterized Wey as an unofficial
CEO of the company or as a controller of the Company.

No facts have been alleged by Plaintiffs to establish
that the non-disclosure of Wey's alleged ownership caused the
delisting or the loss. Further, a variety of other factors are
relevant in the time period between September 10, 2015 and March
29, 2016. The de-listing proceedings before the NASDAQ
transpired over the course of those six months; 6D's auditor,
BDO, resigned on March 17, 2016; and the NASDAQ denied 6D's
appeal to overturn the delisting decision on March 24, 2016. SAC
¶¶ 166-172. Plaintiffs have failed to allege facts showing that
the purported disclosure of the "fraud" - as opposed to these or
other intervening events – caused the drops in 6D's stock price
referenced by Plaintiffs. See Lentell, 396 F.3d at 177
(dismissal required in absence of "facts sufficient to support
an inference that it was defendant's fraud - rather than other
salient factors - that proximately caused plaintiff's loss").

35

**VII.    Conclusion**

Based upon the conclusions set forth above, the

Defendant's motion is granted, and the Second Amended Complaint

is dismissed with prejudice.

**New York, NY**
**March** 6 **, 2017**

_____
ROBERT W. SWEET
U.S.D.J.

36