```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/30/21
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Joseph Puddu, *et al.*,

Plaintiffs,

—v—

6D Global Technologies, Inc., *et al.*,

Defendants.

---

15-cv-8061 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Presently before the Court is Defendant Benjamin Wey's motion to dismiss the Second Amended Complaint and motion to strike portions thereof. Dkt. No. 218. For the reasons that follow, that motion is DENIED.

## I.        Background

The Plaintiffs filed this putative class action complaint on October 13, 2015. Dkt. No. 1. They alleged violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), and Section 20(a) of the Exchange Act. The Complaint has since been amended twice, and the operative pleading—the Second Amended Complaint—was filed on April 4, 2016. *See* Dkt. No. 107 ("SAC"). The Second Amended Complaint alleges that Defendant Benjamin Wey, the alleged "unofficial CEO" of Defendant 6D, violated the federal securities laws by failing to disclose in numerous securities filings that he was the beneficial owner of 46% of 6D's stock that was held in the name of a China-based investment banking firm he controlled and that he conducted and controlled 6D's operations. *See* SAC ¶¶ 10, 86–195. It specifically alleges that

Wey himself violated Section 10(b) of the Exchange Act, Rule 10b-5, and Rule 20(a) of the Exchange Act as a controlling person of 6D. *Id.* ¶¶ 205–224.

The Court assumes the parties' familiarity with the facts of this case, which were summarized extensively in Judge Sweet's March 6, 2017 Opinion & Order. *See Puddu v. 6D Glob. Techs., Inc.*, 239 F. Supp. 3d 694, 705 (S.D.N.Y. 2017), *vacated in part*, 742 F. App'x 553 (2d Cir. 2018). The facts in this section are taken from the Second Amended Complaint, Dkt. No. 107 ("SAC"), and are assumed true for purposes of resolving this motion.

## A. Factual Background

Benjamin Wey is an investment banker and stock promoter, and he controls Defendants NYGG (Asia), Ltd. ("NYGG-Asia") and NYG Capital LLC d/b/a New York Global Group ("NYGG"). SAC ¶¶ 7, 30–32. While, during the relevant period, Wey was acknowledged as the principal of NYGG, the ownership and control over NYGG-Asia was murkier: Wey alleged that NYGG-Asia was separately owned and operated by Ming "Roger" Li, but Plaintiffs allege that Wey was NYGG-Asia's controlling shareholder and that he personally controlled the company's operations. *Id.* ¶¶ 5, 69, 80–81, 126–27, 191. Plaintiffs claim that through those companies, Wey engineered a scheme where Chinese companies seeking a U.S. stock market listing retained NYGG-Asia in order to have Wey assist them in arranging for the auditing, investment banking, legal, and other professional services that are needed to prepare for and obtain a public listing in the United States. *Id.* ¶ 7.

As described by the Plaintiffs, NYGG-Asia would help companies list in the United States through the use of reverse mergers. *Id.* ¶ 47. In a reverse merger, a private company is "acquired" by a defunct public shell. *Id.* The private company thus becomes a subsidiary of the public company. *Id.* In return, the shareholders of the private company receive a majority of the

defunct public shell's shares. *Id.* Through his companies, then, Wey would locate public shells to put into place the reverse merger scheme. *Id.* ¶ 48. Before the reverse merger took place, however, Wey would first acquire the public shells' shares. *Id.* As a result, once the reverse mergers closed, Wey would hold "substantially all of NYGG Clients' shares" that did not otherwise go to the former private company's shareholders. *Id.* So while the former private company's shareholders would still hold a majority of the public company's shares, Wey and his nominees controlled over 5% of the new public company's shares. *Id.* The Plaintiffs allege that Wey would cause the former private company's shareholders to enter into lock-up agreements, which would restrict them from trading their shares. *Id.* And they also allege that Wey did this through "the lawyers he foisted upon the Chinese private companies." *Id.* Through it all, Wey would actively conceal his name and his involvement from the public and would not disclose his holdings to the public market. *Id.* ¶ 49.

The facts underlying this litigation began around 2010. CleanTech Innovations, Inc., a now-defunct Chinese company that was an NYGG-Asia client, applied to have its stock listed on the NASDAQ. *Id.* ¶¶ 67–68. The NASDAQ inquired about CleanTech's relationship with Wey, and CleanTech misrepresented Wey's role, claiming that NYGG-Asia and NYGG were separately owned and operated, that CleanTech had not compensated Wey for his work, and that Wey's role had been limited to introducing CleanTech to financial and professional services providers. *Id.* ¶¶ 67–69. In October 2010, the NASDAQ issued new document and information requests and specifically requested information regarding the work performed by NYGG and NYGG-Asia; CleanTech again represented that Wey's role had been minimal. *Id.* ¶¶ 70–71. The NASDAQ granted CleanTech's listing request, and CleanTech's stock was listed on the NASDAQ on December 10, 2010. *Id.* ¶ 72. But CleanTech did not disclose that it had hired

NYGG-Asia to conduct a private placement of CleanTech stock, which had been pending during its listing application. *Id.* ¶ 73.

In early 2011, CleanTech was delisted by the NASDAQ for failing to disclose its connections with Wey in its listing application. *Id.* ¶ 76.  CleanTech appealed; according to the Plaintiffs, it was Wey who controlled the delisting appeal.  *Id.* ¶ 78.  During the delisting appeals hearings, CleanTech again misrepresented Wey's role.  *Id.* ¶ 79.  Wey personally also misrepresented his role to the NASDAQ and the SEC, repeating, among other things, that NYGG and NYGG-Asia were separately owned and operated, that neither he nor NYGG had any beneficial ownership of the securities that CleanTech issued in December 2010, and that he did not receive any revenues from NYGG-Asia.  *Id.* ¶ 80.  CleanTech's delisting was reversed in 2013, but CleanTech was left owing NYGG-Asia around $16 million.  *Id.* ¶ 8.

In early 2014, Wey urged CleanTech to explore potential sales or mergers.  *Id.* ¶ 86–88. In June 2014, CleanTech announced that it would merge with a private company, Six Dimensions, to become Defendant 6D Global Technologies, Inc. ("6D").  SAC ¶ 7.  As part of the merger, CleanTech would sell its existing business and convert CleanTech's debt held by NYGG-Asia into equity in the new company, 6D.  *Id.*  The merger closed in September 2014, and NYGG-Asia held around 45% of 6D's shares.  *Id.* ¶ 95.

6D's bylaws indicated that its day-to-day business was handled by the newly named executive officers, nominated by the company's Board of Directors, who were identified for the benefit of shareholders in the company's SEC filings.  *Id.* ¶¶ 137–38, 149.  The implication was that NYGG-Asia's control would be limited to matters requiring stockholder approval.  *Id.* ¶¶ 151–52, 156, 157.  Plaintiffs allege that because of Wey's notoriety, the 6D Defendants could not disclose Wey's association with 6D.  *Id.* ¶¶ 67, 174–75, 177–78.  Wey himself acknowledged

to Defendant Kang, a 6D executive, that "you don't want to be seen with me."  *Id.* ¶ 179.

Accordingly, Defendant Kang instructed other 6D employees not to discuss or mention Wey in

any emails, except in an emergency, and to use a code word to refer to Wey.  *Id.* ¶ 181.

Meanwhile, Wey was heavily involved in the day-to-day management of 6D, including taking

responsibility for securing the company's financing, selecting an auditor, and interviewing and

signing off on a CFO candidate.  *Id.* ¶ 107.  Plaintiffs allege that Wey dictated when 6D

personnel could sell their stock and would direct them to sell stock to his friends, that he selected

counsel and gave instructions relating to ongoing litigation, that he was responsible for the

company's capital markets strategy and activity, and that he controlled the company's

acquisition strategy, among other things.  *Id.* ¶¶ 107–10, 115, 117.  They also claim the he

manipulated the company's stock.  *Id.* ¶ 127.  And Plaintiffs further allege that Wey reviewed

and provided comments on 6D's SEC filings before they were filed.  *Id.* ¶ 107.

   Plaintiffs point to communications among 6D executives that specifically contemplated

Wey's financial interests and role as a shareholder, admitted that Wey had influence over the

company, and that referred interchangeably to NYGG-Asia and Wey as the holder of the 45%

interest in 6D's stock.  *See, e.g.*, *id.* ¶¶ 13, 115, 126–28.  At a meeting with Discover Growth

Fund, a large investor of 6D, both Kang and Wey acknowledged Wey's role.  *Id.* ¶¶ 127–28.

   On September 10, 2015, the United States Department of Justice and the SEC announced

that they had indicted and sued, respectively, Wey and some of his associates for securities fraud,

including in connection with CleanTech.  The SEC complaint and DOJ indictment, and the

accompanying press releases, revealed that NYGG-Asia was a Wey nominee, and that Wey—not

Li, as had been claimed—was 6D's controlling shareholder. *Id.* ¶ 164.  Shortly thereafter, the

NASDAQ stopped trading in 6D's stock, after discovering that Wey held NYGG-Asia's 6D shares. *Id.* ¶¶ 164–67.

While auditing 6D's 2015 financial statements, BDO USA LLP ("BDO") assessed whether Wey's influence over 6D violated its internal controls. BDO eventually determined that Wey and Kang had disobeyed the Board's explicit instructions by issuing stock options to NYGG employees, and that Kang had repeatedly lied to 6D's Board, and to internal investigators, about Wey's role in the company. *Id.* ¶ 15. BDO told the Board that it could no longer rely on Kang's representations, and it, along with 6D's committee chair, resigned and made its findings public. *Id.*

Trading of 6D's stock resumed in March 2016. The stock price fell from $2.90 to $1.00 on the first day and to $0.21 over the next three trading days. *Id.* ¶ 172.

**B. Procedural Background**

This case has a long procedural history. As already stated, the Second Amended Complaint was filed on April 4, 2016. On August 19, 2016, Defendants 6D Global Technologies, Inc., Tejune Kang, Terry Mcewen, and Mark Szynkowski (collectively, the "6D Defendants") moved to dismiss the Second Amended Complaint against them. Dkt. No. 111. District Judge Robert W. Sweet granted their motion to dismiss on March 6, 2017. *See* Dkt. No. 121; *Puddu v. 6D Glob. Techs., Inc.*, 239 F. Supp. 3d 694 (S.D.N.Y. 2017), *vacated in part*, 742 F. App'x 553 (2d Cir. 2018). On August 2, 2018, the Second Circuit vacated in part the dismissal. *See Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553 (2d Cir. 2018). In its summary order, the Second Circuit determined that the Second Amended Complaint adequately pled that Wey beneficially owned NYGG-Asia's 6D shares through his "near-complete" control of NYGG-Asia, that Wey was treated by 6D executives "as a powerful shareholder of 6D," and

that the failure to disclose Wey's involvement was materially misleading, among other things. *Id.* at 553–55.

Through it all, however, Wey had not yet appeared in this litigation. Wey was served the original Complaint on January 16, 2016, by leaving the original Complaint and summons with the doorman of his building and mailing copies of both documents to him at the same address. *See* Dkt. No. 94. Plaintiffs mailed Wey copies of the Amended and Second Amended Complaints and filed affirmations of service on the docket. *See* Dkt. Nos. 148, 153. On April 29, 2019, Plaintiffs requested that the Clerk of Court enter a default against Wey, *see* Dkt. No. 157, and on April 30, 2019, the Clerk of Court entered a certificate of default against him, *see* Dkt. No. 161.

On June 13, 2019, Wey's counsel entered a notice of appearance and filed a motion to dismiss the claims alleged in the Second Amended Complaint and strike portions thereof. *See* Dkt. Nos. 166, 167. On June 14, 2019, this Court directed the Clerk of Court to terminate that motion in light of the default that had previously been entered against Wey and ordered the parties to meet and confer regarding a proposed briefing schedule for any intended motion to vacate the default. *See* Dkt. No. 174. On June 24, 2019, the Court set a briefing schedule for Wey's motion to vacate the default pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. *See* Dkt. No. 184. On May 31, 2020, the Court granted Wey's motion to vacate the default. *See* Dkt. No. 213.

Wey filed the present motion to dismiss and motion to strike on June 22, 2020, Dkt. No. 218, and the motion is fully briefed. Dkt. Nos. 225, 226.

## II.    LEGAL STANDARD

On a motion to dismiss under Rule 12(b)(6), a court must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)). Nonetheless, the court should not accept legal conclusions as true; "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim achieves "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While plausibility is "not akin to a 'probability requirement,' [] it asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, and if plaintiffs cannot "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed," *Twombly*, 550 U.S. at 570. "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

Plaintiffs' claims under Section 10(b), meanwhile, must satisfy the requirements of Federal Rule of Civil Procedure 9(b), which requires a party alleging fraud to "state with particularity the circumstances constituting fraud." In addition, "the Private Securities Litigation Reform Act ('PSLRA') requires a complaint to 'specify each statement [or omission] alleged to have been misleading, the reason or reasons why the statement [or omission] is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state

with particularity all facts on which that belief is formed.'" *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 725 (S.D.N.Y. 2015) (alterations in original) (quoting 15 U.S.C. § 78u-4(b)(1)). Notwithstanding this, "[courts] do not require pleading of detailed evidentiary matters." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

Along with the facts pleaded in the Amended Complaint, which the Court assumes as true for the purposes of this motion, the Court may consider "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have been, filed with the SEC, and (4) facts of which judicial notice properly may be taken." *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 831 (S.D.N.Y. 2019) (citing *Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011)).

## III.    DISCUSSION

Wey first argues that the Second Amended Complaint fails to plead facts to support the Plaintiffs' theory that Wey was responsible for any misstatements or material omissions. *See* Dkt. No. 219 ("Def. Br.") at 11–14.  He also claims that Plaintiffs further failed to plead facts giving rise to a strong inference of scienter, as is required to state a securities fraud claim. *Id.* at 15–21.  Furthermore, he argues that Plaintiffs failed to adequately plead scheme liability with respect to Wey. *Id.* at 21–22.  And he claims that the Section 20(a) claim against him must be dismissed. *Id.* at 22–23.  Wey separately argues that the Second Amended Complaint should be dismissed against him because, according to him, Plaintiffs delayed in prosecuting the case against him. *Id.* at 23–24.

### A.  Section 10(b) claims

To state a claim under Section 10(b) of the Exchange Act and Rule 10b–5(b), "a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Indiana Pub. Ret. Sys. v. SAIC*, Inc., 818 F.3d 85, 93 (2d Cir. 2016).

"Section 10(b) makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." *Novak v. Kasaks,* 216 F.3d 300, 305 (2d Cir. 2000) (alterations in original) (quoting 15 U.S.C. § 78j(b)).  Rule 10b-5 specifies that this statute proscribes "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* at 305–06 (quoting 17 C.F.R. § 240.10b-5).

"[Section 10(b)] claims require that Plaintiff[s] plausibly allege 'a material misrepresentation or omission by the defendant[s].'" *In re Dynagas LNG Partners LP Sec. Litig.*, --- F. Supp. 3d ----, 2020 WL 6947521, at *8 (S.D.N.Y. Nov. 25, 2020) (citation omitted and alterations in original).  As is relevant here, two kinds of omissions can be actionable under this standard: first "a material omission in contravention of an affirmative legal disclosure obligation," and second "a material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., LP,* 634 F.3d 706, 715–16 (2d Cir. 2011).  To determine whether such an omission has occurred, the Court should consider "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach v. Chang,* 355 F.3d 164, 172 n.7 (2d Cir. 2004) (quoting *I.*

*Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)).  *See also Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 836 (S.D.N.Y. 2019).

Furthermore, a securities fraud claim for misrepresentations or omissions does not lie when the company "disclosed the very . . . risks about which [a plaintiff] claim[s] to have been misled." *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011); *see also Olkey v. Hyperion 1999 Term Tr., Inc.,* 98 F.3d 2, 4–5 (2d Cir. 1996) (affirming dismissal of federal securities claims when "[t]he prospectuses warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed"); *Dujardin v. Liberty Media Corp.,* 359 F. Supp. 2d 337, 350 (S.D.N.Y. 2005) (concluding that a plaintiff "failed to allege material misrepresentations or omissions sufficient to state a securities fraud claim" because the claim was "premised on facts that were adequately disclosed").  When evaluating whether a company provided sufficient disclosures, the Court should consider not only the disclosures the company makes, but also "information already in the public domain and facts known or reasonably available to the shareholders." *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (quoting *United Paperworkers Int'l Union v. Int'l Paper Co.,* 985 F.2d 1190, 1199 (2d Cir. 1993)). The overarching inquiry is whether "the 'total mix' of information made available" to investors sufficiently disclosed the purported risk.  *Id.* (citation omitted).

In addition, to state a claim under Section 10(b), plaintiffs must plead facts to establish scienter.  The standard to plead scienter under Section 10(b) is higher than the familiar plausibility standard.  *See In re Dynagas*, 2020 WL 6947521, at *8.  "To adequately plead scienter under § 10(b) and Rule 10b-5, a plaintiff must 'plead the factual basis which gives rise to a strong inference of fraudulent intent.'"  *In re BioScrip*, 95 F. Supp. 3d at 732 (quoting *IKB*

*Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 27 (2d Cir. 2014)).  This strong inference of

fraudulent intent can be established by alleging with sufficient particularity (i) "that defendants

had the motive and opportunity to commit fraud" or (ii) "strong circumstantial evidence of

conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v.*

*JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009).  This requires a "comparative

evaluation," in which a court "must consider not only inferences urged by the plaintiff . . . but

also competing inferences rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues*

*& Rights, Ltd.*, 551 U.S. 308, 314 (2007).  Accordingly, "an inference of scienter must be more

than merely plausible or reasonable—it must be cogent and at least as compelling as any

opposing inference of nonfraudulent intent." *Id.*  This inquiry is to be conducted holistically,

looking at "all the facts alleged, taken collectively." *Id.* at 323.  *See also In re Dynagas*, 2020

WL 6947521, at *8.

### 1. Plaintiffs have adequately pled that Wey is liable for material omissions or misstatements

The Court concludes that the allegations in the Second Amended Complaint suffice to

state a plausible claim against Wey.

*First*, Plaintiffs allege that Wey was required to file a Schedule 13D by October 15, 2014,

and that he failed to do so.  *See* SAC ¶ 146.  Section 13(d) of the Securities Exchange Act

requires "certain disclosures to be filed on a Schedule 13D by a person that acquires an interest

in more than 5% of certain classes of securities." *Amida Capital Mgmt. II, LLC v. Cereberus*

*Capital Mgmt., L.P.*, 669 F. Supp. 2d 430, 438 (S.D.N.Y. 2009) (citing 15 U.S.C. § 78m(d) and

17 C.F.R. § 240.13d–101).  Rule 13d-1, promulgated under Section 13(d) of the Exchange Act,

provides that any person who becomes "directly or indirectly the beneficial owner of more than

five percent of [a covered class of equity security] shall, within 10 days after the acquisition, file

with the Commission, a statement containing the information required by Schedule 13D." *See* 17 C.F.R. § 240.13d-1(a). As the Court of Appeals has noted, "Section 13(d)'s purpose is to alert investors to potential changes in corporate control so that they [can] properly evaluate the company in which they had invested or were investing." *United States v. Bilzerian*, 926 F.2d 1285, 1297 (2d Cir. 1991) (citation and quotation marks omitted) (alteration in original); *accord GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971) ("the purpose of section 13(d) is to alert the marketplace to large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control"). Thus, an intentional failure to disclose beneficial ownership information when disclosure was expressly required signals falsely to investors that there is no such ownership to disclose. At least at this juncture, the allegation that Wey was obligated to file the Schedule 13D—and opted not to do so—is enough to adequately plead a material omission for purposes of Plaintiffs' 10(b) claim. Wey argues that "no court in the Second Circuit has found an individual may be liable for securities fraud based on *failure to file* a Schedule 13D absent 'telltale sign[s] of deceptive conduct[.]'" Dkt. No. 226 ("Reply") at 6 n.7. He provides no authority to the contrary, however, and his reading runs against the proposition that "[a]s with any alleged 10b–5 violation, the touchstone is the existence of a duty to disclose." *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 491 (S.D.N.Y. 2009), *aff'd sub nom. Thesling v. Bioenvision, Inc.*, 374 F. App'x 141 (2d Cir. 2010). Because Plaintiffs plead sufficient facts at this juncture to support their contention that Wey had a duty to disclose, they have also plausibly established that Wey's failure to file a Schedule 13D was a material omission that can give rise to liability. In any event, the Second Amended Complaint also pleads facts alleging that Wey engaged in deceptive conduct and that his failure

to file the Schedule 13D was consistent with the other allegedly deceptive efforts to hide his

relationship to 6D.

Wey next argues that the failure to file the Schedule 13D was "immaterial" because

multiple news articles published before he was required to file the Schedule 13D had described

Wey's control over NYGG-Asia.  *See* Reply at 5–6; *see also* Def. Br. at 13–14.  Plaintiffs point

out that the argument sounds in a truth-on-the-market defense, a characterization that Wey does

not dispute.  *See* Dkt. No. 225 ("Pl. Opp. Br.") at 7–8; *see generally* Reply.  The truth-on-the-

market defense provides that "[a] defendant may rebut the presumption that its

misrepresentations have affected the market price of its stock by showing that the truth of the

matter was already known."  *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000).

But an omission or misstatement can be deemed immaterial only if "the corrective information"

that was "conveyed to the public" was done so "with a degree of intensity and credibility

sufficient to counter-balance effectively any misleading information created by the alleged

misstatements."  *Id.* (citation and internal quotation marks omitted).  At the motion to dismiss

stage, the truth-on-the-market defense is a heavy burden; "[t]he truth-on-the-market defense is

intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for

failure to plead materiality."  *Id.*

The allegations in the Second Amended Complaint are sufficient to counter Wey's truth-

on-the-market defense at this juncture.  Among other things, it is far from clear that several

isolated news articles published before the start of the Class Period sufficed to "counter-balance"

the misrepresentation that was effected by Wey's failure to file the Schedule 13D.  Moreover, the

Plaintiffs allege that, on multiple occasions, Wey denied ownership of NYGG-Asia.  *See* SAC ¶¶

80–84.  Those representations plausibly distorted the information available on the market,

despite the existence of the news articles on which Wey relies.  On this record, "it cannot be said that no reasonable investor could have been misled" by the failure to file a Schedule 13D.  *See Ganino*, 228 F.3d at 168.  Plaintiffs are entitled to have all reasonable inferences drawn in their favor.

Wey's attempts to rely on the truth-on-the-market defense based on the existence of several news articles that spoke to Wey's relationship with NYGG and NYGG-Asia do not provide any adequate basis for dismissal.  Plaintiffs allege that Wey, along with the other Defendants, publicly denied the information that Wey owned or otherwise controlled NYGG-Asia and expressly downplayed Wey's relationship to the company.  *See* SAC ¶¶ 80–81, 83–84. In the cases that Wey cites, though, the courts deemed relevant that the defendants had not made any materially misleading statements.  *See, e.g.*, *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 577 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).  Plaintiffs' allegations that Wey expressly distorted the information in the public sphere inform the overall fact-intensive inquiry regarding whether a reasonable investor "could have been misled" by the failure to file a Schedule 13D.  Even assuming *arguendo* that a reasonable investor would have been aware of those news articles, the Court concludes that Plaintiffs are entitled to the reasonable inference that the allegations that Wey further sought to discredit the allegedly truthful information contained in those articles perverted the "corrective information" that was contained in those articles by undermining their reliability.  *Ganino*, 228 F.3d at 167.  This factual context renders plausible Plaintiffs' contention that the failure to file a Schedule 13D was misleading even if several news articles over the years discussed Wey's relationship to NYGG-Asia.

*Second*, the Court concludes that Plaintiffs have established a plausible inference that Wey was the "maker" of the misleading statements and omissions that were contained in 6D's official forms and statements.  The Second Circuit has already held that Plaintiffs have adequately pled that the allegations in the Complaint "permit the inference that Wey had the power to direct the voting and/or disposition (i.e., that he was a 'beneficial owner') of NYGG-Asia's shares in 6D."  *Puddu*, 742 F. App'x at 556.  And it thus determined that 6D's failure to disclose this information pursuant to SEC regulations (including 17 C.F.R. § 229.403(a)) was sufficient to establish a material misstatement or omission as to the 6D Defendants.  *Id.* at 555–56.  That alone does not resolve the issue presented in this motion, however, for the Second Circuit did not expressly link Wey to the statements themselves.  However, the Court concludes that allegations in the Second Amended Complaint plausibly lend themselves to such an inference.

"For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142–143 (2011).  In the ordinary case, the Supreme Court explained, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed."  *Id.*  But in singling out "ordinary case[s]," the Court implicitly recognized that the analysis extends beyond the narrower grounds of attribution.  *Id*.  Furthermore, nothing in *Janus* implies that "there can be only one 'maker' of a statement in the case of express or implicit attribution." *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 n.9 (S.D.N.Y. 2011).  "Whether a defendant is the 'maker' of the misstatement may depend on inferential or circumstantial evidence."  *In re*

*Weight Watchers Int'l Inc. Sec. Litig.*, No. 19-CV-2005 (WHP), 2020 WL 7029134, at *22 (S.D.N.Y. Nov. 30, 2020).

At this juncture, Plaintiffs have plausibly alleged that Wey was the "ultimate authority," or at least *an* ultimate authority, in determining what 6D included and did not include in its forms. As already noted, the Plaintiffs allege that Wey reviewed SEC filings, provided instructions on what to include and not include, and participated in conference calls concerning the preparation of 6D's 10-Ks and 10-Qs. *See* SAC ¶ 107. Moreover, they include specific allegations that, as a more general matter, Wey's involvement in the day-to-day activities at 6D was so extensive that 6D's executives, including Kang, both saw and acknowledged Wey as their superior. *Id.* ¶¶ 10, 127. Drawing all reasonable inferences in Plaintiffs' favor, these facts collectively support a plausible inference that Wey was the "ultimate authority" in deciding what to include in the forms.

*Third*, the allegations in the Second Amended Complaint also support Wey's liability for other misstatements and misrepresentations on the basis of the "group pleading doctrine." That doctrine provides that "group-published" documents, including "statements in prospectuses, registration statements, annual reports, [and] press releases," can be deemed attributable to "individuals with direct involvement in the everyday business of the company."[1] *DeAngelis v. Corzine,* 17 F. Supp. 3d 270, 280–82 (S.D.N.Y. 2014) (quoting *In re BISYS Sec. Litig.,* 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005)); *see also City of Pontiac Gen. Empls.' Ret. Sys. v. Lockheed Martin Corp.,* 875 F. Supp. 2d 359, 373 (S.D.N.Y.2012). This applies to individuals "who either

---

[1] Courts have noted that the "group pleading doctrine" applies to written statements but not to oral statements. *See, e.g.*, *Levy v. Maggiore*, 48 F. Supp. 3d 428, 448–49 (E.D.N.Y. 2014); *see also Camofi Master LDC v. Riptide Worldwide, Inc.,* No. 10–CV–4020, 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011).

were *or acted like* a corporate insider." *Levy v. Maggiore*, 48 F. Supp. 3d 428, 449 (E.D.N.Y. 2014) (emphasis added). The doctrine "does not permit plaintiffs to presume the state of mind of the defendants at the time the alleged misstatements were made." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 530 (S.D.N.Y. 2010); *see also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004). Some courts have determined that the "group pleading doctrine" did not survive the enactment of the PSLRA and the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). *See Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 9 (2d Cir. 2020) (noting that some courts have held that the group pleading doctrine is no longer viable but declining to reach the question). As Plaintiffs argue, however, there appear to be two separate doctrines that are identified as the "group pleading doctrine." *See* Pl. Opp. Br. at 11 n.6. Supporting this reading is the fact that, post-*Janus*, the Second Circuit reaffirmed that "[w]here a plural author is implied by the nature of the representations—for instance, where, as here, (1) the alleged fraud is based on statements made in the offering materials and (2) the complaint gives grounds for attributing the statements to the group—group pleading may satisfy the source identification required by Rule 9(b)." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 173 (2d Cir. 2015). That iteration of the group pleading doctrine is consistent with what Plaintiffs assert here.

Plaintiffs allege that Wey was heavily involved with the daily operations of 6D, and that he acted as a corporate insider. They allege many facts in support of their theory: they allege that Wey had primary responsibility for securing 6D's financing; that Wey was involved in laying out the company's capital markets strategy; that Wey demanded that 6D change its auditor; that Wey was involved in interviewing and selecting executives, including the CFO; that Wey instructed Kang to create and implement a specific document destruction policy; that Wey

managed several operational matters for 6D, including one incident where a marketing meeting was rescheduled because Wey could not attend; that Wey selected 6D's counsel, and that until September 2015, 6D was represented in litigation matters by one of Wey's lawyers; that Wey was cc'd on correspondence between 6D executives and the company's lawyers; that Wey regularly visited 6D's offices; and that Wey was regularly provided material non-public information.  *See* SAC ¶¶ 107(a)–107(k).

Perhaps most importantly, Plaintiffs also allege that Wey was personally involved in reviewing 6D's SEC filings before they were filed, and that he would provide instructions and that he attended and participated in conference calls concerning preparation of the company's 10-Ks and 10-Qs.  *Id.* ¶ 107(g).  Drawing all reasonable inferences in Plaintiffs' favor, these facts establish at least a plausible inference that Wey was "directly involved in the everyday business of the company," *DeAngelis*, 17 F. Supp. 3d at 282, and that he "acted like a corporate insider," *Levy*, 48 F. Supp. 3d at 449.

Wey describes the Plaintiffs' theory as "novel" on the basis that it posits that "an individual who is neither an employee nor a director may be liable for securities fraud based on misstatements or omissions in a company's public filings."  *See* Reply at 4.  And he emphasizes that the Plaintiffs cite no cases that support such a theory.  But none of the cases on which Plaintiffs rely state that an official position within the organization is a *prerequisite* to the group pleading doctrine.  On the contrary, the language in those cases support a functional analysis that looks to an individual's actual role within an organization and not just their official position.  In *ICD Capital, LLC v. CodeSmart Holdings, Inc.*, the district court took the position that "an individual's title does not mechanically establish a special relationship between that corporate insider and an outside entity."  *ICD Cap., LLC v. CodeSmart Holdings, Inc.*, No. 14-CV-8355

(JFK), 2020 WL 815733, at *5 (S.D.N.Y. Feb. 19, 2020).  Rather than supporting the theory that

an official title is a prerequisite, however, that court's reasoning supports the more logical

conclusion that what matters is what the individual *does* within an organization and not just what

his title is.  And within the context of this more functional test, Plaintiffs' allegations that 6D's

executives *acknowledged* Wey's role in the company, going so far as to admit that they "work

for" him, further support the proposition that Wey was a corporate insider, regardless of his

official title in the company.

Furthermore, Wey's role in allegedly reviewing SEC filings, providing instructions, and

participating in conference calls concerning preparation of 6D's 10-Ks and 10-Qs are specific,

non-conclusory allegations that support Plaintiffs' theory that Wey "*was involved* in the

development of the misleading document[s]"—the kinds of allegations that were not present in

*ICD Capital, LLC.  Id.*  At this stage, Plaintiffs have adequately pled sufficient facts to be

entitled to the reasonable inference that Wey's role within 6D amounted to that of a corporate

insider, and as such that Wey may be held liable for 6D's materially misleading misstatements

and omissions on official forms that required the company to disclose that Wey was a beneficial

owner.  *See* SAC ¶¶ 133–159.

### 2.  Plaintiffs have adequately pled scheme liability

The Court also concludes that Plaintiffs have sufficiently alleged scheme liability.  In

order to state a claim for scheme liability under Rule 10b5–(c), a complaint must include an

"allegation that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of

the alleged scheme to defraud, (3) [with] scienter, and (4) reliance."  *See Sec. & Exch. Comm'n*

*v. Lee*, 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010) (internal quotation marks omitted).  Such

allegations are also subject to the heightened pleading requirements of Rule 9(b). *See United States Sec. & Exch. Comm'n v. Wey*, 246 F. Supp. 3d 894, 915–16 (S.D.N.Y. 2017).

The Second Circuit held in 2005 that "where the sole basis for [market manipulation claims under Rule 10b5–(a) and 10b5–(c)] is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under [Rule 10b–5(c)]. . . ." *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161, 177 (2d Cir. 2005). Following that decision, however, the Supreme Court recently held that the "dissemination of false or misleading statements with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5," and that even a disseminator who did not "make" the misstatements as defined by *Janus* can be held liable as a primary violator. *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1100–01 (2019); *see also Sec. & Exch. Comm'n v. Fiore*, 416 F. Supp. 3d 306, 320 (S.D.N.Y. 2019).

The parties dispute whether *Lorenzo* extends to this case. Wey claims that *Lorenzo* does not extend to this case because Wey is not alleged to have disseminated any false or misleading statements. *See* Def. Br. at 21; Reply at 8–9. Plaintiffs insist that *Lorenzo* "is not distinguishable," but the claim proves illusory, for grounds for distinction exist. There, the Supreme Court explained that the question before it was "whether those who do not 'make' statements . . . but who disseminate false or misleading statements . . . can be found to have violated" Rule 10b5–(a) and Rule 10b5–(c). *Lorenzo*, 139 S. Ct. at 1099.

The question, then, is whether *Lorenzo*'s language can be read to stretch scheme liability to cases in which plaintiffs are specifically alleging that the defendant *did* "make" misleading statements (or omissions) as prohibited in Rule 10b5–(b). Courts are split on this issue. Some courts have read *Lorenzo* broadly, insisting that "[r]ather than positing a fine distinction between 'making' statements and 'disseminating' them, *Lorenzo* effectively abrogated the line of cases on

which defendants rely and permits liability under Rule 10b-5(a) and (c) for both making and disseminating misleading statements—despite some resulting redundancy with Rule 10b–5(b)." *United States Sec. & Exch. Comm'n v. Kameli*, No. 17-CV-4686, 2020 WL 2542154, at *14 (N.D. Ill. May 19, 2020).  That same court then said that after *Lorenzo*, scheme liability claims "may be based on misrepresentations and omissions."  *Id.*  Other courts, meanwhile, have read *Lorenzo* narrowly, insisting that *Lorenzo* merely extends scheme liability to those who "disseminate false or misleading statements" but that it does not hold that "misstatements alone are sufficient to trigger scheme liability."  *Sec. & Exch. Comm'n v. Rio Tinto PLC*, No. 17-CV-7994 (AT) (DCF), 2021 WL 818745, at *2 (S.D.N.Y. Mar. 3, 2021).

Even the Supreme Court was uncertain about *Lorenzo*'s reach, observing that the provisions of Rule 10b–5 "capture a wide range of conduct," that "[a]pplying them may present difficult problems of scope in borderline cases," and that "[p]urpose, precedent, and circumstance could lead to narrowing their reach in other contexts."  *Lorenzo*, 139 S. Ct. at 1101. But the opinion provides some guidance.  The Court observed that "this Court and the Commission have long recognized considerable overlap among the subsections of the Rule and related provisions of the securities laws."  *Id.* at 1102.  And it noted that "'[e]ach succeeding prohibition' was . . . 'meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections.'"  *Id.* (citing *United States v. Naftalin*, 441 U.S. 768, 774 (1979)).  It further observed that "[w]e have found 'no warrant for narrowing alternative provisions . . . adopted with the purpose of affording added safeguards.'"  *Id.* (citing *Naftalin*, 441 U.S. at 774 (cleaned up)).  It also noted approvingly that "since its earliest days, the [S.E.C.] has not viewed these provisions as mutually exclusive."  *Id.*

In line with the reasoning in *Lorenzo*, the Court sees no basis to conclude that a plaintiff may not establish, in a scheme liability claim, the existence of a "manipulative or deceptive act" by pointing to alleged misrepresentations or omissions.  Nor is this interpretation inconsistent with the surplusage canon, for "[a]s long as *some* misstatements (or omissions) covered by subsection (b) remain outside the grasp of scheme liability under subsections (a) and (c), however—and some clearly do—there is no surplusage in the language of the regulation." *S.E.C. v. Familant*, 910 F. Supp. 2d 83, 95 (D.D.C. 2012).  A claim brought under subsection (c) would have to establish different elements than one brought under subsection (b), including, notably, the existence of an alleged scheme to defraud.

Wey does not move to dismiss Plaintiffs' scheme liability claim as to any of the other elements, and the Court has already concluded that Plaintiffs have plausibly alleged the existence of alleged misstatements and omissions.  Accordingly, the motion to dismiss is DENIED as to this claim.

### 3. Plaintiffs have adequately pled scienter

Wey next argues that Plaintiffs have failed to plead facts to support a finding of scienter.  As already noted, to adequately plead scienter under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *see also Puddu*, 742 F. App'x at 556.  The dispositive question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323 (2007).  This strong inference of fraudulent intent can be established by alleging with sufficient particularity (i) "that defendants had the motive and opportunity to commit fraud" or (ii) "strong circumstantial evidence of

conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009).  Scienter claims may be assessed "holistically" when assessing whether a strong inference of fraudulent intent has been established.  *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 213 n.11 (2d Cir. 2020); *see also In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17-CV-1954 (PAC), 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018) ("[E]ven if the allegations of motive were weak, they can still support a strong inference of scienter when they are accompanied by 'extensive allegations of circumstantial evidence of recklessness and misconduct that strongly buttress the motive alleged.'" (citing *In re Silvercorp Metals, Inc. Sec. Litig*, 26 F. Supp. 3d 266, 275 (S.D.N.Y. 2014))).  Scienter must be pleaded as to each individual defendant.

Plaintiffs have pleaded sufficient facts to establish a strong inference of scienter.  They first argue that Wey had both motive and opportunity to commit the alleged fraud.  *See* Pl. Opp. Br. at 16–17.  Motive can be "shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures; opportunity could be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged."  *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015) (citing *S. Cherry St., LLC v. Hennessee Grp. LLC,* 573 F.3d 98, 108 (2d Cir. 2009)).  Plaintiffs need not show that the fraud succeeded, but they must show that the false materially misleading statements, or material omissions, "reasonably could have been expected" to result in a benefit.  *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993).

The Second Amended Complaint contains allegations that Wey repeatedly employed a strategy of "(1) covertly acquir[ing] large stock interests in U.S-listed shell companies; (2)

caus[ing] the companies to list on major U.S. exchanges, artificially inflating trading prices through stock manipulation; and (3) covertly sell[ing] his shares at a profit; while (4) supplementing his income by causing the Chinese companies to pay him investment banking fees," and it alleges that "Wey's scheme required that he exercise control over the companies and that "he and the companies conceal Wey's involvement from the public."  SAC ¶ 46.  The Plaintiffs also point to prior instances, including his involvement with CleanTech, that paralleled this general scheme.  *See* SAC ¶¶ 3, 47–85.  And they allege that through this scheme, Wey made over $70 million.  SAC ¶ 3.  The Plaintiffs also plausibly establish that concealing Wey's involvement was critical due to Wey's notoriety, including prior run-ins with the NASDAQ that would complicate the road toward getting 6D listed on major exchanges.  *See* SAC ¶¶ 99–105; 173–181.  These allegations plausibly establish a motive to commit the fraud alleged in the Second Amended Complaint.

The Second Amended Complaint also plausibly alleges opportunity, both in its description of Wey's maneuvering in the early creation of 6D, including an allegation that Wey admitted to Discover Growth Fund's broker that Wey "controlled 6D's public trading and recent price movements had been caused by Wey's manipulation."  SAC ¶ 127.  Plaintiffs also allege that Wey successfully completed the first three parts of the alleged scheme—he successfully hid his involvement, he caused 6D's shares to be listed on the NASDAQ, and he successfully manipulated movements in 6D's stock price—and was unable to complete the fourth part of the scheme only due to Wey's having been indicted (the criminal charges have since been dismissed).  These allegations establish a plausible inference that Wey had an *opportunity* to effect the fraud alleged in the Second Amended Complaint.

**B.  Section 20(a) claim**

Wey also seeks to dismiss Plaintiffs' Section 20(a) claim against him.  Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "To make out a prima facie case under § 20(a) of the Exchange Act, a plaintiff 'must show a primary violation [here, the alleged Rule 10b–5 violations] by the controlled person . . . and control of the primary violator by the targeted defendant [], and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *Ganino*, 228 F.3d at 170 (quoting *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1472 (2d Cir. 1996)).

The Second Circuit has already found that Plaintiffs plausibly alleged that the controlled persons, including 6D executives, violated § 10(b).  *See Puddu*, 742 F. App'x at 556. Furthermore, as already noted, the Second Amended Complaint contains considerable factual allegations to support that Wey had "control" of the 6D executives and that he influenced many aspects of 6D's operations.  *See, e.g.*, SAC ¶ 107.  It also pleads that Kang, 6D's CEO, admitted in private that he works for Wey, along with allegations that Wey himself asserted that he controlled 6D.  *Id.* ¶ 10, 127.  And, as explained above, the Second Amended Complaint also plausibly establishes that Wey was "in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person[s]." *Ganino*, 228 F.3d at 170 (quoting *First Jersey Sec., Inc.,* 101 F.3d at 1472).  Drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that the Plaintiffs have sufficiently alleged Wey's control and that they have plausibly alleged facts to support their 20(a) claim.

**C.  Wey no longer asserts a failure to plead reliance or "in connection with" elements**

In his brief in support of the motion to dismiss, Wey asserted that Plaintiffs failed to allege reliance or that they failed to purchase securities in connection with Wey's alleged omissions.  *See* Def. Br. at 14–15.  After that brief was filed, however, Plaintiffs and Wey filed a Stipulation Notice of Errata which attached Plaintiffs' PSLRA certifications which were inadvertently left out of the Second Amended Complaint when it was filed and which addressed Wey's arguments that the Complaint did not allege certain Plaintiffs' dates of purchase.  *See* Dkt. No. 222.  In his reply, Wey agreed that he no longer asserts a failure to plead reliance or "in connection with" elements.  *See* Reply at 3 n.4.  Thus, the motion to dismiss on this point is denied.

**D.  Wey's motion to strike is denied**

Wey also requests that the Court strike portions of the Amended Complaint. Under Rule 12(f), a court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  Such motions "are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation."  *Lennon v. Seaman*, 63 F. Supp. 2d 428, 446 (S.D.N.Y. 1999).  The Second Circuit has admonished that "courts should not tamper with the pleadings unless there is a strong reason for so doing."  *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).  No such strong reason exists here, and the motion to strike is denied.

Wey seeks to strike references to the federal criminal indictment that was subsequently dismissed; allegations in the companion SEC enforcement action that was also dismissed; the Amended Complaint's references to Wey's alleged improprieties, including a sexual harassment civil lawsuit that was eventually voluntarily dismissed; allegations regarding Wey's behavior as it relates to the delisting of CleanTech and references to that company's lawsuit against the NASDAQ; and allegations relating to Discover Growth Fund's litigation against 6D.  *See* Def. Br. at 5–6.

All of these allegations are potentially relevant to a number of issues that are material to this litigation, including, most notably, the possible reasons why Wey allegedly deemed it necessary to conceal his involvement. The notoriety that Plaintiffs allege flows directly to the reasons why Wey, along with 6D, would be concerned that investors would recoil were they to learn that Wey was involved. Those allegations are relevant to Plaintiffs' scienter argument. Furthermore, Wey fails to establish that references to unadjudicated allegations made in the course of since-dismissed litigation are irrelevant. "It makes little sense to say that information from such a study—which the [SAC] could unquestionably rely on if it were mentioned in a news clipping or public testimony—is immaterial simply because it is conveyed in an unadjudicated complaint. The other complaints on which the [SAC] relies are of a similar character." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 414 (S.D.N.Y. 2020) ("Courts in this District have made clear that there is no 'bright-line rule prohibiting citations to allegations from other proceedings.'" (citing *Hirsch v. Complex Media, Inc.*, No. 18-CV-5488 (CM), 2018 WL 6985227, at *10 (S.D.N.Y. Dec. 10, 2018))). The factual allegations in those since-dismissed cases are potentially relevant to the alleged conduct at issue here. Indeed, in its opinion in this case, the Second Circuit specifically cited the factual allegations contained in the SEC Complaint that Wey now seeks to strike. *See Puddu*, 742 F. App'x at 556.

The motion to strike those parts of the Second Amended Complaint is thus DENIED.

## E.  Wey's motion to dismiss for failure to prosecute is denied

Wey also requests that the Court dismiss the Second Amended Complaint under Federal Rule 41(b), on the basis of "Plaintiffs' protracted delay in prosecuting it." Def. Br. at 23. He bases his request on the theory that while he was served with the original complaint on January

14, 2016, *see* Dkt. No. 92, he was not served the First Amended Complaint and Second Amended Complaint until three years later.  The motion to dismiss for failure to prosecute is denied, as well.

Dismissal for failure to prosecute is a "harsh remedy to be utilized only in extreme situations."  *Minnette v. Time Warner*, 997 F.2d 1023, 1027 (2d Cir. 1993) (citation omitted).  When faced with a motion to dismiss for failure to prosecute, courts typically consider whether: (1) plaintiffs' failure to prosecute caused a delay of significant duration; (2) plaintiffs were given notice that further delay would result in dismissal; (3) the defendant is likely to be prejudiced by further delay; (4) there is a need to alleviate court calendar congestion that outweighs the plaintiffs' right to an opportunity for a day in court; (5) there are lesser sanctions that are more appropriate.  *See St. Prix v. Sirus XM Satellite Radio*, No. 11-CV-1506 (CM) (KNF), 2014 WL 405812, at *2 (S.D.N.Y. Jan. 29, 2014) (citing *U.S. ex rel. Drake v. Norden Sys., Inc.*, 375 F.3d 248, 254 (2d Cir. 2004)).

None of these factors support dismissal for failure to prosecute.  *First*, Plaintiffs' failure to serve Wey with the First and Second Amended Complaint may have delayed the progress of this litigation by several years.  But Wey bears much of the responsibility for that delay; he had actual notice of the litigation, having been served the original Complaint, and he opted not to appear.  When vacating Wey's default, the Court noted that it was "a close call" whether his default had been willful, and that it "may have been careless or even grossly negligent for Wey . . . to sit by and await service of the pleadings having been made aware of the fact that he had been named as a Defendant in this action."  *Puddu v. 6D Glob. Techs., Inc.*, No. 15-CV-8061 (AJN), 2020 WL 2833852, at *4 (S.D.N.Y. May 31, 2020).  At a minimum, the first factor does not support the harsh remedy of dismissal for failure to prosecute.

*Second*, Plaintiffs were not given prior notice that failure to prosecute the action could result in dismissal.  Wey argues that his motion to dismiss was sufficient to place Plaintiffs on notice, citing to *Lopez v. Catholic Charities of Archdiocese of New York* for the proposition that "a motion pursuant to Rule 41(b) . . . provides the plaintiff with notice."  No. 00-CV-1247 (AGS), 2001 WL 50896, at *4 (S.D.N.Y. Jan. 22, 2001).  Of course, by the time Wey filed his Rule 41(b) motion, Plaintiffs had *already* served Wey with the FAC and SAC and were thus not failing to prosecute the action.  This factor, again, strongly counsels against dismissal.

*Third*, to the extent that Wey is prejudiced by any further delay, the Court notes again that he bears significant responsibility.  He had actual notice of the action as early as 2016.  And he failed to appear, despite being properly served, even before the Amended and Second Amended Complaint were filed.  While the Court ultimately determined that Wey's default was not willful, neither is the Court willing to countenance gamesmanship.

Wey does not address the fourth factor, and, in any event, the Court concludes that any need to alleviate the Court's calendar congestion does not outweigh the plaintiffs' right to an opportunity for a day in court.

As to the fifth factor, the Court need not consider whether lesser sanctions are more appropriate because it concludes that no sanctions are necessary or appropriate.

The motion is DENIED.

## F.  Conclusion

For the reasons stated above, Wey's motion to dismiss the Second Amended Complaint and strike portions thereof is DENIED.  This resolves Dkt. No. 218.

The Court will schedule a pre-trial conference by separate Order.

SO ORDERED.

Dated: March 30, 2021
       New York, New York

_____
        ALISON J. NATHAN
     United States District Judge