UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

    JOSEPH PUDDU, *et al.*,

        Plaintiffs,

                           15-cv-8061 (AJN)

-against-                      **JURY TRIAL DEMANDED**

6D GLOBAL TECHNOLOGIES, INC.,
BENJAMIN WEY, *et al.*,

        Defendants/Third-Party Plaintiff,

-against-

ADAM HARTUNG and BDO USA, LLP,
        Third-Party Defendants.

-------------------------------------------------------- X

### THIRD-PARTY COMPLAINT

Defendant/Third-Party Plaintiff Mr. Benjamin Wey by his attorneys, Warren A. Raiti, of Navarro

Attorneys at Law, as and for their complaint against the Third-Party Defendants, alleges, upon

information and belief as follows:

1. The factual statements herein are based upon actual knowledge, information and belief, or will have substantial evidentiary support after reasonable inquiry and further investigation or discovery:

### NATURE OF THE CASE

2. Plaintiffs Joseph Puddu and Mark Ghitis ("Plaintiffs"), on behalf of themselves and all others similarly situated, have filed an initial and amended complaints against Defendant Mr. Benjamin Wey (hereinafter "Mr. Wey"), 6D Global Technologies, Inc. (hereinafter "6D") and others, culminating in the Second Amended Complaint, a copy of which is attached hereto as Exhibit A (hereinafter the "SAC").

3. It is alleged that during the class period as defined in the SAC (hereinafter the "Class Period"), Plaintiffs were shareholders of 6D, which traded on the Nasdaq Stock Market, LLC (hereinafter "Nasdaq").

4. Plaintiffs allege, and Mr. Wey denies, that Mr. Wey engaged in a course of fraudulent and manipulative conduct in violation of the federal securities laws, that resulted in the halt and eventual delisting of 6D from Nasdaq.

5. Plaintiffs claim to have been damaged when 6D's securities were delisted from Nasdaq on April 1, 2016, and allege in the SAC that, upon delisting, Plaintiffs' stock dropped from a price of $2.90 to $0.21.

6. Defendant/Third-Party Plaintiff Mr. Wey denies all allegations of wrongdoing, or that any loss of value to the Plaintiffs was caused by any wrongful act or omission to act on his part, or on the part of any agent or natural or corporate related person, acting on his

behalf or subject to his control.

7. If any negligent or wrongful act or omission to act of Defendant/Third-Party Plaintiff Mr. Wey is found to have occurred in connection with the circumstances provided in the SAC, such negligence was not the direct or proximate cause of any damage or loss sustained by Plaintiff.

8. Upon information and belief, the delisting of 6D and any alleged consequential damage to Plaintiffs were caused by certain careless, negligent, and wrongful acts or omissions to act of Third-Party Defendants BDO USA, LLP ("BDO") and Adam Hartung ("Hartung") (collectively "Third-Party Defendants"), which acts or omissions to act occurred within the borders of the State of New York.

9. Upon information and belief, the Third-Party Defendants, themselves or by their agents, servants or employees acting within the scope of their employment or agency by 6D, acted negligently and in their own self-interest with regard to 6D, instead of in consonance with their fiduciary obligations and duties of loyalty in the midst of unproven and later dismissed allegations that formed the basis for the Complaint alleging Mr. Wey exercised control over the operations and management of 6D, as raised in various civil litigations against Mr. Wey, all of which have been withdrawn or dismissed, including claims brought by: (i) the U.S. Department of Justice ("DOJ"); (ii) the U.S. Securities and Exchange Commission ("SEC"), both in September 2015, and; (iii) a suit filed by Discover Growth Fund ("Discover") and dismissed by Judge Castel shortly thereafter wherein the Court held that: (1) "[t]he best that Discover was able to muster suggesting that Wei dominated 6D is circumstantial evidence in the form of disputed accounts of an August 18, 2015 meeting between the parties;" (2) "[t]he charge in the indictment and the

allegation in the SEC complaint [now both voluntarily withdrawn] are not evidence of the truth of the assertions therein;" (3) that "[t]he most [Discover] shows is that Wei was involved in some way with 6D and NYGG-Asia," and; (4) "that [the circumstance of the now withdrawn Indictment against Mr. Wey] does not establish that Wei dominated, controlled or used 6D, itself, for his personal ends." *See Discover Growth Fund v. 6D Global Technologies Inc.*, 2015 WL 6619971, at *7 (S.D.N.Y. 2015) (collectively the "Dismissed Allegations").

10. Third-Party Defendants breached their fiduciary duties to 6D and otherwise failed to adequately conduct themselves in their duties and obligations toward 6D with the same standard of care and loyalty ordinarily attendant to fiduciary based professional services in the case of BDO and its agents, and Chairpersons of public audit committees in the case of Adam Hartung, by intentionally, or at a minimum recklessly:

(a) in the case of Hartung and BDO, failing to undertake an objective or reasonable analysis of the financial operations and corporate governance of 6D in connection with BDO's review of the Dismissed Allegations and in lieu of selfish interests, in particular: (i) Hartung's desire to become CEO of 6D and pay himself a higher salary; (ii) BDO, by and through one or more of its individual agents' reciprocal intent, to receive additional fees and compensation by virtue of Hartung's power to grant such expansion of work and fees in his hopeful CEO role, and; (iii) in the case of both BDO and Hartung placing fear of reputational loss as a result of the Dismissed Allegations above the reasonable exercise of their duties to 6D;

(b) in the case of Hartung and BDO, colluding to utilize the threatened resignation of BDO and an impending deadline for 6D to file its Annual Report on SEC Form-

4

10K for the fiscal year ending 2015 (the "2015 10K") as a foil to forcibly effectuate the replacement of Tejune Kang as CEO of 6D (hereinafter "Mr. Kang") with Hartung;

(c) in the case of Hartung, deliberately inflating or providing misleading and confusing information to BDO relating to his purported knowledge of Mr. Wey's alleged (but non-existent) control over 6D, in an effort to discredit the veracity of its CEO, Mr. Kang, further opening a possible opportunity for Hartung to ascend to the position of CEO in his place. Upon information and belief, Mr. Hartung's representations to BDO concerning Mr. Kang and Mr. Wey's conduct were false, or otherwise calculated to lead a listener to the improper conclusion that Mr. Kang was not trustworthy and was under the control of Mr. Wey;

(d) in the case of BDO, refusing to conduct any further analysis or work on 6D's 2015 10K just days before the March 31, 2016 due date, which BDO knew: (i) could not be filed without BDO's approval, and; (ii) would immediately cause 6D to violate Nasdaq continued listing rules, effectively removing their ability to remain listed regardless of the outcome of 6D's then pending Nasdaq appeal;

(e) in the case of BDO, simultaneously retracting their approval of 6D's Annual Report on SEC Form-10K for the fiscal year ended 2014, thereby immediately rendering 6D unable to meet Nasdaq continued listing obligations, let alone prior to the deadline for the 2015 10K, which at the time was only days away;

(f) in the case of BDO, *after* demanding a Securities and Exchange Act, Section 10A investigation be conducted prior to opining on the financials for any future 10K filings, refusing without basis or explanation, apart from proverbially stating

"because we quit," to evaluate detailed independently available exculpatory evidence and highly reputable Section 10-A analysis, produced by Blank Rome, LLP, finding no basis in fact whatsoever for allegations that Mr. Wey "controlled 6D" and confirming the veracity and legitimacy of its shareholder base, both of which issues were pillars of the Dismissed Allegations BDO was using as a predicate to refuse 6D services on the eve of filing of its 2015 10K;

(g) in the case of BDO, fabricating or otherwise recklessly or negligently concluding that Mr. Kang acted dishonestly in connection with the Section 10A investigation conducted by Blank Rome, LLP, and causing the market at large and Nasdaq to improperly rely on that false or recklessly erroneous assertion, which directly contributed in material part to Nasdaq's determination to delist 6D and the harm to its stock price in the market at large as claimed by Plaintiffs in the SAC.

11. The foreseeable result of Hartung and BDO's conduct was that BDO and Hartung's relationship with Mr. Kang and 6D quickly deteriorated and led to an attempted coup of Mr. Kang in his role as CEO, in the form of a proposal to 6D's Board of Directors to terminate Mr. Kang. Upon information and belief, this effort was rejected (without even a *second* to carry the motion to a vote) by each of the other three members of 6D's Board, not including Mr. Kang. SAC at ¶170.

12. Upon information and belief, within 48 hours of the 6D Board decision not to replace Mr. Kang with Hartung, BDO abruptly terminated their relationship with 6D.

13. Having formally terminated their relationship with 6D, however, BDO continued to send missives to Mr. Kang in the week leading up to the due date for the 2015 10K, accusing him of not being a credible person and concluding that some illegal activities had

6

occurred at 6D, and recalling their audit opinion of the 10K for 6D in 2014, while at the same time acknowledging the existence of but refusing to even consider the Section 10A conclusions of Blank Rome, LLP. Upon information and belief, BDO had an affirmative obligation to 6D to complete its audit absent evidence of wrongdoing.

14. BDO's failure to even attempt to resolve its open questions concerning 6D in good-faith was a breach of its standard of care for a fiduciary auditor-client relationship with 6D, which required that BDO objectively complete a full review of all readily available information and have more than just a basis of third-party allegations to cease an audit relationship at such a critical time.

15. The direct result of BDO's resignation and retraction of its audit opinion going back two years to 2014, was that 6D was unable to timely file periodic reports, a failure which from the perspective of both institutional and private investors triggers a default reaction to "SELL" and constituted a superseding or at a minimum intervening factor with regard to the Plaintiffs' alleged losses, wholly independent from the impact of the Dismissed Allegations against Mr. Wey, and far more catastrophic from the perspective of an ordinary investor.

16. Therefore, Defendant Mr. Wey demands judgment jointly and severally against BDO USA, LLP and Mr. Adam Hartung for all or a portion of sums that may be adjudged against him in the Plaintiffs' favor, whether by full indemnification of any judgment or by virtue of contribution in such amount of damages as were directly or proximately caused by the Third-Party Defendants, and interceded or superseded any causation improperly attributed to Mr. Wey.

## JURISDICTION AND VENUE

17. This Court has jurisdiction pursuant to 28 U.S.C. § 1367(a) in that the claims of Mr. Wey are directly related to the claims within the original jurisdiction of this Court in the Second Amended Complaint as to form part of the same case or controversy.

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the substantial events giving rise to the claim occurred within the district.

## PARTIES

19. Plaintiffs: Joseph Puddu and Mark Ghitis, brought the underlying action forming the substance of the SAC. They purport to be individual investors who acquired securities of 6D Global Technologies, Inc. ("6D") during the alleged "Class Period" (as defined in the SAC). Dkt. Nos. 1 and 92.

20. Defendant/Third-Party Plaintiff Benjamin Wey: Defendant and Third-Party Plaintiff Benjamin Wey ("Mr. Wey") resides in New York City.  He was born in China in 1971 and attended college in the U.S. on scholarship, earning a Bachelor's degree in 1994 and a Master of Business Administration degree in 1999. In 2013, Mr. Wey was awarded a Master of Science degree from the Columbia Business School of Columbia University. He became a naturalized US citizen in 2001. Mr. Wey has spent more than 20 years in the international business consulting industry and has developed expertise in finance and international business consulting, crisis management, and corporate advisory in the U.S. and China.

21. Third-Party Defendant BDO: At all relevant times, Third-Party Defendant BDO USA, LLP ("BDO"), was a United States Member Firm of BDO International, a global

8

accounting network. BDO does business in a number of locations across the country, including New York City. BDO maintains a place of business at 100 Park Avenue, New York, NY 10017.

22. <u>Third-Party Defendant Hartung</u>: At all relevant times, Third-Party Defendant Adam Hartung ("Hartung") was a director of 6D Global, Chairman of the Audit Committee and a member of its Compensation, Governance and Nominating Committees. Upon information and belief, at all times relevant to the claims in this Complaint, Hartung resided in Chicago, Illinois and New York, New York.

23. <u>Relevant Defendant Tejune Kang</u>: Mr. Kang founded 6D in 2004, and is currently 6D's Chairman and CEO. Upon information and belief, Mr. Kang is a resident of New York.

24. <u>Relevant Defendant 6D</u>: 6D Global Technologies, Inc. ("6D"), is a corporation duly organized under the laws of the State of Delaware. Upon information and belief, 6D maintains a principal place of business located at 1500 Broadway, Suite 505, New York, New York, 10036.

25. <u>Relevant Non-Party Nasdaq</u>: Non-Party NASDAQ Stock Market LLC ("Nasdaq") is a registered national securities exchange providing listing, trading, and other financial products and services to companies around the world. Companies listed on Nasdaq are governed by Nasdaq's initial and continued listing standards, including Nasdaq Rules 5250(c)(1) requiring timely filing of all periodic statements, and Rule 5250(f) relating to the payment of Nasdaq listing fees.

## **PROCEDURAL HISTORY**

26. On October 13, 2015, Plaintiffs filed a Complaint alleging violations of Section 10(b) of

the Securities Exchange Act of 1934, and Rule 10b–5 promulgated thereunder by the

Securities and Exchange Commission, and Section 20(a) of the Exchange Act. The

Complaint has since been amended twice, and the Second Amended Complaint ("SAC")

was filed on April 4, 2016. Dkt. No. 107.

27. Defendants filed a Motion to Dismiss Plaintiffs' SAC on August 19, 2016. *See* Dkt. No.

112.  On March 6, 2017, Defendants' Motion to Dismiss was granted and the SAC was

dismissed with prejudice by Judge Robert W. Sweet. Dkt. No. 121.

28. Plaintiffs filed a Notice of Appeal to the dismissal of the SAC on April 3, 2017. *See* Dkt.

No. 123. On August 2, 2018, the previous judgment of the District Court was vacated in

part and the case remanded for further proceedings. Dkt. No. 125.

29. On June 22, 2020, Defendants sought to have the SAC dismissed and strike portions of

the Complaint, and thereby filed a Motion to Dismiss. Dkt. No. 218.

30. On March 30, 2021, Defendants' Motion to Dismiss the SAC and strike portions within

was denied by this Court. Dkt. No. 237.

31. On April 23, 2021 Mr. Wey through his attorneys filed his Answer to the SAC, along

with affirmative defenses, and a letter articulating concerns about the roles played by

BDO USA, LLP and Adam Hartung, questioning the factual basis of Plaintiffs'

allegations, and noting that Mr. Wey expected to file a Third-Party Complaint against

BDO USA, LLP and Adam Hartung. Dkt. Nos. 247-48.

## **SPECIFIC ALLEGATIONS**

32. This is a Third-Party Action in which Defendant/Third-Party Plaintiff Mr. Wey seeks

indemnification and contribution from Third-Party Defendants, Adam Hartung and BDO

USA, LLP, ("Hartung" and "BDO") for the claims asserted in the SAC. Defendant/Third-Party Plaintiff Wey strongly denies all claims asserted by Plaintiffs in the SAC, and vehemently denies committing any actions in violation of securities or other laws.

33. On or about the summer of 2014, Kang began interviewing different audit firms, including Grant Thornton and BDO. Kang's main concern in going public was to make sure that all financials and requirements by Nasdaq would be filed in a timely manner so that 6D would make an optimal impression on the market.

34. On or about the summer of 2014, Kang hired BDO because it appeared to be the best fit for 6D. BDO assured Kang that it would timely comply with all required filings.

35. Upon information and belief, during the same time period, Kang was compiling members for 6D's Board. The Board Kang assembled included Adam Hartung, who became the Chairman of 6D's audit committee.

36. On or about September 2014, the SEC approved the merger between 6D Global Technologies, Inc. (or its predecessor), a private technology company focused on the intersection of internet technology and marketing, and CleanTech Innovations, Inc., which was a company already listed on the Nasdaq, and whose prior bouts and victory over a Nasdaq delisting decision had been public knowledge (the "Merger").

37. On or about December 12, 2014, Nasdaq approved 6D for trading on Nasdaq as a successor entity to CleanTech. On that same day, 6D started trading on Nasdaq under the ticker: SIXD.

38. On or about September 10, 2015, the Dismissed Allegations were unsealed and filed,

respectively by the DOJ and SEC.

39. No government agency has ever made any allegation or brought any charges involving 6D or alleging that Mr. Wey exercised control over, or in any way acted improperly with regard to 6D, much less that he controlled the day-to-day business operations or corporate decision making of 6D. Those allegations were brought by Discover, copied by Plaintiffs, and dismissed by Judge Paul Castel. *Discover Growth Fund*, 2015 WL 6619971, at *7.

40. On or about that same day, September 10, 2015, Nasdaq halted the trading of 6D claiming that they had questions regarding 6D's shareholder base and that they would furnish 6D with a letter requesting certain information.

41. Upon information and belief, 6D received Nasdaq's letter. Among Nasdaq's concerns was 6D's relationship with Mr. Wey.

42. In addressing Nasdaq's concerns, 6D promptly severed ties with Mr. Wey. Kang, as CEO of 6D, also severed all ties with Mr. Wey.

43. In addition, upon information and belief, 6D asked NYGG Asia to sign a proxy vote and give up any right to vote independently. In doing so, 6D sought to neutralize a potential "bad actor" based on Nasdaq's concerns. In effect, 6D promptly did everything it was asked to demonstrate that it was an independent company from Mr. Wey.

44. On October 13, 2015, Plaintiffs in this action filed their initial complaint, mirroring the Dismissed Allegations.

45. On or about November 20, 2015, Nasdaq sent a delisting notice to 6D which expressly focused on two principal premises as a basis for issuing the notice of delisting determination:

(a) allegations that Mr. Wey or affiliates of Mr. Wey exerted significant influence over the Company, which upon information and belief, were drawn not from facts but from unfounded allegations contained in the original complaint filed by Plaintiffs in this action (the "Complaint");

(a) Mr. Wey or affiliates of Mr. Wey orchestrated a scheme to enable the Company to list its securities on Nasdaq by artificially inflating the Company's shareholder count and stock price in a manner similar to that alleged in the Dismissed Allegations.

46. 6D timely filed an appeal of the delisting, which stayed the effect of delisting until a final disposition by Nasdaq.

47. Upon information and belief, the depreciation of the value of 6D stock resulted not from information hitting the market about Mr. Wey or the shareholder ownership of 6D, but rather as the result of BDO causing 6D to miss the filing dates for its 2015 10K and without a reasonable basis to withdraw from its representation at the eleventh hour.

48. Upon information and belief, immediately after 6D received its first notice of delisting determination in November 2015, three of 6D's Board members resigned. Kang scrambled to find appropriate candidates to replace the outgoing Board members. He proposed 3 rounds of candidates that the Board rejected.

49. Frustrated and under pressure, Kang consulted Rob Matlin of K&L Gates about the situation. Matlin called the Board's nominating committee and advised them to accept or find new candidates within 30 days or be considered abandoning their position in violation of their fiduciary duty.

50. Upon information and belief, within 30 days 6D's nominating committee approved two new Board members: Peter Chrzaszcs and Michael Bannout.

51. Upon information and belief, as soon as Nasdaq delisted 6D, BDO expressly asked 6D to undergo a 10A investigation to evaluate the concerns raised by Nadsaq which mirrored those in the Dismissed Allegations and the initial complaint filed by Plaintiffs in this action. BDO stated that it would resign as the company's auditor if 6D refused to undergo the investigation.

52. Upon information and belief, Kang agreed to the 10A investigation and spoke to Hartung, the chairman of 6D's audit committee. Kang asserted that 6D had nothing to hide, that the investigation should take place, and that the investigation should prioritize its focus on Nasdaq's concerns in its delisting letter, specifically questions about 6D's shareholder base allegedly controlled by Mr. Wey.

53. Blank Rome, LLP was retained by the Audit Committee of 6D to conduct the 10A investigation in or around December of 2015.

54. In January 2016, 6D attended their appeal hearing before Nasdaq, and made their presentation to the independent board.

55. Upon information and belief, 6D intentionally did not ask Hartung to be part of the team. Kang had found Hartung's behavior suspicious and not consistent with the best interests of 6D or its many public shareholders, including Plaintiffs, who were relying on 6D's ability to address Nasdaq's concerns forthrightly and with evidentiary support.

56. That evidentiary support from a highly credible and independent third party would need to await the conclusion of Blank Rome's work.

57. Upon information and belief, in January 2016, at the Nasdaq appeal hearing, 6D made a strong presentation before Nasdaq. 6D argued that they had done everything to address Nasdaq's concerns, including: (i) severing ties with Wey; (ii) neutralizing NYGG Asia's vote; and (iii) articulating that Wey did not own or control any of 6D's shares or the company.

58. Upon information and belief, 6D argued that it had not done anything wrong and should be able to trade.

59. Nasdaq determined that it would wait and see what the 10A investigation would reveal. The implication was that if the 10A report was clean, 6D would begin trading again because there would be no reason for Nasdaq to deny 6D's request.

60. Upon information and belief: (a) during this time, Hartung proposed an overtly and overly broad scope for the 10A investigation; (b) Hartung told Kang that he wanted comprehensive computer forensics on every employee's laptop in the company; (c) Kang told him that it would be imprudent to do that because there were over 100 employees in the company, many at very low operational levels having no rational relationship to any management authority or decision making, and that such a broad scope would: (i) not address the scope of concerns raised by Nasdaq or shed light on any matters raised in the Dismissed Allegations and what (if any) impact that had on 6D, and (ii) cause unnecessary upheaval of ordinary operational staff who were critical to 6D's continued operations in the ordinary course of business.

61. Upon information and belief, Kang again reiterated that the investigation should focus on Nasdaq's concerns, especially in light of the upcoming January 2016 Nasdaq independent hearing panel for 6D's appeal of Nasdaq's delisting. Kang told Hartung and the rest of

the Board that it was crucial that the investigation be completed before the hearing date so that 6D would have all pertinent data points to present to Nasdaq, and be in the strongest position for their appeal.

62. Upon information and belief, Hartung tried to delay and sabotage the investigation and started to act in a more and more threatening manner in terms of his voice and body language towards Kang. Hartung accused Kang of trying to rush the investigation for improper purposes. Hartung continued to attempt to delay Blank Rome's investigation by expanding the scope or otherwise causing incidental delays. At the same time, Hartung began excluding other members of the audit committee and the Board generally from his communications with BDO.

63.  Exercising an almost restricted line of private communication with BDO, Hartung claimed to 6D and the Board that there was a lot of generally suspicious activity at 6D in the view of BDO and that BDO wanted a larger scope to the investigation. During this time Hartung was the primary and largely exclusive contact person between 6D and BDO, and continued to push to expand the scope of the investigation into matters that were not relevant to Nasdaq's concerns which related to the Dismissed Allegations.

64. Expansion of the investigation's scope beyond the points of Nasdaq's concern (namely those in the Dismissed Allegations and Plaintiffs' Complaint) slowed down the 10A process and Blank Rome's ability to complete the most obvious and critical aspects of the 10A investigation.

65. If 6D was permanently delisted, Kang told Hartung it would be on him because Hartung was trying to delay the investigation unnecessarily and sabotage their appeal with Nasdaq by preventing 6D from doing the work necessary to provably exculpate itself from any

even tenuous connection of 6D to the alleged wrongdoing in the Dismissed Allegations.

66. Upon information and belief, the investigation by Blank Rome included computer forensics on the officers and Board members of 6D, interviews with corporate employees, and extensive research on all of the company's shareholders. Blank Rome's investigation was completed in February 2016, and a copy of their conclusions are attached hereto as Exhibit B.

67. Blank Rome's investigation concluded with a positive report that provided more than sufficient support for BDO to complete and attest to the financials for the 2015 10K.

68. Specifically, after conducting an exhaustive investigation into whether Mr. Wey exercised any control or even undue influence over 6D: (i) **Blank Rome, LLP found no evidence** that the Company's current or former Board members were unduly influenced by Wey, including Mr. Kang; (ii) **Blank Rome, LLP found no evidence** of inflation of the Company's shareholder count to help it obtain the listing of the Company's securities on Nasdaq, and; (iii) **Blank Rome, LLP found no evidence** that Wey or anyone at the Company manipulated the Company's stock price.

69. Nevertheless, the completion of the 2015 10K and the inaction by BDO and Hartung dragged on. Upon information and belief, Kang had found Hartung's behavior strange and suspicious from the time 6D was halted on the Nasdaq. It did not become clear until months later that Hartung had been acting in his self-interest and in collusion with BDO.

70. Specifically, and upon information and belief, Hartung was financially struggling.

71. Upon information and belief, in an attempt to raise money to offset losses he suffered as the result of a failing oil well business that was driving Hartung toward insolvency,

Hartung, only a few months prior, had desperately attempted to verbally convince 6D's management to use nearly $1,000,000 in funds invested by shareholders in 6D, for the purchase of software owned by Hartung that had no benefit to 6D or its shareholders.

72. On or about the time period November 2015 – December 2016, Hartung had multiple calls and meetings with BDO. Kang became aware of this and reminded and reinforced to Hartung that he should include all members of the audit committee in these meetings because BDO worked for the audit committee and not for the Chairman alone. Hartung continued to exclude the members of the audit committee from the calls and meetings.

73. Upon information and belief, Kang reminded BDO that when they were hired, they had assured him that they would timely file the required 10Ks. On or about mid-March of 2016, Kang also reminded BDO that the 10K was due in two weeks and received indications from BDO that the 10K would be filed.

74. Upon information and belief, BDO was furnished with all required financials and 6D was waiting for their final 10K draft and BDO's exculpatory report. Kang asked 6D CFO Mark Szynkowski about the final draft. It became apparent that BDO was stalling. Synkowski told Kang that BDO was asking for nominal things there were immaterial to their 10K report.

75. Upon information and belief, on or about March 15, 2016, prior to 6D's annual Board meeting, Hartung invited Directors Chrzaszcs and Bannout to a private dinner. During the dinner, Hartung posed a question to Chrzaszcs and Bannout that surprised them. Hartung told them that he was thinking about asking Kang to resign, and that if Kang refused to do so, Hartung would resign himself and that they should as well.

76. Upon information and belief, Hartung also told them that he was considering asking the Board to pass a motion to fire Kang, and then asked Directors Chrzaszcs and Bannout if they would support the motion. The implication was that Hartung would take over as CEO if the motion was passed. Director Chrzaszcs then asked Hartung if he would relocate to New York from Chicago if the motion was successful, and Hartung replied that he could manage working remotely from Chicago.

77. Upon information and belief, Chrzaszcs and Bannout found Hartung's behavior suspicious and were not convinced by various attempts by Hartung to demonize Mr. Kang. In their capacity as Board members and to maintain neutrality, Chrzaszcs did not tell Kang about the dinner with Hartung until a week or two later, after the March 17, 2016 Board meeting.

78. Upon information and belief, by letter dated March 15, 2016, BDO informed Hartung as Chairman of the audit committee that it could not rely on the presentations of Kang due to alleged inconsistences in prior statements fabricated or recklessly claimed by BDO, and insisted that Kang resign as a condition of its continued representation of 6D. Hartung alerted the Board of the letter and the Board decided to meet on March 17, 2016 to discuss the matter.

79. It was an opportune moment for Hartung – 6D's situation was uncertain and he could attempt a coup to become CEO of a Nasdaq company. In addition, upon information and belief, Hartung's own personal oil company was in shambles and had filed for bankruptcy, resulting in great losses of money.

80. Kang became suspicious that Hartung and BDO were colluding because of the secret meetings between them. Hartung and BDO had at this time also made separate but

similarly timed threats to resign unless Kang resign. This raised Mr. Kang's suspicion of Hartung engaging in self-interested conduct toward 6D calculated for his own benefit and not in the best interests of 6D.

81. Upon information and belief, Hartung and BDO's communications and coordinated actions were either intentionally, recklessly, or negligently not conducted in furtherance of the best interests of 6D and its shareholders and breached their duties of loyalty to 6D.

82. Upon information and belief, as a direct or proximate result of BDO and Hartung's conduct as described above and hereinafter further alleged, 6D filed public notice on SEC Form 12b-25 that would have dealt a functionally irrecoverable death blow to the valuation (let alone demand) of any publicly traded company (the "Form NT").

83. The Form NT stated in no uncertain terms that: (i) not only was 6D going to inevitably report a "substantial net loss" due to a collection of over nine different independent factors, but; (2) *critically*, that it would not be able to timely file its required 2015 10K to explain its operational losses, or even tell investors when its ability to file the 2015 10K and disclose more information about its losses and 6D's operations in general would become available. (https://www.sec.gov/Archives/edgar/data/0001382219/000118518 516003916/sixdglobaltech-nt10k123115.htm).

84. The inability to timely file its 2015 10K immediately placed 6D in violation not just of its obligations under the Securities Act of 1933, which the market heavily relies on as a critical measure of trust, but in direct contravention to Nasdaq's continued listing requirements, placing the company in double jeopardy of delisting even if the conclusions of Blank Rome, LLP in the 10A investigation returned a positive result.

85. Up until the date of March 15, 2016, the reputation of 6D had only been marginally impacted at best by: (i) Nasdaq's public action of a temporary stock halt (which did not mention anything about the Dismissed Allegations) (https://ir.nasdaq.com/static-files/1c2dc665-90df-4da5-9e74-771c5c40e083); (ii) the now dismissed claims by Discover that were filed in federal court, and; (iii) various press releases by the always watchful but largely discounted credibility of repeat class action plaintiffs firms. Upon information and belief, apart from the trading halt, until March 15, 2016, 6D had experienced no material adverse business consequences from any of the Dismissed Allegations, which along with the claims in the SAC are broadly false and unsubstantiated in their own right.

86. Even the SEC, a plaintiff in its own civil action against Mr. Wey, approved the registration of a new series of 6D securities a week after those allegations were publicly filed in September 2015.

87. The impact of the Form NT on the market for 6D's securities was immediate and immensely negative as it was a public filing on the SEC's national EDGAR platform.

88. On or about March 17, 2016, at 6D's Board meeting, Kang refused the request to resign in the belief that it was not in the best interests of 6D or its shareholders. Hartung tried to pass the motion to fire Kang. The motion was not seconded. Hartung then told the Board he wanted to take a break and left the room to make a phone call. Upon information and belief, Hartung called BDO at that time.

89. Upon information and belief, after his phone call, Hartung returned to the Board meeting and asked whether he was still needed. Kang responded that Hartung's services were no longer required and Hartung left. The Board continued with the meeting.

90. Upon information and belief, on or about March 17, 2016, Hartung resigned from his position as a member of 6D's Board. BDO resigned from its position as auditor of 6D the same day, stating in sum and without surplusage that it resigned.

91. If there was any hope of a stable or increasing value for 6D's stock, it was completely wiped away by Hartung and BDO's actions, which served as the direct or proximate and, at a minimum, a superseding and intervening cause of Plaintiffs' losses.

92. Then, only a few days later, and after having resigned, BDO sent a second letter indicating that they would withdraw their financials for the 2014 10K and noting again that BDO resigned from its position as auditor of 6D.

93. On or about March 21, 2016, BDO sent a third letter of resignation to 6D outlining the reasons for their resignation, in particular calling into question Kang's credibility which were based on "inconsistent statements" allegedly made by Mr. Kang. BDO further stated that, as a result of those statements, it was unable to rely on the representations of Mr. Kang, and that it was withdrawing its approval for both 6D's 2014 and 2015 annual financial statements. Moreover, while BDO stated that it could review the 10A (which it had demanded be initiated months prior and plainly resolved all of Nasdaq's and their concerns), it was unwilling to do so.

94. Upon information and belief, the "inconsistent prior statements" alleged by BDO were not grounded in any actual inconsistency whatsoever and arose from BDO's negligent or willful misrepresentation of statements made to Blank Rome by Mr. Kang concerning his recollection of whether 6D paid for any expenses of Mr. Wey in connection with a business trip.

95. Upon information and belief, when asked by Blank Rome whether Mr. Kang had paid the expenses of Mr. Wey during a one-off business trip, Mr. Kang stated that he did not remember whether he had or not because his assistant handled his credit card for purposes of all incidental business expenses, but that he would provide those records to Blank Rome for their review.

96. Upon information and belief, later, when BDO reviewed the records and they reflected minor incidental expenses paid on the same card for the benefit of Mr. Wey, it negligently or willfully used the opportunity to mischaracterize Mr. Kang's earlier statement to imply that he had falsely claimed he had not paid any of Mr. Wey's expenses.

97. Upon information and belief, this entirely negligible expense was then improperly and in contravention of its fiduciary obligations to the company, used by BDO as the basis to: (a) claim that it could not rely on Mr. Kang's prior representations on behalf of 6D, and; (b) withdraw all prior audit opinions in connection with 6D's periodic filings.

98. Upon information and belief, the vitriol and patent bad faith with which BDO acted was reflected in their written reports and communications with third parties concerning 6D, including through the provision of letters and communications (whether directly or compelled by Nasdaq via 6D) that formed the sole and principal basis for Nasdaq's listing counsel and appellate determinations to delist 6D, and the resulting harm to shareholders thereby.

99. Upon information and belief, it was BDO's intentional or reckless conduct towards 6D and Mr. Kang, driven by its agents' reputational and pecuniary self-interest, and the intentionally inaccurate, or at a minimum careless and false, written statements that

formed the basis and decision by Nasdaq to delist 6D and otherwise maintain the trading halt on its stock.

100.     Kang was surprised by the unnecessary vitriol from BDO. Upon information and belief, the egregious nature of the letter was BDO's strategy to ensure that its eleventh hour and factually unsupportable action to withdraw from representing 6D, would proverbially "knock out" Kang and make it difficult for 6D to bring a lawsuit against BDO for abandoning its client days before its annual SEC report was due in breach of its fiduciary duty.

101.     To make matters worse, and entirely unrelated to any of the Dismissed Allegations or allegations in the SAC, 6D was forced by BDO's conduct to file a report of current events on Form 8K on March 23, 2016, reporting as a material disclosable event that BDO had resigned as 6D's auditor on the basis that Mr. Kang was not a truthful CEO because of "certain inconsistencies in prior statements" (the "Terminal 8K").

102.     Upon information and belief, **on March 24, 2016, the day after 6D filed the Terminal 8K, Nasdaq issued a letter denying 6D's appeal of its delisting** (the "Delisting Date"). It passed no opinion on the Dismissed Allegations and found that it did not even need to address the earlier question of whether Mr. Wey exercised improper control of 6D, because despite the positive 10A report from Blank Rome, the Company was in violation of Nasdaq Rules 5101, 5250(c), and 5250(f), none of which had anything to do with Mr. Wey, and everything to do with the: (i) inability of 6D to timely file periodic reports; (ii) its inability to pay listing fees, and; (iii) a determination of Nasdaq

that 6D 's CEO was dishonest with BDO in connection with BDO and Blank Rome's 10A review.

103.    Nasdaq's conclusion that 6D had been dishonest with BDO during the 10A investigation was based on BDO's fabrication of inconsistent statements by Mr. Kang.

104.    The asserted (and in actuality non-existent) discrepancy in Mr. Kang's statement by BDO was made, at a minimum, recklessly, and only arose as the result of BDO's developed animosity toward Mr. Kang, propagated by Hartung over the prior months, and its own reputational concerns in light of the Dismissed Allegations. Its assertions of fact about Mr. Kang's credibility were, nevertheless, false, and the immeasurably detrimental effects of those assertions and conduct which BDO knew would have to be made public, were known to BDO prior to their issuance and occurrence.

105.    Plaintiffs base the start of their period to calculate damages on March 29, 2016, literally around the epicenter of the disastrous impact of BDO's conduct on 6D and its shareholders, and end their computation only a month later, squarely encapsulating the period of damages caused by BDO and Hartung through their joint and several conduct.

106.    Upon information and belief, Nasdaq's final delisting letter had been originally prepared as an approval letter because the wording was generally positive, the 10A report had come back clean, Mr. Wey had been found to have no undue influence over 6D, and 6D had severed all ties with Wey. There had been no reason for Nasdaq to deny 6D's appeal prior to BDO's failure to complete 6D's audit, its resignation, and its misleading and false explanation of its basis to withdraw.

107.    Upon information and belief, Nasdaq denied 6D's appeal to obtain relisting, not

because of anything relating to Mr. Wey, but because of the false and unsupportable

conclusions and conduct of BDO, and the near practical impossibility (as the result of

BDO's resignation, statements, and other conduct) for 6D to timely regain compliance

with its periodic reporting obligations, as BDO not only resigned but withdrew two years

of financial statement opinions on the basis of its false and misleading assertion of

dishonest representations by Mr. Kang that was unscrupulously claimed by BDO in

connection with the 10A investigation in the days and hours leading up to the March 31,

2016 filing date for the company's 2015 10K.

108.     6D tried to appeal Nasdaq's decision once again. However, Kang struggled to find

another auditor willing to take on the job because of BDO's egregious letter.

109.     Eventually, 6D hired Singer Lewak to do two years of audits before a June 2016

Nasdaq hearing date. Singer Lewak as 6D's new auditor stated BDO's resignation was in

fact egregious and in violation of BDO's duty of care, and that the basis provided by

BDO for its resignation, and later relied on by Nasdaq, was false and not supportable by

the facts.

110.     There is no mechanism by which Plaintiffs can adequately separate the purported

effect of the Dismissed Allegations from the conduct of BDO and Hartung, whose

conduct caused an overwhelming, obvious, foreseeable and absolutely baseless and

unnecessary negative affect on the demand and valuation of 6D's stock in the amounts

articulated by Plaintiffs in the SAC.

111.     At the same time, the impact of any action or inaction by Mr. Wey, who

vehemently denies all wrongdoing alleged in the SAC, had been entirely or materially

attenuated by the overwhelmingly positive outcome of the Section 10A report by Blank

Rome, so much so in fact that even Nasdaq declined to use any allegations against Wey as a basis for their delisting decision in light of the obvious and immediate detrimental effects of BDO and Hartung's conduct.

112.     As such, and as a result of the conduct elsewhere described herein, BDO and Hartung are liable for the damages caused to Plaintiffs and to Defendant/Third-Party Plaintiff Wey for liabilities (if any) incurred by him as the result of this action and the SAC.

## AS AND FOR A FIRST CAUSE OF ACTION
### Indemnification by BDO

113.     Upon information and belief, and upon the expectation that a reasonable opportunity for Discovery will support and prove the claims made herein, Defendant/Third-Party Plaintiff Wey:

(a)  repeats, reiterates, and realleges each and every allegation in Paragraphs 1- 112 with the same force and effect as if fully set forth herein;

(b) alleges that, if the Plaintiffs were caused any losses or suffered damages, due to any conduct other than their own negligent or culpable conduct, then such damages were due, in whole or in part, to BDO's actions or the actions of their agents;

(c) alleges that by reason of the foregoing, BDO will be liable to Third-Party Plaintiff Wey for the full amount of any recovery herein by the Plaintiffs in the SAC Action;

## AS AND FOR A SECOND CAUSE OF ACTION
### Contribution by BDO

114.    Upon information and belief, and upon the expectation that a reasonable

opportunity for Discovery will support and prove the claims made herein,

Defendant/Third-Party Plaintiff Wey:

      (a) repeats, reiterates, and realleges each and every allegation in Paragraphs 1- 112

          with the same force and effect as if fully set forth herein;

      (b) alleges that if the Plaintiffs in the SAC Action were caused to sustain the damages

          alleged through any negligence or want of due care other than the negligence or

          want of due care on the part of themselves, then said damages were sustained by

          reason of the negligence and want of due care by acts of commission or omission

          on the part of BDO's actions or the actions of their agents;

      (c) alleges that if any judgment is recovered herein by the Plaintiffs against Third-

          Party Plaintiff Wey, then the Third-Party Plaintiff will be damaged thereby, and

          BDO are or will be responsible for that proportion thereof caused by the

          responsibility of BDO, and for all costs and expenses, no part of which has been

          paid to Mr. Wey.

## AS AND FOR A THIRD CAUSE OF ACTION
### Indemnification by Adam Hartung

115.    Upon information and belief, and upon the expectation that a reasonable

opportunity for Discovery will support and prove the claims made herein,

Defendant/Third-Party Plaintiff Wey:

(d)  repeats, reiterates, and realleges each and every allegation in Paragraphs 1-112 with the same force and effect as if fully set forth herein;

(e) alleges that, if the Plaintiffs were caused any losses or suffered damages, due to any conduct other than their own negligent or culpable conduct, then such damages were due, in whole or in part, to Hartung's actions or the actions of his agents, or otherwise acting pursuant to his authority, supervision, and control, including BDO;

(f) alleges that by reason of the foregoing, Hartung will be liable to Third-Party Plaintiff Wey for the full amount of any recovery herein by the Plaintiffs under the SAC;

## AS AND FOR A FOURTH CAUSE OF ACTION
### Contribution by Hartung

116.     Upon information and belief, and upon the expectation that a reasonable opportunity for Discovery will support and prove the claims made herein, Defendant/Third-Party Plaintiff Wey:

(a) repeats, reiterates, and realleges each and every allegation in Paragraphs 1- 112 with the same force and effect as if fully set forth herein;

(b) alleges that, if the Plaintiffs were caused any losses or suffered damages, due to any conduct other than their own negligent or culpable conduct, then such damages were due, in whole or in part, to Hartung's actions or the actions of his agents, or otherwise acting pursuant to his authority, supervision, and control, including BDO;

(c) alleges that if any judgment is recovered herein by the Plaintiffs against Third-Party Plaintiff Wey, then the Third-Party Plaintiff will be damaged thereby, and

Hartung is or will be responsible for that proportion thereof caused by the

responsibility of Hartung, and for all costs and expenses, no part of which has

been paid to Mr. Wey.

**WHEREFORE**, Third-Party Plaintiff Mr. Benjamin Wey, requests judgment against

Hartung and BDO:

(a) For the full amount of the claims asserted herein, or such other amount as the Court

deems just and proper, of any judgment obtained against Third-Party Plaintiff Wey;

(b) For declaratory relief from all liability for Plaintiffs' claims arising from or in connection

with any losses alleged in the SAC;

(c) For the expenses of this action, costs and any other relief at law or equity which this

Court deems just and proper.

Dated: May 7, 2021

Respectfully submitted,

/s/ Warren A. Raiti

**Navarro, Attorneys at Law**
Warren A. Raiti, Esq. | Partner
1345 Avenue of the Americas
New York, New York 10105
Tel: (212) 681-3466
Fax: (212) 681-3468
E: warren@nmbesq.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2021, I filed the foregoing document via CM/ECF which sent notification of such filing to all counsel of record.

Dated: May 7, 2021

/s/ Warren A. Raiti